IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

═══════════════════════════════

PERNORRIS TAYLOR, SR.,

Plaintiff,

Civil Action No.
9:10-CV-1494 (NAM/DEP)

v.

DR. CHALOM,

Defendant.

═══════════════════════════════

APPEARANCES:                          OF COUNSEL:

FOR PLAINTIFF:

PERNORRIS TAYLOR SR., *Pro Se*
PMB #335
315 Nassau Road
Rossevelt, NY 11575

FOR DEFENDANT:

HON. ERIC T. SCHNEIDERMAN          CHARLES QUACKENBUSH,ESQ.
Office of the Attorney General      Assistant Attorney General
State of New York
Department of Law
The Capitol
Albany, New York 12224

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

REPORT AND RECOMMENDATION

Plaintiff Pernorris Taylor, a former New York State prison inmate who is

proceeding *pro so* and *in forma pauperis*, has commenced this action

pursuant to 42 U.S.C. § 1983 alleging deprivation of his civil rights.  In his

complaint, though vague and sparse in terms of factual allegations, Taylor

appears to claim that the defendant, a physician employed at the prison in

which he was confined at the relevant times, failed to provide him with proper

medical care and to exempt him from working in the facility mess hall due to

his physical condition, in violation of his rights under the Eighth Amendment

to the United States Constitution.

In response to Taylor's complaint, defendant has moved seeking its

dismissal on two grounds.  Defendant maintains that plaintiff's claims are

procedurally barred based upon his failure to avail himself of the internal

prison system grievance process before commencing suit.  Defendant

additionally argues that in any event plaintiff's claims lack merit based upon

his failure to allege a plausible medical indifference cause of action.  For the

reasons set forth below, I recommend that plaintiff's complaint be dismissed

as both procedurally barred and lacking in substantive merit.

2

II.    BACKGROUND[1]

Plaintiff is a former prison inmate recently released from the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"); at the times relevant to his claims, Taylor was designated to the Ogdensburg Correctional Facility ("OCF"), located in Ogdensburg, New York. *See generally* Amended Complaint (Dkt. No. 6); *see also* Dkt. Entry dated August 31, 2011.  Plaintiff claims to be physically disabled as a result of being struck by a motor vehicle in June of 2008 and suffering resulting back and knee injuries.  Amended Complaint (Dkt. No. 6) § II(D).  Plaintiff also suffers from a testicular cyst.  *Id.* at § III.

Upon his arrival at Ogdensburg, plaintiff was assigned to work in the facility mess hall.  Amended Complaint (Dkt. No. 6) § II(D); Statement of Case (Dkt. No. 18) p. 1.  Plaintiff complained to prison officials claiming that he was unable to perform the duties required at the mess hall in light of his limitations in bending, lifting, and standing for long periods of time resulting from his physical injuries.  *Id.*

Though not clear from his complaint, as amended, it appears that

---

[1]       In light of the procedural posture of the case the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in favor of the plaintiff.  *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

3

plaintiff's claims go beyond his mess hall assignment to the alleged failure of Dr. M. Chalom, who is a prison physician at Ogdensburg, to provide him with adequate medical treatment, including to order x-rays desired by the plaintiff. Statement of Case (Dkt. No. 18) p. 1.  Plaintiff also complains that Dr. Chalom, though aware of his condition from having received medical records of his treatment from Nassau County Medical University Hospital, nonetheless failed to remove him from mess hall duty.[2]  Statement of Case (Dkt. No. 18) p. 2.  Taylor further complains that Dr. Chalom did not provide him with an elastic support for his right knee.  *Id.*

II.   PROCEDURAL HISTORY

Plaintiff commenced this action on December 10, 2010, and, at the directive of the court, filed an amended complaint on March 8, 2011 providing somewhat greater elaboration regarding his claims.  Dkt. Nos. 1, 4, 6.  In his complaint plaintiff names Dr. M. Chalom as the sole defendant and appears

---

[2]   Plaintiff also contends that because he has been exposed to Tuberculosis he should be not have been assigned to work around food.  Statement of Case (Dkt. No. 18) p. 2.  Because this argument implicates potential danger to other inmates, rather than the plaintiff, Taylor lacks a standing to assert such a claim.  *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99, 99 S. Ct. 1601, 1607 (1979) (to establish standing for purposes of the constitutional "case or controversy" requirement, a plaintiff "must show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant").

4

to assert a deliberate medical indifference claim under the Eighth
Amendment, seeking an award of monetary damages.  *Id.*

In lieu of answering plaintiff's complaint, defendant has moved to
dismiss plaintiff's claims both for failure to state a claim upon which relief may
be granted and on the ground that the action is procedurally barred based
upon the plaintiff's failure to exhaust available administrative remedies before
commencing suit.  Dkt. No. 15.  That motion, which plaintiff has opposed, *see*
Dkt. Nos. 18, 19, is now ripe for determination and has been referred to me
for the issuance of a report and recommendation, pursuant to 28 U.S.C. §
636(b)(1)(B) and Northern District of New York Local Rule 72.3(c).  *See* Fed.
R. Civ. P. 72(b).

## III.   DISCUSSION

### A.   Dismissal Motion Standard

A motion to dismiss a complaint, brought pursuant to Rule 12(b)(6) of
the Federal Rules of Civil Procedure, calls upon a court to gauge the facial
sufficiency of that pleading, utilizing as a backdrop a pleading standard
which, though unexacting in its requirements, "demands more than an
unadorned, the-defendant-unlawfully-harmed me accusation" in order to
withstand scrutiny.  *Ashcroft v. Iqbal*, 556 U.S. 129, ___, 129 S. Ct. 1937,

1949 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555, 127 S. Ct. 1955, (2007)).  Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  *Id.*  While modest in its requirement, that rule commands that a complaint contain more than mere legal conclusions; "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal,* 129 S. Ct. at 1950.

To withstand a motion to dismiss, a complaint must plead sufficient facts which, when accepted as true, state a claim which is plausible on its face.  *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008) (citing *Twombly*, 550 U.S. at 570, 127 S. Ct. at 1974).  As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiffs'] claims across the line from conceivable to plausible.'" *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 570, 127 S. Ct. at 1974).

In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true and draw all inferences in favor of the non-moving party.  *Cooper v. Pate*, 378 U.S. 546, 546, 84 S. Ct. 1723,

1734 (1964); *Miller v. Wolpoff & Abramson, LLP*, 321 F.3d 292, 300 (2d Cir. 2003), *cert. denied*, 540 U.S. 823, 124 S. Ct. 153 (2003); *Burke v. Gregory*, 356 F. Supp. 2d 179, 182 (N.D.N.Y. 2005) (Kahn, J.).  However, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  *Iqbal*, 129 S. Ct. at 1949.  In the wake of *Twombly* and *Iqbal*, the burden undertaken by a party requesting dismissal of a complaint under Rule 12(b)(6) remains substantial; the question presented by such a motion is not whether the plaintiff is likely ultimately to prevail, "'but whether the claimant is entitled to offer evidence to support the claims.'"  *Log On America, Inc. v. Promethean Asset Mgmt. L.L.C.*, 223 F. Supp.2d 435, 441 (S.D.N.Y. 2001) (quoting *Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669, 673 (2d Cir. 1995)) (citations and quotations omitted).

When assessing the sufficiency of a complaint against this backdrop, particular deference should be afforded to a *pro se* litigant whose complaint merits a generous construction by the court when determining whether it states a cognizable cause of action.  *Erickson*, 127 S. Ct. at 2200 ("'[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers'") (quoting *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S. Ct. 285, 292 (1976) (internal quotations

7

omitted)); *Davis v. Goord*, 320 F.3d 346, 350 (2d Cir. 2003) (citation omitted); *Donhauser v. Goord*, 314 F. Supp. 2d 119, 121 (N.D.N.Y. 2004) (Hurd, J.). In the event of a perceived deficiency in a *pro se* plaintiff's complaint, a court should not dismiss without granting leave to amend at least once if there is any indication that a valid claim might be stated.  *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir.1991); *see also* Fed. R. Civ. P. 15(a) (leave to amend "shall be freely given when justice so requires").

### B.   Failure to Exhaust

In his motion defendant Chalom argues that plaintiff's claims are procedurally barred based upon his failure to file and pursue a grievance through the DOCCS internal administrative process prior to commencing this action.

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a); *see Woodford v. Ngo,* 548

U.S. 81, 84, 126 S. Ct. 2378, 2382 (2006); *Hargrove v. Riley,* No. CV-04-4587, 2007 WL 389003, at *5-6 (E.D.N.Y. Jan. 31, 2007).[3]  "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  *Porter v. Nussle*, 534 U.S. 516, 532, 122 S. Ct. 983, 992 (2002) (citation omitted).  In the event a defendant named in such an action establishes that the inmate plaintiff failed properly to exhaust available remedies prior to commencing the action, his or her complaint is subject to dismissal.  *See Pettus v. McCoy*, No. 04-CV-0471, 2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford*, 548 U.S. at 94-95, 126 S. Ct. at 2387-88 (holding that the PLRA requires "proper exhaustion" of available remedies).  "Proper exhaustion" requires a plaintiff to procedurally exhaust his or her claims by "compl[ying] with the system's critical procedural rules."  *Woodford*, 548 U.S. at 95, 126 S. Ct. at 2388; *see also Macias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007) (citing *Woodford*).[4]

---

[3]     Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

[4]     While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion "in a substantive sense", an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his or her available administrative remedies within the appropriate grievance construct in order to satisfy the

In a series of decisions rendered since the enactment of the PLRA, the Second Circuit has crafted a three-part test for determining whether dismissal of an inmate plaintiff's complaint is warranted for failure to satisfy the PLRA's exhaustion requirement.[5]  *Macias*, 495 F.3d at 41; *see Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir. 2004).  Under the prescribed algorithm, a court must first determine whether administrative remedies were available to the plaintiff at the relevant times.  *Macias,* 495 F.3d at 41; *Hemphill,* 380 F.3d at 686.  If such a remedy existed and was available, the court must next examine whether the defendant has forfeited the affirmative defense of non-exhaustion by failing to properly raise or preserve it or whether, through his own actions in preventing the exhaustion of plaintiff's remedies, he should be estopped from asserting failure to exhaust as a defense.  *Macias*, 495 F.3d at 41; *Hemphill*, 380 F.3d at 686.  In the event the proffered defense survives these first two levels of scrutiny, the court lastly must examine whether special circumstances nonetheless exist and "have been plausibly alleged" to justify the plaintiff's failure to comply with the applicable administrative

─────────────────

PLRA.  *Macias*, 495 F.3d at 43 (quoting *Johnson v. Testman*, 380 F.3d 691, 697-98 (2d Cir. 2004) (emphasis omitted).

[5]        Whether the *Hemphill* test survives following the Supreme Court's decision in *Woodford*, has been a matter of some speculation.  *See, e.g.*, *Newman v. Duncan,* NO. 04-CV-395, 2007 WL 2847304, at * 2 n.4 (N.D.N.Y. Sept. 26, 2007) (McAvoy, S.J. and Homer, M.J.) .

procedural requirements.[6]  *Macias*, 495 F.3d at 41; *Hemphill*, 380 F.3d at 686.

Ordinarily, failure to exhaust is an affirmative defense which must be pleaded and established by the defendant.  *See Arnold v. Goetz*, No. 01 Civ. 8993, 2003 WL 256777, *2-3 (S.D.N.Y. Feb. 4, 2003) (collecting cases); *Torrence v. Pesanti*, 239 F. Supp.2d 230, 231 (D. Conn. 2003) (citing *Jenkins v. Haubert*, 179 F.3d 19 (2d Cir. 1999)).  For this reason, dismissal under Rule 12(b) of the Federal Rules of Civil Procedure for failure to exhaust is not always appropriate.  *See Kasiem v. Switz*, 756 F. Supp. 2d 570, 574 (S.D.N.Y. 2010).  Such a dismissal is proper, however, when a plaintiff's failure to exhaust under the PLRA is "readily apparent" or "unambiguously established in the record," provided that the plaintiff has had notice of the argument and an opportunity to respond.  *Torrence,* 239 F. Supp. 2d at 231-32 (citing *Snider v. Melindez,* 199 F.3d 108, 111-14 (2d Cir. 1999)).

New York prison inmates are subject to an Inmate Grievance Program ("IGP") established by the DOCS and recognized as an "available" remedy for purposes of the PLRA.  *See Mingues v. Nelson*, No. 96 CV 5396, 2004

---

[6]     In practicality these three prongs of the prescribed test, though perhaps intellectually distinct, plainly admit of significant overlap.  *See Hargrove*, 2007 WL 389003, at *8 n.14; *see also Giano v. Goord*, 380 F.3d 670, 677 n.6 (2d Cir. 2004).

WL 324898, at *4 (S.D.N.Y. Feb. 20, 2004) (citing *Mojias v. Johnson*, 351 F.3d 606 (2d Cir. 2003) and *Snider*, 199 F.3d at112-13).  The IGP consists of a three-step review process.  First, a written grievance is submitted to the Inmate Grievance Review Committee ("IGRC") within twenty-one days of the incident.[7]  7 N.Y.C.R.R. § 701.5(a).  The IGRC, which is comprised of inmates and facility employees, then issues a determination regarding the grievance.  *Id.* §§ 701.4(b), 701.5(b).  If an appeal is filed, the superintendent of the facility next reviews the IGRC's determination and issues a decision. *Id.* § 701.5(c).  The third level of the process affords the inmate the right to appeal the superintendent's ruling to the Central Office Review Committee ("CORC"), which makes the final administrative decision.  *Id.* § 701.5(d). Ordinarily, absent the finding of a basis to excuse non-compliance with this prescribed process, only upon exhaustion of these three levels of review may a prisoner seek relief pursuant to section 1983 in a federal court.  *Reyes v. Punzal*, 206 F. Supp. 2d 431, 432 (W.D.N.Y. 2002) (citing, *inter alia*, *Sulton v. Greiner*, No. 00 Civ. 0727, 2000 WL 1809284, at *3 (S.D.N.Y. Dec. 11, 2000)).

In response to the questions posed in the printed form utilized to file his

---

[7]     The IGP supervisor may waive the grievance timeliness requirement due to "mitigating circumstances."  7 N.Y.C.R.R. § 701.6(g)(1)(i)(a)-(b).

12

complaint, plaintiff has acknowledged that his claim arose during the course of his confinement, and that there is a grievance procedure available at Ogdensburg, but that he did not file a grievance utilizing that procedure. Amended Complaint (Dkt. No. 6) § IV.  Plaintiff notes instead that he informed his counselor, Mr. M. Stoner, of the claim.  *Id.*  In his submission in opposition to the motion, plaintiff reiterates having informed his counselor concerning his grievance and states that his counselor did not advise him of the need to file a grievance, instead informing him that he should sign up for sick call to address the issue.[8]  Statement of Case (Dkt. No. 18) p. 3.

The second prong of the *Hemphill* analysis focuses upon "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense."

---

[8]     In support of his motion defendant Chalom has submitted an affidavit from Jeffrey Hale, the Assistant Director of the DOCS Inmate Grievance Program ("IGP"), in which he states that a search of records of the DOCCS Central Office Review Committee ("CORC") failed to reveal submission of any grievance appeal by Taylor to the CORC during the period of his incarceration at Ogdensburg.  *See* Hale Decl. (Dkt. No. 15-2) ¶¶ 1-4.  Because this issue is being addressed on a motion to dismiss pursuant to Rule 12(b)(6), I have not considered the Hale affidavit in making my recommendation.  *See, e.g., Friedl v. City of New York*, 210 F.3d 79, 83-84 (2d Cir.2000) ("a district court errs when it considers affidavits and exhibits submitted by defendants, or relies on factual allegations contained in legal briefs or memoranda in ruling on a 12(b)(6) motion to dismiss.") (internal quotation marks, citations and alteration omitted).

*Hemphill,* 380 F.3d at 686 (citations omitted).  In this instance defendant has properly raised the issue, and plaintiff fails to allege any conduct on the part of the defendant that deterred or inhibited his filing of a grievance.

The third, catchall factor to be considered under the Second Circuit's prescribed exhaustion rubric focuses upon whether special circumstances have been plausibly alleged which, if demonstrated, would justify excusing a plaintiff's failure to exhaust administrative remedies.  *Hemphill,* 380 F.3d at 689; *see also Giano v. Goord,* 380 F.3d 670, 676-77 (2d Cir. 2004); *Hargrove,* 2007 WL 389003, at *10.  Among the circumstances potentially qualifying as "special" under this prong of the test include where a plaintiff's reasonable interpretation of applicable regulations regarding the grievance process differs from that of prison officials and leads him or her to conclude that the dispute is not grievable.  *Giano*, 380 F.3d at 676-77; *see also Hargrove,* 2007 WL 389003, at *10 (quoting and citing *Giano*).

Based upon plaintiff's response to the motion, it does not appear that this narrow exception applies in this instance.  Taylor states that he made his complaints regarding Dr. Chalom known to his counselor, who nonetheless failed to advise him of a need to file a grievance and instead directed him to sick call to address his issue.  *See* Statement of Case (Dkt. No. 18) pp. 3, 5.

Plaintiff does not allege that his counselor informed him that his complaint was not grievable, a circumstance which could potentially implicate a recognized exception to the otherwise steadfast statutory requirement of exhaustion. *Brown v. Koenigsmann*, No. 01 Civ 10013(LMM), 2005 WL 1925649, at *1 (S.D.N.Y. Aug. 10, 2005). Similarly, plaintiff cannot claim an estoppel from raising an exhaustion defense since it was not Dr. Chalom, but another prison official who, he intimates, dissuaded him from filing a grievance. *Id*.

Under these circumstances, plaintiff's claims are procedurally barred based upon his failure to file and pursue a grievance related to the claims raised in his complaint.

C.   Deliberate Indifference

In his motion Dr. Chalom also argues that plaintiff's complaint fails to assert a plausible deliberate medical indifference claim. In support of that contention defendant asserts that the plaintiff has neither pleaded facts demonstrating the existence of a serious medical need, nor has he established a plausible claim of subjective deliberate indifference on the part of Dr. Chalom to any such need.

Claims that prison officials have intentionally disregarded an inmate's

15

medical needs fall under the umbrella of protection from the imposition of cruel and unusual punishment afforded by the Eighth Amendment.  *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S. Ct. 285, 290, 291 (1976).  The Eighth Amendment prohibits punishment that involves the "unnecessary and wanton infliction of pain" and is incompatible with "the evolving standards of decency that mark the progress of a maturing society."  *Id.; see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S. Ct. 1078, 1084 (1986) (citing, *inter alia, Estelle).* While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement.  *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S. Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S. Ct. 2392, 2400 (1981)).  To satisfy their obligations under the Eighth Amendment, prison officials must "ensure that inmates receive adequate food, shelter, and medical care, and must take reasonable measures to guarantee the safety of inmates."  *Farmer*, 511 U.S. at 832, 114 S. Ct. at 1976 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27, 104 S. Ct. 3194, 3200 (1984)) (internal quotations omitted).

A claim alleging that prison officials have violated the Eighth Amendment by inflicting cruel and unusual punishment must satisfy both objective and subjective requirements.  *Wright v. Goord*, 554 F.3d 255, 268

(2d Cir. 2009); *Price v. Reilly*, No. 07-CV-2634 (JFB/ARL), 2010 WL 889787,

at *7-8 (E.D.N.Y. Mar. 8, 2010).  Addressing the objective element, to prevail

a plaintiff must demonstrate a violation sufficiently serious by objective terms,

"in the sense that a condition of urgency, one that may produce death,

degeneration, or extreme pain exists."  *Hathaway v. Coughlin*, 99 F.3d 550,

553 (2d Cir. 1996).  With respect to the subjective element, a plaintiff must

also demonstrate that the defendant had "the necessary level of culpability,

shown by actions characterized by 'wantonness.'"  *Blyden v. Mancusi*, 186

F.3d 252, 262 (2d Cir. 1999).  Claims of medical indifference are subject to

analysis utilizing this Eighth Amendment paradigm.  *See Salahuddin v.

Goord,* 467 F.3d 263, 279-81 (2d Cir. 2006).

### 1.   Objective Requirement

Analysis of the objective, "sufficiently serious," requirement of an Eighth

Amendment medical indifference claim begins with an inquiry into "whether

the prisoner was actually deprived of adequate medical care . . .", and

centers upon whether prison officials acted reasonably in treating the plaintiff.

*Salahuddin*, 467 F.3d at 279.  A second prong of the objective test addresses

whether the inadequacy in medical treatment was sufficiently serious.  *Id*. at

280.  If there is a complete failure to provide treatment, the court must look to

the seriousness of the inmate's medical condition.  *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003).  If, on the other hand, the complaint alleges that treatment was provided but was inadequate, the seriousness inquiry is more narrowly confined to that alleged inadequacy, rather than focusing upon the seriousness of the prisoner's medical condition.  *Salahuddin*, 467 F.3d at 280.  "For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in treatment. . . [the focus of] the inquiry is on the challenged delay or interruption, rather that the prisoner's underlying medical condition alone."  *Id.* (quoting *Smith*, 316 F.3d at 185) (internal quotations omitted).  In other words, at the heart of the relevant inquiry is the seriousness of the medical need, and whether from an objective viewpoint the temporary deprivation was sufficiently harmful to establish a constitutional violation.  *Smith*, 316 F.3d at 186.  Of course, "when medical treatment is denied for a prolonged period of time, or when a degenerative medical condition is neglected over sufficient time, the alleged deprivation of care can no longer be characterized as 'delayed treatment', but may properly be viewed as a 'refusal' to provide medical treatment."  *Id.* at 186, n.10 (quoting *Harrison v. Barkley*, 219 F.3d 132, 137 (2d Cir. 2000)).

Since medical conditions vary in severity, a decision to leave a

condition untreated may or may not raise constitutional concerns, depending on the circumstances.  *Harrison,* 219 F.3d at 136-37 (quoting, *inter alia, Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir. 1998)).  Relevant factors informing this determination include whether the plaintiff suffers from an injury or condition that a "'reasonable doctor or patient would find important and worthy of comment or treatment'", a condition that "'significantly affects'" a prisoner's daily activities, or "'the existence of chronic and substantial pain.'" *Chance,* 143 F.3d at 702 (citation omitted); *Lafave v. Clinton County,* No. CIV. 9:00CV774, 2002 WL 31309244, at *3 (N.D.N.Y. Apr. 3, 2002) (Sharpe, M.J.) (citation omitted).

Plaintiff's complaint is devoid of specifics regarding his back and knee injuries, or his testicular cyst; rather, he merely alleges in a conclusory fashion that he has pain and soreness in both knees, back pain, and a great deal of "pain and suffering" from his cyst.  Plaintiff's complaint does not contain any allegations as to what, if any, treatment he received for those conditions while at Ogdensburg.  Instead, while noting that Dr. Chalom retrieved plaintiff's medical records from an outside medical facility where he apparently received treatment for his injuries, he alleges that Dr. Chalom did not arrange for x-rays or provide him with elastic support for his knee, and

19

argues that the defendant "had the authority to remove [sic] from the mess hall" implying that he should have but did not do so.[9]  *See* Plaintiff's Opposition (Dkt. No. 18) p. 2 of 7.  These allegations are insufficient to satisfy the objective prong of the deliberate indifference test.  Plaintiff's complaint provides no information concerning the alleged inadequacy of treatment received for his medical conditions, and instead appears only to assert plaintiff's disagreement with the course of diagnosis and treatment followed by Dr. Chalom, a matter which is not cognizable under the Eighth Amendment.  *See Rosales v. Coughlin*, 10 F. Supp. 2d 261, 264 (W.D.N.Y. 1998) (citation omitted); *Amaker v. Kelly*, No. 9:01-CV-877, 2009 WL 385413, at *14-16 (N.D.N.Y. Feb. 9, 2009) (Scullin, S.D.J. and Peebles, M.J.).

## 2.   Subjective Element

The second, subjective, requirement for establishing an Eighth Amendment medical indifference claim mandates a showing of a sufficiently culpable state of mind, or deliberate indifference, on the part of one or more of the defendants.  *Salahuddin*, 467 F.3d at 280 (citing *Wilson v. Seiter*, 501 U.S. 294, 300, 111 S. Ct. 2321, 2325 (1991)).  Deliberate indifference, in a

---

[9]      While plaintiff alleges that Dr. Chalom did not provide him with an elastic support for his knee, he also asserts that another physician, Dr. Aley, did provide him with the desired support.  Plaintiff's Motion Opposition (Dkt. No. 18) p. 2 of 7.

constitutional sense, exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference."  *Farmer,* 511 U.S. at 837, 114 S. Ct. at 1979; *Leach v. Dufrain,* 103 F. Supp.2d 542, 546 (N.D.N.Y. 2000) (Kahn, J.) (citing *Farmer*); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.) (same).  Deliberate indifference is a mental state equivalent to subjective recklessness as the term is used in criminal law.  *Salahuddin*, 467 F.3d at 280 (citing *Farmer,* 511 U.S. at 839-40, 114 S. Ct. 1970).

Plaintiff's complaint is similarly deficient in that it does not allege facts plausibly demonstrating that Dr. Chalom was deliberately indifferent to Taylor's condition.  While the complaint does not specify the nature of actions or inactions by Dr. Chalom forming the basis for plaintiff's claims against him, his submission in opposition to the motion provides some degree of clarification.  That document reveals that rather than ignoring plaintiff's medical condition, Dr. Chalom instead made efforts to secure his medical records.  Again, while plaintiff asserts his belief that x-rays should have been ordered and that he was in need of surgery to his right knee, these

allegations, which allege nothing more than a mere disagreement with the treatment he received, are insufficient to  plausibly satisfy the subjective element of the deliberate indifference test.  *See Rosales*, 10 F. Supp. 2d at 264; *Amaker*, 2009 WL 385413, at *14-16.

IV.    SUMMARY AND RECOMMENDATION

Plaintiff's complaint, which sets forth a deliberate medical indifference claim in only skeletal form, devoid of factual allegations which would permit the court to assess whether plaintiff has met the objective and subjective prongs necessary to plead a cognizable deliberate medical indifference cause of action, is subject to dismissal on the merits.  In addition, because it appears clear from his complaint and submissions in opposition to defendant's motion that he failed to file and pursue to the CORC a grievance concerning his medical complaints, plaintiff is procedurally barred from maintaining this action.

Ordinarily, a *pro se* complaint should not be dismissed without leave to amend unless it appears clear that the plaintiff is unable to set forth any facts that would support a plausible cause of action.  *See Gomez v. USAA Federal Savings Bank*, 171 F.3d 794, 796 (2d Cir. 1999); *Brown v. Peters*, 95-CV-1641, 1997 WL 599355, at *1 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.) ("[T]he

court need not grant leave to amend where it appears that amendment would

prove to be unproductive or futile.").  In this instance, however, because

plaintiff has already amended once, and since it seems clear that he is

procedurally barred from raising the claims set forth in his complaint based

upon his failure to exhaust available internal administrative remedies, I

recommend against permitting further amendment.  *See Cortec Indus. Inc. v.*

*Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) .

It is therefore hereby respectfully

RECOMMENDED that defendant's dismissal motion (Dkt. No. 15) be

GRANTED, and that plaintiff's complaint be dismissed in all respects, without

leave to replead.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge

written objections to the foregoing report.  Such objections must be filed with

the clerk of the court within FOURTEEN days of service of this report.

FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE

APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P.  6(a), 6(d), 72;

*Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this

report and recommendation upon the parties in accordance with this court's

23

local rules; and it is further

Dated:      December 13, 2011          David E. Peebles
            Syracuse, NY               U.S. Magistrate Judge



Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
Wayne HARGROVE, Plaintiff,
v.
Sheriff Edward RILEY; Nassau County Correctional
Facility, et al; Nassau County University Medical Staff
and Nassau County Correctional Facility, Defendants.
**Civil Action No. CV-04-4587 (DGT).**

Jan. 31, 2007.

Wayne Hargrove, Ossining, NY, pro se.

Alexander V. Sansone, Troy & Troy, Lake Ronkonkoma,
NY, Joseph Carney, Mineola, NY, for Defendants.

*MEMORANDUM AND ORDER*

TRAGER, J.

**\*1** Inmate Wayne Hargrove ("Hargrove" or "plaintiff")
brings this *pro se* action pursuant to 42 U.S.C. § 1983
against the Nassau County Sheriff, Nassau County
Correctional Facility ("NCCF") and NCCF's medical staff,
(collectively, "defendants"), seeking damages for injuries
allegedly caused by defendants while he was incarcerated
at NCCF. Defendants now move for summary judgment
pursuant to Fed.R.Civ.P. 56 arguing, *inter alia,* that
Hargrove's claims should be dismissed because he failed
to exhaust administrative remedies, as required by the
Prison Litigation Reform Act of 1995 ("PLRA"), 42
U.S.C. § 1997e. For the following reasons, defendants'
motions for summary judgment are granted.

**Background**

On August 27, 2004,[FN1] Hargrove filed a complaint,
alleging that defendants violated his civil rights when they
forcibly administered purified protein derivative skin tests
("PPD test") to test for latent tuberculosis ("TB") in April
2002, 2003 and 2004 while he was incarcerated at NCCF.
Complaint, Ex. C; Aff. in Opp. at 1-4, Ex. A. Hargrove
named Nassau County Sheriff Edward Reilly ("Reilly"),
NCCF and Nassau County University Medical Staff [FN2] as
defendants.[FN3] On November 22, 2004, after discovery,
County Defendants and NHCC Defendants filed separate
motions for summary judgment pursuant to Fed.R.Civ.P.
56. Both defendants properly filed a Local Rule 56.1
Statement and served Hargrove a Notice to *Pro Se* Litigant
Opposing Motion for Summary Judgment, pursuant to
Local Civil Rule 56.2.

FN1. Hargrove signed the complaint August 27,
2004. The *pro se* clerk's office received and filed
the complaint on September 20, 2004. Under the
prison mail-box rule, a *pro se* prisoner's
complaint is deemed filed when it is delivered to
prison authorities. *See, e.g., Walker v.
Jastremski,* 430 F.3d 560, 562 (2d
Cir.2005)(deeming *pro se* prisoner's § 1983
action filed on date complaint was handed to
prison officials). There is no evidence in the
record as to when Hargrove handed the
complaint to prison officials. However, it is clear
the operative date is between August 27, 2004
and September 20, 2004. As discussed, *infra,*
both of these dates occur before Hargrove
properly exhausted the administrative remedies
available to him at NCCF.

FN2. The Nassau County University Medical
Staff are employed by the Nassau Health Care
Corporation ("NHCC"). Pursuant to the
Correctional Center Health Services Agreement
between the County of Nassau and NHCC, dated
September 24, 1999, NHCC provides medical
services for inmates at NCCF. County Defs.'s

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

Not. of Motion, Decl., at 1.

> FN3. Reilly and NCCF are represented separately from NHCC. Accordingly, when a distinction is necessary, Reilly and NCCF will be referred to as "County Defendants" and Nassau County University Medical Staff and NHCC will be referred to as "NHCC Defendants."

**(1)**

**Tuberculosis Testing at NCCF**

Upon entering NCCF, new prisoners must first go through medical intake. Aff. of Kim Edwards, ("Edwards Aff.") ¶ 3. This standard process usually takes seventy-two hours. Edwards Aff. ¶ 4. During medical intake, NCCF tests inmates for TB. Aff. of Getachew Feleke ("Feleke Aff.") ¶ 3. NCCF generally uses a PPD test to detect latent TB. Feleke Aff. ¶ 3. However, if an inmate has previously tested positive for TB, it is NCCF's policy to test for TB using an x-ray instead.[FN4] Feleke Aff. ¶ 3. As part of its Infectious Disease Program, NCCF re-tests inmates for TB each year, beginning after they have been housed in that facility for one year. Edwards Aff. ¶ 5.

> FN4. According to WebMD, "[a] tuberculin skin test should not be done for people who have a(1) Known TB infection [or a] (2) Positive tuberculin skin test in the past. A second test may cause a more severe reaction to the TB antigens." Jan Nissl, RN, BS, *Tuberculin Skin Tests,* W E B M D , h t t p : / / www.webmd.com/hw/lab_tests/hw203560.asp (last visited Jan. 31, 2007).

**(2)**

**Hargrove's Tuberculosis Testing at NCCF**

On March 15, 2002, Hargrove was incarcerated at NCCF.

NHCC Defs.' 56.1 Statement ¶ 1. Before entering the general population, Hargrove was processed through medical intake. NHCC Defs.' 56.1 Statement ¶ 2. The NCCF Medical Intake Chart for Hargrove, dated March 15, 2002 ("3/15/02 Chart"), shows that Hargrove informed medical staff that he had previously been exposed to tuberculosis. NHCC Defs.' Notice of Mot., Ex. C, at 1; NHCC Defs.' 56.1 Statement ¶ 2. The 3/15/02 Chart also shows that Hargrove reported testing positive to a prior PPD test and that he had been treated for TB in 2000. NHCC Defs.' Notice of Mot., Ex. C, at 1. Hargrove alleges that he was exposed to and treated for TB in 1997. Hargrove's Aff. in Opp. to Mot. for Summary Judgment, ("Aff. in Opp."), Ex. A at 1-2. Defendants contend that Hargrove was given an x-ray during the medical intake process because of his reported positive PPD test, and that the x-ray was negative, showing no active TB infection. NHCC Defs.' 56.1 Statement ¶ 2; Edwards Aff. ¶ 3. Without specifying a date, Hargrove generally states that his "request to be x-rayed was denied." Aff. in Opp. at 3.

**\*2** Pursuant to NCCF's Infectious Disease Program, after being incarcerated in NCCF for a year, Hargrove was scheduled to be re-tested for TB. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. On May 24, 2003, Hargrove was given a PPD skin test. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. This test was negative. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. According to Hargrove, he requested an x-ray instead of a PPD test because of his previous exposure to TB, but was forced to submit to the PPD test. He also alleges that defendants threatened to put him in "keep lock" or "lock up" unless he submitted to the PPD test.[FN5] Complaint, Ex. C; Aff. in Opp. at 1-4, Ex. A.

> FN5. Hargrove has made contradictory statements about being placed in "keep lock" or "lock up". It is unclear whether he is alleging that defendants threatened to place him in "lock up" unless he submitted to the PPD test or whether he was actually placed in "lock up" until such time that he agreed to submit to the PPD tests. For example, in his complaint, Hargrove states that when he "refused to submit to another [PPD] test, the Correctional Authorities were brought in and placed [him] in lock up." Complaint ¶ 4. In a hearing before Magistrate Judge Bloom on

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

January 31, 2005, Hargrove stated that he took the PPD tests because he was told that he would be placed in "lock up" until he submitted to the test. Hr'g Tr. 6:1-18; 9:5-10:10. In Exhibit B to his complaint, Hargrove alleges both that he was given an unwarranted TB shot and that when he refused the same shot he was placed in "keep lock." Complaint, Ex. B. There is no evidence in the record that Hargrove was ever segregated from the general population while housed at NCCF, outside of the seventy-two hour initial medical intake period. Aff. of Sgt. Neumann ("Neumann Aff.") at 1-2 (referring to prison records showing Hargrove's holding locations which demonstrate that he was never placed in "lock up"); NCCF 56.1 Statement ¶ E. Whether or not Hargrove was actually placed in "lock up" is not a material fact for purposes of this motion; as explained in detail, *infra,* Hargrove's failure to exhaust administrative remedies under the PLRA precludes a consideration of the merits of his Section 1983 claim.

The following year, in June of 2004, Hargrove was scheduled to be retested. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement ¶ 5. Because of the contradiction between the negative May 2003 PPD test and his reported positive history, NCCF contacted the Infectious Disease Department of the Nassau County Medical Center. Edwards Aff. ¶ 6. It was suggested that Hargrove be given a two-step PPD test, administered fifteen days apart. Feleke Aff. ¶ 4; Edwards Aff. ¶ 6. Hargrove was given these two PPD skin tests in June 2004. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement ¶ 5. Again, Hargrove alleges that these tests were administered against his will and under threat of being placed in quarantine. Complaint, Exs. A, B; Aff. in Opp., Ex. A.

On December 3, 2004, Hargrove was seen by a physician's assistant. NHCC Defs.' 56.1 Statement ¶ 6. During this meeting, Hargrove complained of a dry cough and that the site on his forearm where the June 2004 PPD tests had been administered was red and swollen. NHCC Defs.' 56.1 Statement ¶ 6; 11/28/04 Sick Call Request.

Hargrove's December 18, 2004 chart notes a positive PPD

test and an order was placed in the chart that Hargrove not be submitted for future PPD tests. Edwards Aff. ¶ 7; NHCC Defs.' 56.1 Statement ¶ 8. *See also* 11/19/2004 Grievance.

Hargrove alleges that the following physical ailments were caused by the PPD tests: chronic coughing, high blood pressure, chronic back pain, lung infection, dizzy spells, blurred vision and a permanent scar on both his forearms. Complaint, Ex. C; Aff. in Opp. at 3-4.

### (3)

### NCCF's Inmate Grievance Procedure

NCCF has had an inmate grievance program ("IGP") in place since 2001. Aff. of Kenneth Williams, ("Williams Aff."), at 2. NCCF's IGP is carried out in conformance with the New York State Commission of Corrections Minimum Standards and Regulations for Management of County Jails and Penitentiaries ("Minimum Standards"). *Id.*

The IGP is designed to resolve complaints and grievances that an inmate may have regarding the inmate's care and treatment while incarcerated at NCCF. Williams Aff. at 2. Upon entering NCCF, all inmates receive a copy of the NCCF inmate handbook, which outlines the IGP. *Id.*

**\*3** The record does not include an actual copy of NCCF's IGP, but the NCCF's IGP is detailed in the affidavit of NCCF Investigator Kenneth Williams. FN6 The IGP encourages inmates to resolve their grievances informally with the staff member assigned to the inmate housing unit first. *Id.* If an acceptable resolution cannot be reached, inmates must then proceed through the formal three-step process set out in the IGP. *Id.* at 3.

FN6. Hargrove does dispute any statements made by Investigator Williams regarding the inmate grievance procedure, time limits or its availability to him. Furthermore, Hargrove does

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

not dispute that he received a handbook outlining the IGP.

The first step requires an inmate to submit his grievance form [FN7] to the Inmate Grievance Unit by placing it in a locked box located in each housing area, "within five days of the date of the act or occurrence giving rise to the grievance." [FN8] *Id.* at 2-3. NCCF indexes all grievance forms filed by inmates in a log book and in a computer system. *Id.* at 1, 3. Once a grievance form is received by the Inmate Grievance Unit, the grievance is investigated and the inmate will receive a written determination of the outcome from the Inmate Grievance Coordinator in Section II of the grievance form. [FN9] *Id.* at 3. The inmate is then given a choice to accept or appeal the decision by checking the desired selection and signing his name in Section III of the grievance form. *See, e.g.,* 11/19/2004 Grievance form. If the inmate is not satisfied with the decision of the Inmate Grievance Coordinator, the inmate may appeal the determination to the Chief Administrative Officer. Williams Aff. at 3. Finally, if the inmate is not satisfied with the Chief Administrative Officer's determination, the inmate may appeal to the New York State Commission of Correction Citizen's Policy and Complaint Review Council ("Council"). *Id.* at 3. The Council will then render a final determination. *Id.* at 3.

> FN7. The grievance forms contain four sections to be utilized throughout all three steps of the IGP. Section I provides space for the inmate to explain his complaint and the actions he requests as relief. Section II is for the decision of the Inmate Grievance Coordinator. Section III is titled "Acceptance/Appeal of Grievance Coordinator's decision" and contains two mutually exclusive options in which the inmate must choose one or the other: "I have read and accept the Grievance Coordinator's decision," or "I have read and appeal the Grievance Coordinator's decision." Section IV provides space for the decision of the Chief Administrative Officer.

> FN8. Hargrove has not argued that he was unaware of this five-day deadline.

> FN9. There is no evidence in the record specifying the how long an inmate has to appeal inaction by the Inmate Grievance Unit.

(4)

**Authenticity of the Grievance Forms and Other Documents Submitted by Hargrove**

In support of his allegations that he continuously informed defendants that he had been exposed to TB and, therefore, should not have been given PPD tests, Hargrove submitted three letters with his complaint, two of which were addressed to the Inmate Grievance Committee and one of which was addressed to "To whom it may concern." Complaint, Exs. A-C. He also submitted five complaint letters written to Sheriff Reilly, seventeen sick call requests and nine grievance forms during discovery and with his Affidavit in Opposition to Defendants' Motion for Summary Judgment, explaining that some of the medical records and notarized letters were "missing." Aff. in Opp, Ex. A at 2. Defendants call the authenticity of most of these documents into question, contending that Hargrove never submitted any grievance form or complaint letter before he filed his complaint. County Defs.' Mem. of Law at 16-21; County Defs.' 56.1 Statement at ¶¶ B2, C3, D3.

Kenneth Williams, an investigator at NCCF in the Inmate Grievance Unit, testified that he reviewed all of the grievance forms, complaint letters and sick call requests annexed to Hargrove's Complaint and to Hargrove's Affidavit in Opposition to Defendants' Motion for Summary Judgment. Williams Aff. at 2. Williams testified that he examined the grievance records at NCCF and searched "for any grievances by plaintiff/inmate Hargrove" and found "only two." [FN10] Williams Aff. at 1. The first grievance, dated November 19, 2004, complained that the medical staff continued "forcing [Hargrove] to take a T.B. shot while [he] keep[s] telling them that [he] has been exposed to T.B." 11/19/2004 Grievance; Williams Aff. at 1. In response to this grievance, Hargrove's "positive" TB status was noted in his medical records and an order was placed in Hargrove's medical chart, stating that Hargrove not be subjected to future PPD tests. 11/19/2004 Grievance, Section II;

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

Williams Aff. at 1; NHCC Defs.' 56.1 Statement ¶ 8; Edwards Aff. ¶ 7. In Section III of the 11/19/2004 Grievance, Hargrove acknowledged that he had read the Grievance Coordinator's decision, and that he chose to accept the decision instead of appealing it. 11/19/2004 Grievance. The other grievance received by the Grievance Unit, dated May 11, 2005, complained of an unrelated matter. 5/11/2005 Grievance (complaining of back problems and requesting the return of his medical shoes); Williams Aff. at 1. Thus, Williams concluded that, beside the 11/19/2004 and 5/11/2005 Grievance Forms, none of the other documents were "received by the grievance unit, and, given the locked box system, the grievance-forms were never submitted by plaintiff/inmate." Williams Aff. at 2.

FN10. It is NCCF's procedure to forward to the attention of the Grievance Unit all official grievance forms and complaint letters-even ones not specifically addressed to the Grievance Unit. Williams Aff. at 3.

**\*4** A visual examination of the grievance forms Hargrove submitted in support of his claims suggests forgery. Five of the nine grievance forms were requests to stop PPD testing. *See* April 19, 2002 grievance; April 28, 2002 grievance; April 20, 2003 grievance; April 28, 2003 grievance; November 19, 2004 grievance. The remaining grievance forms concerned Hargrove's requests for medical shoes. *See* March 18, 2002 grievance; July 6, 2002 grievance; February 20, 2003 grievance; May 11, 2005 grievance. Of the grievance forms complaining of unwanted PPD tests, the April 28, 2002 grievance form is a patent photocopy of the April 19, 2002 grievance form, and the April 28, 2003 grievance form is a patent photocopy of the April 20, 2003 grievance form, with only the handwritten dates changed. The only potentially authentic grievance forms relating to Hargrove's complaint about the PPD testing are dated April 19, 2002, April 20, 2003, and November 19, 2004. Of these grievance forms, only the November 19, 2004 has been authenticated by NCCF personnel. *See generally* Williams Aff. at 1-4.

Turning to the complaint letters addressed to Reilly, many contain notary stamps cut from the bottom of unrelated

documents and photocopied onto the bottom of the complaint letters. *See* County Defs.' Mem. of Law at 18-21. C.O. Thomas McDevitt and C.O. Paul Klein, both of whom perform notary services for prisoners at NCCF, have submitted sworn affidavits, stating that they kept individual Notary Log Books covering all dates relevant to this litigation. Aff. of C.O. Klein, ("Klein Aff."), at 1; Aff. of C.O. McDevitt, ("McDevitt Aff."), at 1. McDevitt's Notary Log Book shows that he notarized only one document for Hargrove. This document, dated May 13, 2002, was a motion related to Hargrove's criminal trial. McDevitt Aff. at 1-2. Hargrove signed the Notary Log Book acknowledging receipt of that notarized motion. McDevitt Aff. at 2. McDevitt states that he never notarized any other documents for Hargrove. McDevitt Aff. at 2. However, McDevitt's stamp and signature dated May 13, 2002 (the date of the legitimate notarization) appear on Hargrove's letter to Sheriff Reilly dated May 10, 2002. County Defs.' Not. of Motion, Ex. A.

These facts repeat themselves in regard to the documents bearing the notary stamp and signature of Klein. Klein had performed several legitimate notarizations for Hargrove in connection to Hargrove's criminal trial. Klein Aff. at 1-2. Hargrove signed Klein's Notary Log Book acknowledging receipt of those notarized documents. Klein Aff. at 2. However, Klein states that he never notarized any of Hargrove's letters addressed to Sheriff Reilly that bear Klein's stamp and signature. Klein Aff. at 2. On all of the documents that Hargrove submitted bearing Klein's stamp and signature, the dates and signatures of Klein match identically to the dates on which he had performed legitimate notarizations for Hargrove in connection with his criminal trial. Defendants argue it is clear that the documents bearing the stamps and signatures of McDevitt and Klein were not actually notarized by these notaries. County Defs.' Mem. of Law at 17-22.

**\*5** Hargrove does not deny these allegations. Instead, he resubmits the documents that McDevitt and Klein testify they did not notarize with his Affidavit in Opposition and insists that the documents "refute[ ] the assertions put forth by the defendants." Aff. in Opp. at 2.

**Discussion**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

**(1)**

**Summary Judgment Standard**

A motion for summary judgment is granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A court ruling on a summary judgment motion must construe the facts in the light most favorable to the non-moving party and draw all reasonable inferences in his favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Williams v. Metropolitan Detention Center,* 418 F.Supp.2d 96, 100 (E.D.N.Y.2005). Defendants, the moving party in this action, bear the burden of demonstrating the absence of a genuine issue of material fact. *Baisch v. Gallina,* 346 F.3d 366, 371 (2d Cir.2003).

As Hargrove is proceeding *pro se,* his complaint must be reviewed carefully and liberally, and be interpreted to "raise the strongest argument it suggests," *Green v. United States,* 260 F.3d 78, 83 (2d Cir.2001), particularly when civil rights violations are alleged, *see, e.g., McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004). Plaintiff's complaint does not specify the legal theories upon which it relies, but, in construing his complaint to raise its strongest arguments, it will be interpreted to raise claims under 42 U.S.C. § 1983. *See, e.g., Dufort v. Burgos,* No. 04-CV-4940, 2005 WL 2660384, at *2 (E.D.N.Y. Oct. 18, 2005) (liberally construing plaintiff's complaint, which failed to specify the legal theory or theories upon which it rested, as, *inter alia,* a claim under 42 U.S.C. § 1983); *Williams,* 418 F.Supp.2d at 100 (same).

**(2)**

**Prison Litigation Reform Act**

**a. Purpose of the Prison Litigation Reform Act**

The PLRA was intended to "reduce the quantity and improve the quality of prisoner suits." *Woodford v. Ngo,*

--- U.S. ----, 126 S.Ct. 2378, 2387 (2006) (quoting *Porter v. Nussle,* 534 U.S. 516, 524 (2002)). It seeks to eliminate unwarranted interference with the administration of prisons by federal courts, and thus " 'affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.' " *Woodford,* 126 S.Ct. at 2387 (quoting *Porter,* 534 U.S. at 525).*See also Booth v. Churner,* 532 U.S. 731, 739 (2001). Formal grievance procedures allow prison officials to reconsider their policies, implement the necessary corrections and discipline prison officials who fail to follow existing policy. *See Ruggiero v. County of Orange,* 467 F.3d 170, 177-78 (2d Cir.2006).

**b. The Exhaustion Requirement**

The PLRA's "invigorated" exhaustion provision, 42 U.S.C. § 1997e(a), provides the mechanism to reduce the quantity and improve the quality of prisoners' suits by requiring that prison officials have the opportunity to address prisoner complaints through internal processes before allowing a case to proceed in federal court. *Woodford,* 126 S.Ct. at 2382 (citing *Porter,* 534 U.S. at 524).Section 1997e(a) provides that:

**\*6** [n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other federal law, by a prisoner confined in any jail, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983. *Woodford,* 126 S.Ct. at 2383;*Ruggiero,* 467 F.3d at 174;*Williams,* 418 F.Supp.2d at 100-01. The exhaustion provision is applicable to suits seeking relief, such as money damages, that may not be available in prison administrative proceedings, as long as other forms of relief are obtainable through administrative channels. *Giano v. Goord,* 380 F.3d 670, 675 (2d Cir.2004); *see also Woodford,* 126 S.Ct. at 2382-83 ("[A] prisoner must now exhaust

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

administrative remedies even where the relief sought-monetary damages-cannot be granted by the administrative process.") (citing *Booth*, 532 U.S. at 734).

In June 2006, the Supreme Court held that the PLRA requires "proper exhaustion" before a case may proceed in federal court. *Woodford*, 126 S.Ct. at 2387. "Proper exhaustion" requires a prisoner to use " 'all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).' " *Ruggiero*, 467 F.3d at 176 (citing *Woodford*, 126 S.Ct. at 2385 (emphasis in original). Although the level of detail necessary to properly exhaust a prison's grievance process will vary from system to system, *Jones v. Bock*, 127 S.Ct. 910, 2007 WL 135890, at *12 (Jan. 22, 2007), "proper exhaustion" under the PLRA " 'demands compliance with [that] agency's deadlines and other critical procedural rules.' " *Ruggiero*, 467 F.3d at 176 (quoting *Woodford*, 126 S.Ct. at 2386). Thus, the PLRA's exhaustion requirement is not satisfied by "untimely or otherwise procedurally defective attempts to secure administrative remedies." *Ruggiero*, 467 F.3d at 176 (citing *Woodford*, 126 S.Ct. at 2382).

**(3)**

**Exhaustion Analysis: Hargrove did not Exhaust the Administrative Remedies Made Available by NCCF prior to Bringing Suit**

Section 1997e(a) of the PLRA applies to Hargrove's complaint; Hargrove was and continues to be confined in a correctional facility, *see Berry v. Kerik*, 366 F.3d 85, 87 (2d Cir.2004), and Hargrove's claim is about a "prison condition" within the meaning of the PLRA, *see Williams*, 418 F.Supp.2d at 101. *See also Sloane v. W. Mazzuca*, No. 04-CV-8266, 2006 WL 3096031, at *4 (S.D.N.Y. Oct. 31, 2006) (recognizing PLRA's application to complaint alleging retaliation by prison officials for plaintiff's refusal to consent to a PPD test). Accordingly, the merits of Hargrove's Section 1983 claims can only be addressed if it is first determined that Hargrove properly exhausted each claim under Section 1997e(a) of the PLRA before filing his complaint in federal court.

*7 Hargrove has submitted both forged [FN11] and authentic grievance forms in opposing defendants' motions for summary judgment. Excluding, for the moment, the forged documents, NCCF's records reflect that Hargrove did not submit his first grievance until after he filed the instant complaint. Williams Aff. at 1. Hargrove's first grievance complaining of unwanted PPD testing is dated November 19, 2004, Williams Aff. at 1, two to three months after Hargrove filed his complaint. Additionally, this first grievance, dated November 19, 2004, was submitted five months after the last PPD test was administered to him in June 2004. NHCC Defs.' 56.1 Statement ¶¶ 5,6. This five-month period far exceeds the five-day window provided by NCCF's IGP. Since Hargrove failed to comply with the IGP's deadlines, he did not properly exhaust the available administrative remedies. *Ruggiero*, 467 F.3d at 176 (" 'untimely or otherwise procedurally defective attempts to secure administrative remedies do not satisfy the PLRA's exhaustion requirement.' ") (quoting *Woodford*, 126 S.Ct. at 2382).

> FN11. Based on an examination of the documents themselves, as well as the uncontradicted testimony of the notaries performing services for prisoners at NCCF, *see generally* Klein Aff.; McDevitt Aff., and of the investigator in the Inmate Grievance Unit, *see generally* Williams Aff., it appears that many of the documents submitted by Hargrove are forgeries. However, in order to view the facts in the light most favorable to Hargrove, and so as to avoid making findings of fact in a summary judgment motion, for the purposes of the exhaustion analysis, all of the documents will be considered to be authentic. However, for purposes of the sanctions analysis, the documents will be explored and the consequences of Hargrove's misrepresentations will be addressed.

Furthermore, even if the falsified grievance forms Hargrove submitted in support of his claim are considered authentic, they are still untimely. The diagnostic TB tests (whether x-ray or PPD tests) were given to Hargrove on March 15, 2002, May 24, 2003 and in June of 2004, but the grievance forms Hargrove submitted complaining of unwanted PPD tests are dated April 19, 2002, April 28, 2002, April 20, 2003, April 28, 2003 and November 19,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

2004. None of these grievances were filed "within five days of the of the date of the act or occurrence giving rise to the grievance." Williams Aff. at 3. There is no evidence in the record suggesting that NCCF's IGP allows for a tolling of the five-day time limit in which to file a grievance.[FN12]

> FN12. Even if the submitted grievances had been filed within the proscribed time period, they only show that Hargrove's grievances reached an Inmate Grievance Coordinator, the first formal step of NCCF's three-step administrative grievance process; Hargrove never appealed to the Chief Administrative Officer. By failing to take the next available step in NCCF's IGP, Hargrove failed to satisfy the mandatory exhaustion requirement. *See, e.g., Williams, 418 F.Supp.2d at 101, 102* (dismissing *pro se* complaint where plaintiff could only show he exhausted two of the four-step process mandated by prison's administrative process).

While the letters to Reilly and sick call requests show that Hargrove attempted to bring his complaints about the PPD testing to the attention of the prison staff, *see, e.g.,* Aff. in Opp., Exs. A-D, NCCF's IGP requires use of formal grievance forms. Thus, writing complaint letters and submitting sick call requests did not properly exhaust NCCF's available administrative remedies. *See, e .g., Hernandez v. Coffey,* No. 99-CV-11615, 2006 WL 2109465, at *4 (S.D.N.Y. July 26, 2006) (holding letters did not satisfy plaintiff's exhaustion obligation); *Williams, 418 F.Supp.2d at 101* (holding that because plaintiff's efforts to convey his medical condition through letters and conversations with the warden and medical staff did "not include the required steps of the PLRA's administrative remedy process," plaintiff failed to exhaust); *Mills v. Garvin,* No. 99-CV-6032, 2001 U.S. Dist. LEXIS 3333, at *8 (S.D.N.Y. Mar. 2, 2001) ("letter writing is not the equivalent of an exhaustion of administrative remedies under the PLRA").

As Hargrove failed to properly exhaust his administrative remedies, this action is precluded by 42 U.S.C. § 1997e(a) unless Hargrove can establish excuse for his failure to exhaust.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(4)**

**No Grounds to Excuse Plaintiff's Failure to Exhaust**

**\*8** Exhaustion is an affirmative defense that defendants have the duty to raise. *Jones,* 2007 WL 135890, at * 8-11;*Sloane,* 2006 WL 3096031, at *4;*Williams,* 418 F.Supp.2d at 101. Once argued by the defendants, a plaintiff has an opportunity to show why the exhaustion requirement should be excused or why his failure to exhaust is justified. *See Ruggiero,* 467 F.3d at 175;*Collins v. Goord,* 438 F.Supp.2d 399, 411 (S.D.N.Y.2006) ("[T]he Second Circuit has cautioned that 'while the PLRA's exhaustion requirement is 'mandatory,' certain caveats apply.' ")(internal citations omitted). Thus, before concluding that a prisoner failed to exhaust available administrative remedies as required by Section 1997e(a) of the PLRA, the following three factors must be considered: (1) whether administrative remedies were actually available to the prisoner; (2) whether defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; and (3) whether special circumstances, such as a reasonable misunderstanding of the grievance procedures, exist justifying the prisoner's failure to comply with the exhaustion requirement. *Ruggiero,* 467 F.3d at 175 (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)).[FN13]

> FN13. Courts in the Second Circuit have questioned what effect, if any, the Supreme Court's recent decision in *Woodford* requiring "proper exhaustion" may have on the three-step *Hemphill* inquiry. The Second Circuit has yet to address this issue. *See Ruggiero,* 467 F.3d at 175-76 (declining to "determine what effect *Woodford* has on our case law in this area ... because [plaintiff] could not have prevailed even under our pre-*Woodford* case law"). To date, district courts have acknowledged the tension, but resolved to apply *Hemphill* to exhaustion claims until instructed otherwise by the Second Circuit. *See, e.g., Larkins v. Selsky,* 04-CV-5900, 2006 WL 3548959, at *9, n. 4 (S.D.N.Y. Dec. 6,

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

2006) (applying the current law of the Second Circuit to exhaustion claims); *Sloane,* 2006 WL 3096031, at *5 ("Until such time as the Court of Appeals considers the impact of *Woodford,* if any, on its prior rulings, this Court must follow the law of the Second Circuit. The Court will therefore apply the current law of this circuit to the exhaustion claims."); *Collins v. Goord,* 438 F.Supp.2d at 411 n. 13 (acknowledging that *Woodford* and *Hemphill* may be in tension, but deciding exhaustion claims under *Hemphill* inquiry); *Hernandez v. Coffey,* No. 99-CV11615, 2006 WL 2109465, at *3 (S.D.N.Y. July 26, 2006) (same). Here, Hargrove does not prevail under *Hemphill;* therefore, there is no occasion to address the potential effect *Woodford* may have had in his case.

**a. Whether administrative remedies were "available" to Hargrove**

The first step in the *Hemphill* inquiry requires a court to determine whether administrative remedies were available to the prisoner. *Hemphill,* 380 F.3d at 686. The test for assessing availability is an "objective one: that is, would a similarly situated individual of ordinary firmness have deemed them available." *Id.* at 688 (internal quotation marks omitted). In making this determination, "courts should be careful to look at the applicable set of grievance procedures." *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004). Exhaustion may be considered unavailable in situations where plaintiff is unaware of the grievance procedures or did not understand it, *Ruggiero,* 467 F.3d at 179, or where defendants' behavior prevents plaintiff from seeking administrative remedies,[FN14]*Hemphill v. State of New York,* 380 F.3d 680, 686 (2d Cir.2004).

FN14. Case law does not clearly distinguish between situations in which defendants' behavior renders administrative remedies "unavailable" to the plaintiff and cases in which defendants are estopped from asserting non-exhaustion as an affirmative defense because of their behavior. As such, there will be some overlap in the analyses.

Here, Hargrove has not claimed that NCCF's administrative grievance procedure was unavailable to him. In fact, Hargrove demonstrated his access to and knowledge of NCCF's IGP by filing proper grievances on November 19, 2004 and on May 10, 2005. Hargrove did not dispute any part of Investigator Williams's affidavit detailing the IGP and its availability to inmates since 2001. Specifically, Hargrove did not dispute, upon entering the facility, that he received a copy of the inmate handbook outlining the IGP. He has not claimed that he is unfamiliar with or unaware of NCCF's IGP. Hargrove has not alleged that prison officials failed to advance his grievances [FN15] or that they threatened him or took any other action which effectively rendered the administrative process unavailable.

FN15. Although not specifically alleged, interpreting the evidence to "raise the strongest argument," Hargrove may be arguing that NCCF's IGP was not available to him because the Grievance Coordinator failed to respond to his grievances. In the single grievance regarding PPD tests that defendants concede is authentic, Hargrove writes, "[n]ow for the third time your office refused to answer my grievances so please look into this matter because the T.B. shot is [sic] effecting my health." 11/19/04 Grievance. This language implies that Hargrove filed grievances in the past and received no response from the Inmate Grievance Coordinator. Furthermore, Hargrove wrote on one of the submitted copies of the November 19, 2004 grievance that "[t]his is the only accepte[sic] that Plaintiff got back from all grievances and letters that the Plaintiff sent to Sheriff Riley and his medical staffs about his staff making [sic] take T.B. test for 3 year[s]." County Defs'. Not. of Motion, Ex. A, 11/19/2004 grievance.

First, it must be reiterated that filing of the initial grievances was untimely. However, even assuming *arguendo* that the original grievances had been timely filed, district courts in the Second Circuit have held that the "lack of a response from the [Inmate Grievance Review Committee] does not excuse an inmate's obligation to exhaust his

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

remedies through available appeals." *Hernandez v. Coffey,* 2006 WL 2109465, at *3-5. *See also Hemphill,* 380 F.3d at 686 ("Threats or other intimidation by prison officials may well deter a prisoner of 'ordinary firmness' from filing an internal grievance, but not from appealing directly to individuals in positions of greater authority within the prison system"); *Acosta v. Corr. Officer Dawkins,* No. 04-CV-6678, 2005 WL 1668627, at *3 (S.D.N.Y. July 14, 2005) (inmate required to appeal lack of response to exhaust administrative remedies); *Mendoza v. Goord,* No. 00-CV-0146, 2002 U.S. Dist. LEXIS 22573, at *6 (S.D.N.Y. Nov. 21, 2002) ("If, as a result of a negligent error by prison officials-or even their deliberate attempt to sabotage a prisoner's grievance-the prisoner [does not receive a response] on his complaint, he is not thereby forestalled from appealing"). Hargrove did not assert or provide evidence suggesting that he appealed the unresponsiveness or that those appeals were not advanced.

**\*9** Additionally, Hargrove's transfer from NCCF to Sing Sing Correctional Facility ("Sing Sing") in July 2005 did not excuse his previous failure to properly exhaust. *See, e.g., Sims v. Blot,* No. 00-CV-2524, 2003 WL 21738766, at *4 (S.D.N.Y. July 25, 2003) (determining that failure to exhaust administrative remedies is not excused by transfer to another facility); *Santiago v. Meinsen,* 89 F.Supp.2d 435, 440-41 (S.D.N.Y.2000) (determining that plaintiff should not be "rewarded" for failing to participate in grievance procedure before being transferred). Hargrove had ample opportunity to properly file his grievances and to appeal their results as required by NCCF's procedures while he was imprisoned at NCCF. The last PPD test Hargrove complains of was given in 2004; therefore, Hargrove had until June or July of 2004 to timely file his grievance in accordance with NCCF's IGP. Hargrove was not transferred to Sing Sing until July 2005. County Defs.' Mem. of Law at 2. Thus, Hargrove's transfer cannot excuse his previous failure to properly exhaust.

**b. Estoppel**

The second step of the inquiry asks whether defendants are estopped from raising exhaustion as a defense. Specifically, "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Hemphill,* 380 F.3d at 686 (internal citations omitted).

Here, Hargrove has not made any statements that would permit a finding that defendants should be estopped from raising the affirmative defense of exhaustion or that defendants waived the right to raise the defense. Defendants first raised the PLRA's exhaustion requirement as an affirmative defense in their respective answers. *See* County Defs.' Am. Answer at 3; NHCC Defs.' Answer at 1. County Defendants raised it again in their motion for summary judgment. *See* County Defs.' Mem of Law at 15-23. Thus, defendants are not estopped from raising the affirmative defense now. *See, e.g., Sloane,* 2006 WL 3096031, at *8 (exhaustion defense not waived where defendants first raised it in their motion to dismiss).

Additionally, defendants have not threatened Hargrove or engaged in other conduct preventing him from exhausting the available administrative remedies. *Cf. Ziemba v. Wezner,* 366 F.3d 161, 162 (2d Cir.2004) (holding defendants were estopped from asserting non-exhaustion because of prison officials' beatings, threats and other conduct inhibiting the inmate from filing proper grievances); *Feliciano v. Goord,* No. 97-CV-263, 1998 WL 436358, at *2 (S.D.N.Y. July 27, 1998) (holding defendants were estopped from asserting non-exhaustion where prison officials refused to provide inmate with grievance forms, assured him that the incidents would be investigated by staff as a prerequisite to filing a grievance, and provided prisoner with no information about results of investigation). Hargrove has not argued otherwise. *See Ruggiero,* 467 F.3d at 178 (holding defendants were not estopped from asserting a failure to exhaust defense where plaintiff pointed to no affirmative act by prison officials that would have prevented him from pursing administrative remedies); *Sloane,* 2006 WL 3096031, at *8 (finding no estoppel where plaintiff did not argue that defendants prevented him from pursuing the available administrative remedies); *Hernandez,* 2006 WL 2109465,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

at *4 (finding no estoppel where plaintiff did not argue that any threats or intimidation prevented him from pursuing his appeals). Thus, for the same reasons that administrative remedies were not deemed unavailable to Hargrove, defendants are not estopped from raising a failure to exhaust defense.

### c. Special circumstances

**\*10** Even where administrative remedies are available and the defendants are not estopped from arguing exhaustion, the court must "consider whether 'special circumstances' have been plausibly alleged that justify 'the prisoner's failure to comply with administrative procedural requirements.' " *Hemphill,* 380 F.3d at 688 (quoting *Giano,* 380 F.3d at 676). For example, plaintiff's reasonable interpretation of regulations differing from prison official's interpretation has been held to constitute a "special circumstance." *Giano,* 380 F.3d at 676-77. No special circumstances have been alleged that would excuse Hargrove from availing himself of administrative remedies. *See Sloane,* 2006 WL 3096031, at *8; *Freeman v. Goord,* No. 02-CV-9033, 2004 U .S. Dist. LEXIS 23873, at * 9-10 (S.D.N.Y.2004) (granting motion to dismiss where "there is no evidence in the record ••• of any 'special circumstances' in this action.")

**(5)**

### Hargrove's Failure to Exhaust, in Addition to his Fraud on the Court, Warrants Dismissal with Prejudice

Hargrove has not sufficiently rebutted the defendants' assertion of failure to exhaust, and a liberal reading of his submissions does not reveal any grounds to excuse that failure.

Because Hargrove filed a complaint in federal court before filing a grievance, permitting his unexhausted and unexcused claim to proceed would undercut one of the goals of the exhaustion doctrine by allowing NCCF to be haled into federal court without the "opportunity to correct

its own mistakes with respect to the programs it administers." *Woodford,* 126 S.Ct. at 2385. *See also Ruggiero,* 467 F.3d at 178 (citing *Porter,* 534 U.S. at 525). Thus, his complaint must be dismissed.

In general, dismissal without prejudice is appropriate where plaintiff has failed to exhaust but the time permitted for pursuing administrative remedies has not expired. *Berry v. Kerik,* 366 F.3d 85, 87 (2d Cir.2004). Dismissal with prejudice is appropriate where "administrative remedies have become unavailable after the prisoner had ample opportunity to use them and no special circumstances justified failure to exhaust." *Berry,* 366 F.3d at 88. Here, Hargrove's administrative remedies were available to him during his entire period of confinement at NCCF. He remained incarcerated in NCCF throughout the time period in which he alleges the PPD tests are given. He could have exhausted remedies for his grievances at any time. Therefore, Hargrove had ample opportunity to seek administrative remedies but failed to do so. Because there is no evidence in the record that administrative remedies are still available to Hargrove, as the five-day time period had run, and because Hargrove has alleged no special circumstances justifying his failure to exhaust, his complaint is accordingly dismissed with prejudice. *Berry,* 366 F.3d at 88 (upholding dismissal with prejudice where plaintiff had no justification for his failure to pursue administrative remedies while they were available.)

**\*11** Additionally, defendants' have moved for sanctions based on Hargrove's alleged submission of falsified evidence. If a party commits a fraud on the court, the court has the inherent power to do whatever is reasonably necessary to deter abuse of the judicial process. *Shangold v. The Walt Disney Co.,* No. 03-CV-9522, 2006 WL 71672, at *4 (S.D.N.Y. January 12, 2006) (citing *Chambers v. NASCO, Inc.,* 501 U.S. 32, 44 (1991)). Fraud upon the court has been defined as "fraud which seriously affects the integrity of the normal process of adjudication." *Gleason v. Jandrucko,* 860 F.2d 556, 559 (2d Cir.1988); *McMunn v. Mem'l Sloan-Kettering Cancer Center,* 191 F.Supp.2d 440, 445 (S.D.N.Y.2002). In order for a court to grant sanctions based upon fraud, it must be established by clear and convincing evidence that a party has "sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by ... unfairly hampering

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

the presentation of the opposing party's claim or defense." *McMunn,* 191 F.Supp.2d at 455 (quoting *Aoude v. Mobil Oil Corp.,* 892 F.2d 1115, 1119 (1st Cir.1989).

After carefully reviewing the allegedly fraudulent documents, it must be concluded that Hargrove consciously falsified these documents. *See, e.g., Shangold,* 2006 WL 71672, at *1, *3 (finding clear and convincing evidence of fraud where plaintiffs fabricated a timeline and plot outlines to advance their claims); *McMunn,* 191 F.Supp.2d at 446 (finding clear and convincing evidence of fraud where plaintiff edited audio tapes and represented that they were unedited during discovery). The notaries performing services for prisoners at NCCF testify that they never notarized many of the documents supplied by Hargrove. *See* Klein Aff.; McDevitt Aff. Furthermore, a visual examination of the documents themselves makes it clear that many of the documents submitted by Hargrove are forgeries.

In considering what sanction to impose, courts consider the following five factors: (i) whether the misconduct was the product of intentional bad faith; (ii) whether and to what extent the misconduct prejudiced the plaintiffs; (iii) whether there was a pattern of misbehavior rather than an isolated instance; (iv) whether and when the misconduct was corrected; and (v) whether further misconduct is likely to occur in the future. *Scholastic, Inc. v. Stouffer,* 221 F.Supp.2d 425, 444 (S.D.N.Y.2002) (citing *McMunn,* 191 F.Supp.2d at 461).

Here, Hargrove's deception was not an isolated instance; he fabricated the dates on many grievance forms, in addition to improperly duplicating notary stamps on complaint letters to make them look authentic. Klein Aff. at 2; McDevitt Aff. at 2; County Defs.' 56.1 Statement ¶¶ C3, D3. He submitted these forgeries to defendants during discovery and again as exhibits to his Affidavit in Opposition to Defendant's Motion for Summary Judgment. A severe sanction is warranted as Hargrove's forgeries were intentional, he never corrected them once their authenticity was challenged and he continues to insist on their veracity. Aff. in Opp. at 1-4. Given that there is clear and convincing evidence that Hargrove has continuously and consciously perpetrated a fraud on the court through his submission of fraudulent documents and sworn

affirmations of those documents' authenticity, dismissal with prejudice is especially appropriate. *See, e.g., Shangold,* 2006 WL 71672, at *5 (dismissing with prejudice where plaintiffs fabricated evidence to advance their claims); *Scholastic,* 221 F.Supp.2d at 439-444 (dismissing with prejudice where plaintiff produced seven pieces of falsified evidence); *McMunn,* 191 F.Supp.2d at 445 (dismissing with prejudice where plaintiff "lie[d] to the court and his adversary intentionally, repeatedly, and about issues that are central to the truth-finding process").

### Conclusion

**\*12** Because Hargrove did not satisfy the exhaustion requirement under the PLRA, defendants' motions for summary judgment are granted. Further, considering the fraud Hargrove perpetrated on the court, the claims are dismissed against all defendants with prejudice. The Clerk of the Court is directed to close the case.

SO ORDERED:

E.D.N.Y.,2007.
Hargrove v. Riley
Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)
(Cite as: 2006 WL 2639369 (N.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
James PETTUS, Plaintiff,
v.
Jospeh McCOY, Superintendent, Deputy Ryan,
Defendants.
No. 9:04-CV-0471.

Sept. 13, 2006.

James Pettus, Comstock, NY, pro se.

Charles J. Quackenbush, New York State Attorney
General, The Capitol Albany, NY, for Defendants.

### DECISION and ORDER

THOMAS J. McAVOY, Senior District Judge.

**\*1** Plaintiff commenced the instant action asserting
various violations of his constitutional rights arising out of
his placement at the Southport Correctional Facility. In his
Complaint, Plaintiff alleges that he was improperly sent to
the Special Housing Unit ("SHU") at a maximum security
facility and that being in SHU has put his life in jeopardy.
Currently before the Court is Defendants' motion for
summary judgment pursuant to Fed.R.Civ.P. 56 seeking
dismissal of the Complaint in its entirety for failure to
exhaust administrative remedies.

### I. FACTS[FN1]

> FN1. The following facts are taken from
> Defendants' statement of material facts submitted

pursuant to N.D.N.Y.L.R. 7.1(a)(3). These facts
are deemed admitted because they are supported
by the record evidence and Plaintiff failed to
submit an opposing statement of material facts as
required by Rule 7.1(a)(3). Plaintiff was
specifically advised by Defendants of his
obligation to file an opposing statement of
material facts and to otherwise properly respond
to the motion for summary judgment.

Plaintiff is an inmate in the custody of the New York State
Department of Correctional Services. Plaintiff signed the
instant Complaint on April 7, 2004. On his Complaint
form, Plaintiff indicated that there is a grievance
procedure available to him and that he availed himself of
the grievance procedure by filing a complaint with the
IGRC [FN2], followed by an appeal to the superintendent of
the facility, and then to the Central Office Review
Committee in Albany. The Complaint indicates that
Plaintiff is "waiting for response from Albany." The
Complaint was filed on April 27, 2004.

> FN2. Inmate Grievance Review Committee.

On April 12, 2004, prior to the filing of the instant
Complaint, Plaintiff filed a grievance relating to the issues
presented in this case. On April 19, 2004, the IGRC
recommended that Plaintiff's grievance be denied. Plaintiff
then appealed that decision to the facility Superintendent.
In the meantime, on April 27, Plaintiff commenced the
instant litigation. On May 3, 2004, after Plaintiff filed the
Complaint in this case, the Superintendent denied
Plaintiff's grievance. On May 5, 2004, Plaintiff appealed
the decision to the Central Office Review Committee in
Albany. On June 23, 2004, the Central Office Review
Committee denied Plaintiff's appeal. Plaintiff did not file
any other grievances in connection with the matters raised
in this lawsuit.

Defendants now move to dismiss on the ground that
Plaintiff commenced the instant action before fully
exhausting his available administrative remedies.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)
(Cite as: 2006 WL 2639369 (N.D.N.Y.))

## II. DISCUSSION

The sole issue presented is whether Plaintiff was required to complete the administrative process before commencing this litigation. This issue has already been addressed by the Second Circuit in *Neal v. Goord,* 267 F.3d 116 (2d Cir.2001). The issue in that case was "whether plaintiff's complaint should have been dismissed despite his having exhausted at least some claims during the pendency of his lawsuit." *Id.* at 121. The Second Circuit held that "exhausting administrative remedies after a complaint is filed will not save a case from dismissal." *Id.*

In this case, Defendants have established from a legally sufficient source that an administrative remedy is available and applicable. *Mojias v. Johnson,* 351 F.3d 606, 610 (2d Cir.2003); *see also* 7. N.Y.C.R.R. § 701.1, *et seq.* Plaintiff's Complaint concerns his placement in SHU at a maximum security facility. These are matters that fall within the grievance procedure available to NYSDOCS inmates and are required to be exhausted under the Prison Litigation Reform Act, 42 U.S.C. § 1997e. Plaintiff has failed to demonstrate any applicable exception to the exhaustion requirement. Because Plaintiff commenced the instant litigation prior to fully completing the administrative review process, the instant Complaint must be dismissed without prejudice. *Neal,* 267 F.3d 116.

## III. CONCLUSION

**\*2** For the foregoing reasons, Defendants' motion for summary judgment is GRANTED and the Complaint is DISMISSED WITHOUT PREJUDICE. The Clerk of the Court shall close the file in this matter.

IT IS SO ORDERED.

N.D.N.Y.,2006.
Pettus v. McCoy
Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2007 WL 2847304 (N.D.N.Y.)
(Cite as: 2007 WL 2847304 (N.D.N.Y.))

C

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
LaCream NEWMAN, Plaintiff,
v.
George B. DUNCAN, Superintendent of Great Meadow
Correctional Facility; David Carpenter, Deputy
Superintendent; Patrick Vanguilder, Deputy
Superintendent of Security; William Mazzuca,
Superintendent of Fishkill Correctional Facility; R.
Ercole, Deputy Superintendent of Security; J. Conklin,
Corrections Sergeant; and John Doe, Corrections
Officer, Defendants.
**No. 04-CV-395 (TJM/DRH).**

Sept. 26, 2007.

LaCream Newman, Auburn, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State
of New York, Charles J. Quackenbush, Esq., Assistant
Attorney General, of Counsel, Albany, NY, for
Defendants.

### DECISION & ORDER

THOMAS J. McAVOY, Senior United States District
Judge.

### I. INTRODUCTION

**\*1** This *pro se* action brought pursuant to 42 U.S.C. §
1983 was referred to the Hon. David R. Homer, United
States Magistrate Judge, for a Report and
Recommendation pursuant to 28 U.S.C. § 636(b) and
Local Rule 72.3(c). No objections to the

Report-Recommendation and Order dated September 6,
2007 have been filed. Furthermore, after examining the
record, this Court has determined that the
Report-Recommendation and Order is not subject to attack
for plain error or manifest injustice. Accordingly, the
Court adopts the Report-Recommendation and Order for
the reasons stated therein.

It is therefore,

**ORDERED** that

(1) Defendants' motion for summary judgment (Docket
No. 36) is **GRANTED** as to defendants Duncan,
Carpenter, VanGuilder, Mazzuca, Ercole, and Conklin and
as to all of Newman's causes of action;

(2) The complaint is **DISMISSED** without prejudice as to
defendant John Doe; and

(3) This action is **TERMINATED** in its entirety as to all
defendants and all claims.

**IT IS SO ORDERED**

### REPORT-RECOMMENDATION AND ORDER[FN1]

> FN1. This matter was referred to the undersigned
> for report and recommendation pursuant to 28
> U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

DAVID R. HOMER, U.S. Magistrate Judge.

Plaintiff pro se LaCream Newman ("Newman"), an inmate
in the custody of the New York State Department of
Correctional Services ("DOCS"), brings this action
pursuant to 42 U.S.C. § 1983 alleging that defendants,
seven DOCS employees, violated his constitutional rights
under the Eighth and Fourteenth Amendments. [FN2] See
Compl. (Docket No. 1). Presently pending is defendants'

Not Reported in F.Supp.2d, 2007 WL 2847304 (N.D.N.Y.)
(Cite as: 2007 WL 2847304 (N.D.N.Y.))

motion for summary judgment pursuant to Fed.R.Civ.P. 56. Docket No. 36. Newman opposes the motion. Docket No. 41. For the following reasons, it is recommended that defendants' motion be granted.

> FN2. Newman's Fourteenth Amendment claims were previously dismissed. *See* Docket No. 28.

### I. Background

The facts are presented in the light most favorable to Newman as the non-moving party. *See* Ertman v. United States, 165 F.3d 204, 206 (2d Cir.1999).

On October 23, 2002, Newman was being transferred from Great Meadow Correctional Facility ("Great Meadow") to Fishkill Correctional Facility's ("Fishkill") Special Housing Unit ("SHU").[FN3] *See* Pelc. Aff. (Docket No. 36), Ex. B. Before arriving at Fishkill, Newman was temporarily housed at Downstate Correctional Facility ("Downstate"). *Id.* While being housed at Downstate, an inmate attempted to sexually assault Newman. *See* Compl. at ¶ 7. On October 24, 2002, Newman was transferred from Downstate to Fishkill. *See* Pelc. Aff., Ex. B. Upon arrival at Fishkill, Newman was assigned to a double occupancy cell. *See* Compl. at ¶ 10. On October 29, 2002, an inmate again attempted to sexually assault Newman. *See* Compl. at ¶ 12; *see also* Harris Aff. (Docket No. 36) at Ex. A. On November 15, 2002, Newman was transferred to Clinton Correctional Facility ("Clinton"). *See* Pelc. Aff., Ex. B. This action followed.

> FN3. SHUs exist in all maximum and certain medium security facilities. The units "consist of single-or double-occupancy cells grouped so as to provide separation from the general population ...." N.Y. Comp.Codes R. & Regs. tit. 7, § 300.2(b) (2004). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

### II. Discussion

Newman asserts six causes of action, each alleging that defendants' failure to house Newman in a single occupancy cell constituted cruel and unusual punishment under the Eighth Amendment. Defendants seek judgment on all claims.

### A. Standard

**\*2** A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir.1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. Gallo v. Prudential Residential Servs. 22 F.3d 1219, 1223-24 (2d Cir.1994); Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir.1988). When, as here, a party seeks summary judgment against a pro se litigant, a court must afford the non-movant special solicitude. *Id.; see also* Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir.2006). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. Anderson, 477 U .S. at 247-48.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2847304 (N.D.N.Y.)
(Cite as: 2007 WL 2847304 (N.D.N.Y.))

### B. Exhaustion

Defendants contend that Newman has failed to demonstrate any reasonable excuse for failing to exhaust his administrative remedies as to his Eighth Amendment claim. *See* Defs. Mem. of Law (Docket No. 36) at 6-11. Newman contends that he failed to exhaust his administrative remedies after the attempted sexual assaults because (1) he was threatened by John Doe; (2) he was in transit between DOCS facilities; and (3) he was dealing with the mental and emotional effects of the attempted assaults. *See* Pl. Reply Mem. of Law (Docket No. 41) at 1-3.

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), subjects suits concerning prison conditions brought under federal law to certain prerequisites. Specifically, the PLRA dictates that a prisoner confined to any jail, prison, or correctional facility must exhaust all available administrative remedies prior to bringing any suit concerning prison life, " 'whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.' " *Ziemba v. Wezner,* 366 F.3d 161, 163 (2d Cir.2004) (quoting *Porter v. Nussle,* 534 U.S. 516, 532 (2002)); *see also Jones v. Bock,* 127 S.Ct. 910, 918-19 (2007) ( "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court.") (citation omitted)); *Woodford v. Ngo,* 126 S.Ct. 2378, 2382-83 (2006). Administrative remedies include all appellate remedies provided within the system, not just those that meet federal standards. *Woodford,* 126 S.Ct. at 2382-83. However, the Second Circuit has recognized three exceptions to the PLRA's exhaustion requirement:[FN4]

> FN4. It is unclear whether *Woodford* has overruled the Second Circuit's exceptions to the exhaustion requirement. *See Miller v. Covey,* No. Civ. 05-649 (LEK/GJD), 2007 WL 925054, at *3-4 (N.D.N.Y. Mar. 29, 2007). However, it is not necessary to determine what effect *Woodford* has on the Second Circuit's exceptions to the exhaustion requirement because Newman's contentions cannot prevail even under pre-*Woodford* case law. *See Ruggiero v. County of Orange,* 467 F.3d 170, 176 (2d Cir.2006)

*3 when (1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the prisoner's failure to comply with the exhaustion requirement.

*Ruggiero,* 467 F.3d at 175 (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)

"The PLRA's exhaustion requirement is designed to 'afford [ ] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.' " *Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir.2004) (quoting *Porter,* 534 U.S. at 524-25)). " '[A] grievance suffices if it alerts the prison to the nature of the wrong for which redress is sought.' " *Id.* (quoting *Strong v. David,* 297 F.3d 646, 650 (7th Cir.2002)). Inmates must provide sufficient information to "allow prison officials to take appropriate responsive measures." *Id.*

DOCS has established a grievance procedure which includes a three-stage review and appeal process. *See* N.Y. Correct. Law § 139 (McKinney 2003); N.Y. Comp.Codes R. & Regs. tit. 7, § 701.1-.16 (2003);[FN5] *Hemphill,* 380 F.3d at 682-83. When an inmate files a grievance, it is investigated and reviewed by an Inmate Grievance Resolution Committee ("IGRC"). If the grievance cannot be resolved informally, a hearing is held. The IGRC decision may be appealed to the Superintendent of the facility. Finally, an inmate may appeal the Superintendent's decision to the Central Office Review Committee ("CORC"). N.Y. Comp.Codes R. & Regs. tit.7, § 701.7(c).

> FN5. The Court is aware that the sections governing the Inmate Grievance Program procedures in the Official Compilation of Codes, Rules & Regulations of the State of New York were re-numbered in June 2006. *See Bell v. Beebe,* No. Civ. 06-544 (NAM/GLD), 2007 WL 1879767, at *3 n. 4 (N.D.N.Y. June 29, 2007). However, in the interests of clarity, the Court will cite the section numbers of the provisions

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2847304 (N.D.N.Y.)
(Cite as: 2007 WL 2847304 (N.D.N.Y.))

that were in effect at the time Newman filed his complaint.

Here, it is undisputed that Newman's first attempt to file a grievance regarding the alleged sexual assaults did not occur until September 21, 2003, nearly one year after the alleged assaults. *See* Pl. Reply Statement of Material Facts (Docket No. 41) at Ex. 2; *see also* Newman Dep. (Ullman Decl. at Ex. 1, Docket No. 36) at 85-87. In his complaint, Newman contends that he failed to file a timely complaint due to "fear." *See* Pl. Reply Statement of Material Facts at Ex. 2. However, the Inmate Grievance Program ("IGP") supervisor at Clinton rejected Newman's attempt to file his complaint as a grievance because Newman failed to "expand on what/who caused the 'fear.' " *Id.* The IGP supervisor also noted that Newman had been housed at Clinton for the previous nine months and, thus, had "ample opportunity to file [his] complaint before [September 2003]." *Id.* Newman attempted to file an appeal of the IGP supervisor's decision to the Superintendent, but the supervisor advised Newman "[t]here is no provision to appeal the IGP Supervisors decision (to not accept a grievance) to the Superintendent. You may file a separate grievance on the determination by submitting it to the IGRC office." *Id.*

**\*4** On or about October 15, 2003, Newman filed a grievance requesting that the October 10, 2003 decision of the IGP supervisor be reversed. *See* Ullman Decl. (Docket No. 36) at Exs. 5 & 6. Newman alleged that the following "mitigating circumstances" prevented him from filing a timely grievance regarding the October 2002 sexual assaults: "1. I was in transit within the 14 days of the incident; to a number of correctional facilities; in addition to MHU within NYS DOCS; 2. I was confronted with fear (threats); which was made by CO's at Fishkill SHU 200 which I wasn't to make mention of the situation and that he could cause me to be placed in the same situation again and no on[e] would help me." *Id.* The IGRC denied Newman's grievance, finding that "[Newman] has been in [Clinton] since Dec. 2002 which gave him adequate time to file complaint which would have been accepted if filed then. Grievant did not provide mitigating circumstances to warrant the acceptance of complaint." Ullman Decl., Ex. 5 at 4. The Superintendent and CORC both denied Newman's appeals, finding that Newman had failed to present mitigating circumstances to excuse his delay in submitting the complaint. *See* Ullman Decl, Exs. 7 & 8.

In claiming that his non-exhaustion should be excused, Newman makes three arguments. First, he contends that a corrections officer at Fishkill (John Doe) threatened him, warning that if Newman reported the October 29, 2002 sexual assault then he would be placed back in the "same predicament" he was in before. *See* Newman Dep. at 83. However, Newman was transferred to Clinton in November 2002 and, thus, could have immediately filed a grievance now that he was separated from the officer who threatened him. *See* Pelc Decl. (Docket No. 36) at Ex. B. Further, Newman testified that he felt "safe" while at Clinton, demonstrating that any fear he may have had surrounding the filing of a grievance was left behind at Fishkill. *See* Newman Dep. at 66. Moreover, Newman ultimately did file a grievance while at Clinton. *See* Ullman Decl., Exs. 5 & 6. Thus, Newman's first argument for failure to properly exhaust is not persuasive.

Second, Newman contends that his frequent transfers between DOCS facilities within fourteen days of the sexual assaults prevented him from timely filing a grievance. However, this argument is not persuasive because DOCS regulations state that "[e]ach correctional facility housing a reception/classification/transit inmate population shall insure all inmates access to the IGP." N.Y. Comp.Codes R. & Regs. tit.7, § 701.14. Further, Newman arrived at Clinton on November 15, 2003 and was not moved to another DOCS facility until November 19, 2003, thus affording him nearly a year where he was not "in transit." *See* Pelc. Decl. at Ex. B.

Third, Newman contends that this Court should apply the "special circumstances" exception under *Hemphill* because he was dealing with the mental and emotional effects of the sexual assaults, thus preventing his filing of a grievance. *See* Newman Dep. at 83-84; Pl. Reply Mem. of Law at 2-3; *see also Hemphill,* 380 F.3d at 686. However, the special circumstances exception under *Hemphill* concerned an inmate's justifiable confusion regarding the proper DOCS procedure for filing an expedited grievance, not an inmate's mental or emotional condition. *See Hemphill,* 380 F.3d at 689-91. Thus, absent any documented mental illness that prevented Newman from filing a grievance, his third argument excusing his failure to timely exhaust his administrative remedies is not persuasive.[FN6]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2847304 (N.D.N.Y.)
(Cite as: 2007 WL 2847304 (N.D.N.Y.))

FN6. Moreover, shortly after the second assault, Newman wrote a letter to his counselor requesting that he be able to correspond with another inmate. *See* Newman Dep. at 42-43. Thus, in light of his ability to correspond with his counselor shortly after the incident, Newman's contention that he was too emotionally distraught to file a grievance is without merit.

**\*5** Therefore, it is recommended that defendants' motion on this ground be granted.

### C. Eighth Amendment[FN7]

FN7. In his complaint, Newman contends that defendants' conduct constituted cruel and unusual punishment in violation of the Eighth Amendment because their failure to comply with DOCS regulations "facilitated ... the cause for the incident of attempted rape/physical assault that occurred to plaintiff therein at Fishkill SHU 200, on or about 10/29/02." Compl. at ¶¶ 15, 17, 19, 21, 23. Therefore, Newman's cause of action is best addressed under the Eighth Amendment's failure to protect standard.

Newman contends that defendants knew or should know that he was a homosexual and that his placement in a double occupancy cell "facilitated ... the cause for the incident of attempted rape/physical assault that occurred to plaintiff therein at Fishkill SHU 200, on or about 10/29/02." Compl. at ¶¶ 15, 17, 19, 21, 23.

Prison officials have a duty to protect inmates from violence by other inmates. *See Farmer v. Brennan,* 511 U.S. 825, 833 (1994). When asserting a failure to protect claim, an inmate must establish that he was "incarcerated under conditions posing a substantial risk of serious harm" and that the defendants acted with deliberate indifference to the inmate's safety. *Id.* at 834. Deliberate indifference is established when the official knew of and disregarded an excessive risk to inmate health or safety. *Id.* at 837. However, "the issue is not whether [a plaintiff] identified

his enemies by name to prison officials, but whether they were aware of a substantial risk of harm to [him]." *Hayes v. New York City Dep't of Corr.,* 84 F.3d 614, 621 (2d Cir.1991).

Here, Newman contends that on two separate occasions, fellow inmates "attempted to rape/physical[ly] assault" him. *See* Compl. at ¶¶ 7, 11, 15, 17, 19, 21, 23. However, it is undisputed that Newman did not suffer any actual injury [FN8] from these attempted assaults. *See* Defs. Statement of Material Facts (Docket No. 36) at ¶¶ 71-76; Pl. Reply Statement of Facts at ¶¶ 71-76; *see also* Newman Dep. at 31-32, 35-37, 41-42, 68-74, 95-96; Harris Aff. at Ex. A. The law is clear that an inmate must demonstrate an "actual injury" when alleging a constitutional violation. *See Brown v. Saj,* No. Civ. 06-6272(DGL), 2007 WL 1063011, at *2 (W.D.N.Y. Apr. 5, 2007) (citing *Lewis v. Casey,* 518 U.S. 343, 349 (1996)). These two isolated incidents, coupled with Newman's failure to allege any injury resulting from the attempted sexual assaults, fail to demonstrate a constitutional violation under the Eighth Amendment. *See Boddie v. Schnieder,* 105 F.3d 857, 861-62 (2d Cir.1997) (holding that isolated incidents of sexual assault, without any injury, fail to state an Eighth Amendment claim); *see also Brown,* 2007 WL 1063011, at *2 (dismissing inmate's failure to protect claim for failure to demonstrate an actual injury).

FN8. To the extent that Newman contends that the attempted assaults caused him any mental or emotional injury, this claim must fail because "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e) (2003); *see also Thompson v. Carter,* 284 F.3d 411, 417 (2d Cir.2002) (holding that § 1997e(e) "applies to claims in which a plaintiff alleges constitutional violations so that the plaintiff cannot recover damages for mental or emotional injury for a constitutional violation in the absence of a showing of actual physical injury").

Therefore, in the alternative, it is recommended that

Not Reported in F.Supp.2d, 2007 WL 2847304 (N.D.N.Y.)
(Cite as: 2007 WL 2847304 (N.D.N.Y.))

defendants' motion on this ground be granted.

### D. Qualified Immunity

Defendants also contend that they are entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability insofar as their conduct does not violate clearly established constitutional law of which a reasonable person would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229 (N.D.N.Y.2002), *aff'd,* 80 Fed.Appx. 146 (2d Cir. Nov. 10, 2003). A court must first determine that if plaintiff's allegations are accepted as true, there would be a constitutional violation. Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230. Here, as discussed *supra,* accepting all of Newman's allegations as true, he has not shown that defendants violated his constitutional rights.

**\*6** Therefore, in the alternative, defendants' motion for summary judgment on this ground should be granted.

### E. Failure to Serve Defendant John Doe

Newman's complaint asserts a claim against John Doe, a defendant who has neither been identified nor served with the complaint. Rule 4(m) of the Federal Rules of Civil Procedure requires that service of process be effectuated within 120 days of the date of the filing of the complaint. *See also* N.D.N.Y.L.R. 4.1(b). Because defendant John Doe has not been identified by Newman or timely served with process, it is recommended that the complaint be dismissed without prejudice against this defendant.

### III. Conclusion[FN9]

FN9. Defendants also contend that Newman failed to demonstrate that they were personally involved in the alleged constitutional violations. *See* Defs. Mem. of Law at 11-14. However, it is recommended herein that defendants' motion

should be granted as to all of Newman's claims on other grounds. Thus, this argument need not be addressed.

For the reasons stated above, it is hereby

**RECOMMENDED** that:

1. Defendants' motion for summary judgment (Docket No. 36) be **GRANTED** as to defendants Duncan, Carpenter, VanGuilder, Mazzuca, Ercole, and Conklin and as to all of Newman's causes of action;

2. The complaint be **DISMISSED** without prejudice as to defendant John Doe; and

3. This action therefore be **TERMINATED** in its entirety as to all defendants and all claims.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2007.
Newman v. Duncan
Not Reported in F.Supp.2d, 2007 WL 2847304 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



245 F.Supp.2d 527

(Cite as: 245 F.Supp.2d 527)

United States District Court,

S.D. New York.
David ARNOLD, Plaintiff,
v.
C.O. A. GOETZ, Sgt. A. Montegari, and C.O. W. Kelly,
Defendants.
No. 01 Civ. 8993(WK).

Feb. 4, 2003.

State prison inmate sued prison and officials, claiming that he was beaten by prison correctional officers. Defendants moved to dismiss, for lack of subject matter jurisdiction and failure to state claim. The District Court, Whitman Knapp, Senior District Judge, held that: (1) inmate's failure to exhaust administrative remedies did not divest court of jurisdiction, and (2) motion to dismiss would be converted to motion for summary judgment, after officials supported claim that inmate did not exhaust administrative remedies by use of materials outside of pleadings.

Order accordingly.

West Headnotes

[1] Prisons 310 ☞ 318

310 Prisons

310II Prisoners and Inmates
310II(H) Proceedings
310k316 Exhaustion of Other Remedies
310k318 k. Particular Cases. Most Cited Cases
(Formerly 98k6)
Court would consider claim by state prison inmate, that he was beaten by correctional personnel, despite claim that exhaustion of administrative remedies was required under Prison Litigation Reform Act (PLRA) before court had jurisdiction. Civil Rights of Institutionalized Persons Act, § 7(a), as amended, 42 U.S.C.A. § 1997e(a).

[2] Prisons 310 ☞ 317

310 Prisons

310II Prisoners and Inmates
310II(H) Proceedings
310k316 Exhaustion of Other Remedies
310k317 k. In General. Most Cited Cases
(Formerly 98k6)
Prison Litigation Reform Act's (PLRA) exhaustion requirement is not jurisdictional in nature. Civil Rights of Institutionalized Persons Act, § 7(a), as amended, 42 U.S.C.A. § 1997e(a).

[3] Prisons 310 ☞ 317

310 Prisons

310II Prisoners and Inmates
310II(H) Proceedings
310k316 Exhaustion of Other Remedies
310k317 k. In General. Most Cited Cases
(Formerly 98k6)
When a defendant raises a prisoner's failure to comply with the Prison Litigation Reform Act's (PLRA) exhaustion requirement, the failure is properly assessed as an affirmative defense; for that reason, the defense may be waived by a defendant, or forfeited by failure to raise the defense. Civil Rights of Institutionalized Persons Act, § 7(a), as amended, 42 U.S.C.A. § 1997e(a).

[4] Administrative Law and Procedure 15A ☞ 229

15A Administrative Law and Procedure

15AIII Judicial Remedies Prior to or Pending Administrative Proceedings
15Ak229 k. Exhaustion of Administrative Remedies. Most Cited Cases
Statute requiring exhaustion of administrative remedies may be jurisdictional if it is more than a codified

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

245 F.Supp.2d 527

(Cite as: 245 F.Supp.2d 527)

requirement of administrative exhaustion and contains sweeping and direct statutory language that goes beyond a requirement that only exhausted actions be brought.

**[5] Federal Courts 170B** ☞ **246**

170B Federal Courts

    170BIII Federal Question Jurisdiction
        170BIII(D) Pleading
            170Bk246 k. Anticipation of Defense. Most Cited Cases

    District court's subject matter jurisdiction to entertain a suit based on a federal claim is not defeated by a defendant's assertion of a position that is properly characterized as an affirmative defense.

**[6] Federal Civil Procedure 170A** ☞ **2533.1**

170A Federal Civil Procedure

    170AXVII Judgment
        170AXVII(C) Summary Judgment
        170AXVII(C)3 Proceedings
            170Ak2533 Motion
                170Ak2533.1 k. In General. Most Cited Cases

    Motion to dismiss, for failure to state claim, made by prison officials sued by inmate allegedly beaten by corrections officers, would be converted into motion for summary judgment, after officials included with motion evidence, outside of pleadings, that inmate had not exhausted administrative remedies as required by Prison Litigation Reform Act (PLRA). Civil Rights of Institutionalized Persons Act, § 7(a), as amended, 42 U.S.C.A. § 1997e(a); Fed.Rules Civ.Proc.Rules 12(b)(6), 56, 28 U.S.C.A.

**[7] Federal Civil Procedure 170A** ☞ **657.5(2)**

170A Federal Civil Procedure

    170AVII Pleadings and Motions
        170AVII(A) Pleadings in General
        170Ak654 Construction
            170Ak657.5 Pro Se or Lay Pleadings
                170Ak657.5(2) k. Civil Rights

Proceedings in General. Most Cited Cases

    Where court is considering a motion to dismiss the claims of a litigant proceeding pro se, it must construe that litigant's pleadings liberally, especially when it is dealing with a complaint alleging civil rights violations. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[8] Prisons 310** ☞ **321**

310 Prisons

    310II Prisoners and Inmates
        310II(H) Proceedings
        310k316 Exhaustion of Other Remedies
            310k321 k. Evidence. Most Cited Cases
    (Formerly 98k6)

    Since the Prison Litigation Reform Act's (PLRA) exhaustion requirement is an affirmative defense, the defendants bear the burden of proving plaintiff's failure to comply with the exhaustion requirement. Civil Rights of Institutionalized Persons Act, § 7(a), as amended, 42 U.S.C.A. § 1997e(a).

**[9] Civil Rights 78** ☞ **1308**

78 Civil Rights

    78III Federal Remedies in General
        78k1306 Availability, Adequacy, Exclusivity, and Exhaustion of Other Remedies
            78k1308 k. Administrative Remedies in General. Most Cited Cases
    (Formerly 78k194)

    Ordinarily, plaintiffs pursuing civil rights claims under §1983 need not exhaust administrative remedies before filing suit in court. 42 U.S.C.A. § 1983.

**[10] Civil Rights 78** ☞ **1319**

78 Civil Rights

    78III Federal Remedies in General
        78k1314 Adequacy, Availability, and Exhaustion of State or Local Remedies
            78k1319 k. Criminal Law Enforcement; Prisons. Most Cited Cases
    (Formerly 78k209)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

245 F.Supp.2d 527

(Cite as: 245 F.Supp.2d 527)

Congress, in enacting the Prison Litigation Reform Act (PLRA), carved out an exception to the general rule that exhaustion of state remedies is not a prerequisite to filing suit under §1983. 42 U.S.C.A. § 1983; Civil Rights of Institutionalized Persons Act, § 7(a), as amended, 42 U.S.C.A. § 1997e(a).

**[11]** Prisons 310 ☞ 317

310 Prisons

    310II Prisoners and Inmates
      310II(H) Proceedings
        310k316 Exhaustion of Other Remedies
          310k317 k. In General. Most Cited Cases
(Formerly 98k6)
Prison Litigation Reform Act's (PLRA) exhaustion provision requires prisoner to exhaust all available remedies before bringing an action regarding prison conditions. Civil Rights of Institutionalized Persons Act, § 7(a), as amended, 42 U.S.C.A. § 1997e(a).

**[12]** Civil Rights 78 ☞ 1311

78 Civil Rights

    78III Federal Remedies in General
      78k1306 Availability, Adequacy, Exclusivity, and Exhaustion of Other Remedies
        78k1311 k. Criminal Law Enforcement; Prisons. Most Cited Cases
(Formerly 78k194)
Under Prison Litigation Reform Act's (PLRA) exhaustion provision, claims of every sort relating to conditions and occurrences of prison life-including individual claims of assault or excessive force-must be exhausted before an action can be commenced in district court pursuant to § 1983. 42 U.S.C.A. § 1983; Civil Rights of Institutionalized Persons Act, § 7(a), as amended, 42 U.S.C.A. § 1997e(a).

**[13]** Civil Rights 78 ☞ 1311

78 Civil Rights

    78III Federal Remedies in General
      78k1306 Availability, Adequacy, Exclusivity, and

Exhaustion of Other Remedies
        78k1311 k. Criminal Law Enforcement; Prisons. Most Cited Cases
(Formerly 78k194)
Inmate's civil rights action predicated on allegations of assault by prison guards was subject to Prison Litigation Reform Act's (PLRA) exhaustion requirement. 42 U.S.C.A. § 1983; Civil Rights of Institutionalized Persons Act, § 7(a), as amended, 42 U.S.C.A. § 1997e(a).

**[14]** Prisons 310 ☞ 317

310 Prisons

    310II Prisoners and Inmates
      310II(H) Proceedings
        310k316 Exhaustion of Other Remedies
          310k317 k. In General. Most Cited Cases
(Formerly 98k6)
Under certain circumstances, a correctional institution's failure to provide an inmate with sufficient information about the available grievance procedures may excuse his failure to exhaust administrative remedies, as required by Prison Litigation Reform Act (PLRA). Civil Rights of Institutionalized Persons Act, § 7(a), as amended, 42 U.S.C.A. § 1997e(a).

**[15]** Prisons 310 ☞ 317

310 Prisons

    310II Prisoners and Inmates
      310II(H) Proceedings
        310k316 Exhaustion of Other Remedies
          310k317 k. In General. Most Cited Cases
(Formerly 98k6)
Correctional officials are entitled to the benefit of Prison Litigation Reform Act's (PLRA) exhaustion requirement as long as the institution has made a reasonable, good faith effort to make the grievance procedure available to inmates; an inmate may not close his eyes to what he reasonably should have known. Civil Rights of Institutionalized Persons Act, § 7(a), as amended, 42 U.S.C.A. § 1997e(a).

**[16]** Prisons 310 ☞ 313

245 F.Supp.2d 527

(Cite as: 245 F.Supp.2d 527)

310 Prisons

　　310II Prisoners and Inmates
　　　　310II(H) Proceedings
　　　　　　310k307 Actions and Litigation
　　　　　　　　310k313 k. Trial. Most Cited Cases
　　(Formerly 98k6)
　　When an inmate claims ignorance of the grievance procedure, it becomes a question of fact whether the grievance procedure was an available administrative remedy he was required to exhaust under Prison Litigation Reform Act (PLRA). Civil Rights of Institutionalized Persons Act, § 7(a), as amended, 42 U.S.C.A. § 1997e(a).

**[17]** Federal Civil Procedure 170A ☞ 1832

170A Federal Civil Procedure

　　170AXI Dismissal
　　　　170AXI(B) Involuntary Dismissal
　　　　　　170AXI(B)5 Proceedings
　　　　　　　　170Ak1827 Determination
　　　　　　　　　　170Ak1832 k. Matters Considered in General. Most Cited Cases
　　Rule governing motions to dismiss for failure to state a claim does not give the district court authority to consider matters outside the pleadings; it simply delineates the procedures which must be followed in testing the legal sufficiency of a complaint. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[18]** Federal Civil Procedure 170A ☞ 1832

170A Federal Civil Procedure

　　170AXI Dismissal
　　　　170AXI(B) Involuntary Dismissal
　　　　　　170AXI(B)5 Proceedings
　　　　　　　　170Ak1827 Determination
　　　　　　　　　　170Ak1832 k. Matters Considered in General. Most Cited Cases
Federal Civil Procedure 170A ☞ 2533.1

170A Federal Civil Procedure

　　170AXVII Judgment
　　　　170AXVII(C) Summary Judgment

　　　　　　170AXVII(C)3 Proceedings
　　　　　　　　170Ak2533 Motion
　　　　　　　　　　170Ak2533.1 k. In General. Most Cited Cases
　　When a District Court is provided with materials outside the pleadings in the context of a motion to dismiss for failure to state a claim, it has two options: the court may exclude the additional materials and decide the motion on the complaint alone or convert the motion to one for summary judgment. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[19]** Federal Civil Procedure 170A ☞ 2533.1

170A Federal Civil Procedure

　　170AXVII Judgment
　　　　170AXVII(C) Summary Judgment
　　　　　　170AXVII(C)3 Proceedings
　　　　　　　　170Ak2533 Motion
　　　　　　　　　　170Ak2533.1 k. In General. Most Cited Cases
　　Where a court converts the motion to dismiss to one for summary judgment, a non-moving party who is proceeding pro se must be advised that all assertions of material fact in the defendants' affidavits and other papers in support of their motion will be taken as true unless the pro se litigant contradicts those factual assertions in one or more affidavits made on personal knowledge containing facts that would be admissible in evidence, or by submitting other materials as provided in summary judgment rule. Fed.Rules Civ.Proc.Rule 56(e), 28 U.S.C.A.

**\*530** David Arnold, Green Haven Correctional Facility, Drawer B, Stormville, NY, for Plaintiff, pro se.

Rebecca Ann Durden, Assistant Attorney General, Office of the Attorney General of the State of New York, New York, NY, for Defendants.

### *OPINION & ORDER*

WHITMAN KNAPP, Senior District Judge.
　　Plaintiff David Arnold ("Arnold" or the "plaintiff") is an inmate at the Green Haven Correctional Facility. Arnold, proceeding *pro se,* brought this action pursuant to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

245 F.Supp.2d 527

(Cite as: 245 F.Supp.2d 527)

42 U.S.C. § 1983 in order to recover damages for an alleged assault he suffered at the hands of Correctional Officer A. Goetz, Correctional Officer W. Kelly, and Sergeant A. Montegari (collectively the "defendants"). The defendants argue that Arnold failed to exhaust his administrative remedies and thereby failed to satisfy the exhaustion requirement imposed by the Prison Litigation Reform Act of 1995, Pub.L. No. 104-134, Title VIII, § 803(d), 110 Stat. 1321-71 (1996) (codified as amended at 42 U.S.C. § 1997e(a))("PLRA"). As such, they now move to dismiss Arnold's action pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

## BACKGROUND

Arnold is an inmate at the Green Haven Correctional Facility. (Am. Compl. at 2.) On June 22, 2001, Correctional Officer A. Goetz ("Goetz") ordered Arnold "to lock in." (Am. Compl. at 3.) Thereafter, Goetz allegedly entered Arnold's cell, grabbed him by the neck, and told Arnold that he would have "to learn to respect him." (Am. Compl. at 4.) When Goetz then purportedly pushed Arnold's face towards Goetz's crotch and told the plaintiff to "suck his penis," Arnold refused and began to struggle with him. *Id.* Goetz allegedly responded by beating the plaintiff. *Id.* He then led Arnold out of his cell and purportedly threw him to the floor in such a manner that the plaintiff struck his head. *Id.*

At this stage, another correctional officer escorted Arnold down some stairs. *Id.* While the plaintiff stood facing a wall in handcuffs, Correctional Officer W. Kelly ("Kelly") and Sergeant A. Montegari ("Montegari") came by to question Arnold regarding his assault against a staff member. (Am. Compl. at 5.) Before the plaintiff had a chance to answer their questions, Montegari and Kelly allegedly began to beat him. *Id.*

In light of the purported injuries he sustained from these assaults, the plaintiff brought this action against Goetz, Kelly, and Montegari pursuant to 42 U.S.C. § 1983. After filing his initial Complaint in 2001, he later filed an Amended Complaint in January 2002. In his Amended Complaint, the plaintiff indicated that a grievance procedure existed at the Green Haven Correctional Facility. (*See* Am. **\*531** Compl. at 2.) He also indicated that he had never presented the facts related to the assaults to correctional officials by way of that

procedure. *See id.* In responding to a question on the form complaint which inquired about why the plaintiff failed to follow the grievance procedure, he simply stated: "Because I did not know what to do." (Am. Compl. at 3.)

Shortly after the plaintiff filed his Amended Complaint, the defendants moved to dismiss this action. They contend that the action must be dismissed because the plaintiff failed to exhaust his administrative remedies in satisfaction of the PLRA's exhaustion requirement. When the plaintiff failed to respond to that motion over the ensuing months, we issued an order affording him one more opportunity to submit such a response. *See Arnold v. Goetz* (S.D.N.Y. Dec. 17, 2002) No. 01 Civ. 8993(WK), 2002 U.S. Dist. LEXIS 24224, at \*1-\*2. We directed Arnold to submit an opposition brief, if he so chose, by January 17, 2003. *Id.* at \*2. As part of that directive, we also allowed Arnold to explain "what he meant when he indicated in his Amended Complaint that he 'did not know what to do' with respect to submitting a grievance" even though he apparently knew that a grievance program existed at Green Haven. *Id.* To date, Arnold has not submitted an opposition brief and has offered no explanation regarding his statements in the Amended Complaint.

## DISCUSSION

## I. Motion To Dismiss For Lack Of Subject Matter Jurisdiction

[1] The defendants move this Court to dismiss the plaintiff's action pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. In other words, they contend that we lack subject matter jurisdiction to entertain this lawsuit and that the plaintiff has failed to state a claim upon which relief can be granted. *See* Fed.R.Civ.P. 12(b)(1); Fed.R.Civ.P. 12(b)(6). Where, as here, the defendants have moved for dismissal under Rule 12(b)(1) as well as on other grounds, we must initially consider their Rule 12(b)(1) challenge since all other objections and defenses would become moot and need not be addressed if we first dismiss the action for lack of subject matter jurisdiction. *See United States ex rel. Kreindler & Kreindler v. United Techs. Corp.* (2d Cir.) 985 F.2d 1148, 1155-1156, *cert. denied* (1993) 508 U.S. 973, 113 S.Ct. 2962, 125 L.Ed.2d 663; *Rhulen Agency, Inc. v. Alabama Ins. Guar. Ass'n* (2d Cir.1990) 896 F.2d 674,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

245 F.Supp.2d 527

(Cite as: 245 F.Supp.2d 527)

678.

[2] Federal Rule of Civil Procedure 12(b)(1) provides for the dismissal of a complaint when the court "lacks jurisdiction over the subject matter." Fed.R.Civ.P. 12(b)(1). However, the PLRA's exhaustion requirement is not jurisdictional in nature. *Graham v. Perez* (S.D.N.Y.2000) 121 F.Supp.2d 317, 322. *See also Handberry v. Thompson* (S.D.N.Y. Jan. 28, 2003) No. 96 Civ. 6161(CBM), 2003 WL 194205, at *3 ("the PLRA exhaustion requirement is not jurisdictional"); *Mendoza v. Goord* (S.D.N.Y. Nov. 21, 2002) No. 00 Civ. 0146 (GEL), 2002 WL 31654855, at *2 n. 3 (" § 1997e(a)'s exhaustion requirement is not jurisdictional"); *Rodriguez v. Ghoslaw* (S.D.N.Y. June 28, 2002) No. 98 Civ. 4658(GEL), 2002 WL 1424586, at *2 ("Failure to exhaust is not a jurisdictional matter"); *Cuoco v. U.S. Bureau of Prisons* (S.D.N.Y. Mar. 31, 2000) No. 98 Civ. 9009(WHP), 2000 WL 347155, at *8 ("Exhaustion of administrative remedies under the PLRA is not jurisdictional"); *Santiago v. Meinsen* (S.D.N.Y.2000) 89 F.Supp.2d 435, 441 ("the exhaustion requirement of the PLRA is not jurisdictional"); *Howard v. Headly* (E.D.N.Y.1999) 72 F.Supp.2d 118, 122-123 ("[T]he Fifth, Sixth, Seventh, **532** and Ninth Circuits have held that the administrative exhaustion provision of 42 U.S.C. § 1997e(a) is not a jurisdictional requirement ... It is assumed that the Second Circuit will concur, as the Court does, ... and hold, as have all those circuits courts which have considered the issue, that the statute does not preclude subject matter jurisdiction."); *Hayes v. N.Y.S. D.O.C. Officers* (S.D.N.Y. Dec. 28, 1998) No. 97 Civ. 7383(MBM), 1998 WL 901730, at *7 n. 4 (internal citations omitted) ("[T]he vast majority of courts to have considered the issue have concluded that exhaustion under the PLRA is not a jurisdictional prerequisite. In light of § 1997e(c)(2), these courts are plainly correct.").

[3] Rather, "[w]hen a defendant raises a prisoner's failure to comply with the PLRA's exhaustion requirement, the failure is properly assessed as an affirmative defense." *Gonzalez v. Officer in Charge of Barber Shop on Duty on May 13, 1999* (S.D.N.Y. Mar. 13, 2000) No. 99 Civ. 3455(DLC), 2000 WL 274184, at *3. *See also Acosta v. Artuz* (2d Cir.2000) 221 F.3d 117, 121 (referring to the failure to exhaust administrative remedies in compliance with the PLRA as an affirmative defense); *Jenkins v.*

*Haubert* (2d Cir.1999) 179 F.3d 19, 28-29 ("Because, under the PLRA, a prisoner must exhaust administrative remedies before filing a § 1983 suit ..., a defendant in a prisoner § 1983 suit may also assert as an affirmative defense the plaintiff's failure to comply with the PLRA's requirements."); *Reyes v. Punzal* (W.D.N.Y.2002) 206 F.Supp.2d 431, 433 ("in the Second Circuit, failure to comply with the PLRA's exhaustion requirement is viewed as an affirmative defense"); *John v. N.Y.C. Dep't of Corr.* (S.D.N.Y.2002) 183 F.Supp.2d 619, 624 ("Failure to comply with the exhaustion requirement is an affirmative defense."); *Hallett v. New York State Dep't of Corr. Servs.* (S.D.N.Y.2000) 109 F.Supp.2d 190, 196 ("[I]n the Second Circuit, failure to comply with the PLRA's exhaustion requirement is viewed as an affirmative defense."); *Cuoco,* 2000 WL 347155, at *8 ("Exhaustion of administrative remedies under the PLRA ... is an affirmative defense."); *Howard v. Goord* (E.D.N.Y. Dec. 28, 1999) No. 98-CV-7471 (FB), 1999 WL 1288679, at *2 ("When a defendant raises a prisoner/plaintiff's failure to comply with the PLRA's exhaustion requirement, the failure is properly assessed as an affirmative defense."). For that reason, the defense "may be waived by a defendant, or forfeited by failure to raise the defense." *Rodriguez,* 2002 WL 1424586, at *2. *See also Perez v. Wisconsin Dep't of Corr.* (7th Cir.1999) 182 F.3d 532, 536 ("Defendants may waive or forfeit reliance on § 1997e(a), just as they may waive or forfeit the benefit of a statute of limitations."); *Graham,* 121 F.Supp.2d at 322 ("[T]he exhaustion requirement of the PLRA ... may be waived in appropriate circumstances."). *Cf. Davis v. New York* (2d Cir.2002) 316 F.3d 93, 101 (remanding case to district court to consider whether defendants waived compliance with the PLRA's exhaustion requirement by failing to raise the issue).

Although many courts agree that the PLRA's exhaustion requirement is not a jurisdictional prerequisite, we are cognizant that this view is not universally held in our district. A split exists among our fellow courts with respect to this issue. *See Handberry,* 2003 WL 194205, at *3; *Law v. Bergamini* (N.D.N.Y. Dec. 19, 2002) No. 01-CV-463 (LEK/DEP), 2002 U.S. Dist. LEXIS 25434, at *8 n. 3, *approved* (N.D.N.Y. Jan. 14, 2003) 2003 U.S. Dist. LEXIS 487, at *4-*5. Certain courts in this district have dismissed an inmate's § 1983 action for lack of subject matter jurisdiction in accordance with **533** Rule

245 F.Supp.2d 527

(Cite as: 245 F.Supp.2d 527)

12(b)(1) where they determined that the inmate failed to exhaust his administrative remedies. *See Harris v. Totten* (S.D.N.Y. Jan 31, 2003) No. 01 Civ. 5214 (SHS), 2003 WL 221745, at *1, *4; *Paulino v. Amicucci* (S.D.N.Y. Jan. 27, 2003) No. 02 Civ. 208 (LAP), 2003 WL 174303, at *2-*3; *Timmons v. Pereiro* (S.D.N.Y. Jan. 27, 2003) No. 00 Civ. 1278 (LAP), 2003 WL 179769, at *1-*2; *Cherry v. Edwards* (S.D.N.Y. Nov. 20, 2002) No. 01 Civ. 7886 (AGS), 2002 WL 31619038, at *1-*2; *Meehan v. Frazier* (S.D.N.Y. Oct. 27, 2002) No. 01 Civ. 9591(KMW)(KNF), 2002 U.S. Dist. LEXIS 20604, at *11; *Benitez v. Straley* (S.D.N.Y. Sept. 18, 2002) No. 01 Civ. 0181(RCC) (RLE), 2002 WL 31093608, at *2-*3; *Hines v. Valhalla County Corr. Facility* (S.D.N.Y. Aug. 8, 2002) No. 0C Civ. 6935 (SAS), 2002 WL 1822740, at *1, *4; *Monsalve v. Parks* (S.D.N.Y. June 21, 2002) No. 01 Civ. 6010 (LMM), 2002 WL 1359725, at *3; *Long v. Lafko* (S.D.N.Y. July 31, 2001) No. 00 Civ. 723 (VM), 2001 WL 863422, at *2; *Hernandez v. Greiner* (S.D.N.Y. May 1, 2000) No. 99 Civ. 4601 (NRB), 2000 WL 520639, at *2; *Williams v. Muller* (S.D.N.Y. April 25, 2000) No. 98 Civ. 5204 (BSJ), 2000 WL 487954, at *3. *Cf. Johnson v. Bendheim* (S.D.N.Y. July 13, 2001) No. 00 Civ. 720 (JSR), 2001 WL 799569, at *4; *Rodriguez v. Goord* (S.D.N.Y. Dec. 1, 2000) No. 99 Civ. 11665 (VM), 2000 WL 1773513, at *1-*2; *Lombardo v. Goord* (S.D.N.Y. July 26, 2000) No. 99 Civ. 1676(NRB)(KNF), 2000 U.S. Dist. LEXIS 10476, at *6-*7.

We respectfully disagree with the primary premise underlying these decisions, namely that the PLRA's exhaustion requirement implicates a court's subject matter jurisdiction. *See, e.g., Long, 2001 WL 863422, at *1.* Although the Second Circuit has yet to rule on this question, every circuit court to have considered the issue has concluded that an inmate's failure to comply with § 1997e(a) does not deprive federal courts of jurisdiction. *See Casanova v. Dubois* (1st Cir.2002) 289 F.3d 142, 146; *Ali v. District of Columbia* (D.C.Cir.2002) 278 F.3d 1, 5-6; *Foulk v. Charrier* (8th Cir.2001) 262 F.3d 687, 697 (citing *Chelette v. Harris* (8th Cir.2000) 229 F.3d 684, 686-688, *cert. denied* (2001) 531 U.S. 1156, 121 S.Ct. 1106, 148 L.Ed.2d 977); *Nyhuis v. Reno* (3d Cir.2000) 204 F.3d 65, 69 n. 4; *Wyatt v. Leonard* (6th Cir.1999) 193 F.3d 876, 879; *Rumbles v. Hill* (9th Cir.1999) 182 F.3d 1064, 1068, *cert. denied* (2000) 528 U.S. 1074, 120 S.Ct.

787, 145 L.Ed.2d 664; *Perez, 182 F.3d at 535*; *Dickey v. Kennard* (10th Cir. Sept. 2, 1998) No. 97-4206, 156 F.3d 1243, 1998 WL 568026, at *1 (unpublished table decision); *Underwood v. Wilson* (5th Cir.1998) 151 F.3d 292, 295, *cert. denied* (1999) 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012.

[4] Many of these circuit courts arrived at this conclusion for two reasons. As the Fifth Circuit explained, "[a] statute requiring exhaustion of administrative remedies may be jurisdictional if it is 'more than a codified requirement of administrative exhaustion' and contains 'sweeping and direct' statutory language that goes beyond a requirement that only exhausted actions be brought." *Underwood, 151 F.3d at 294* (quoting *Weinberger v. Salfi* (1975) 422 U.S. 749, 757, 95 S.Ct. 2457, 45 L.Ed.2d 522). However, " '[section] 1997e(a) contains no such sweeping and direct language barring federal jurisdiction under 28 U.S.C. § 1331.' " *Rumbles, 182 F.3d at 1067* (quoting *Underwood, 151 F.3d at 294). See also Ali, 278 F.3d at 5-6; Chelette, 229 F.3d at 688.*

Other provisions of the PLRA, such as 42 U.S.C. § 1997e(c)(2), also counsel against construing the PLRA's exhaustion requirement as a jurisdictional prerequisite. Section 1997e(c)(2) allows a district **534 court to dismiss a prisoner's claims for a number of specific reasons without first requiring the exhaustion of administrative remedies. *Rumbles, 182 F.3d at 1068* (citing 42 U.S.C. § 1997e(c)(2)). "The court would not be empowered to do so if the exhaustion provision deprived the court of jurisdiction over the action." *Underwood, 151 F.3d at 295. See also Chelette, 229 F.3d at 687; Nyhuis, 204 F.3d at 69 n. 4; Hayes, 1998 WL 901730, at *7 n. 4.*

[5] These persuasive rationales are "irresistible and manifestly correct." *Handberry, 2003 WL 194205, at *3.* We therefore join the chorus of voices concluding that an inmate's failure to exhaust administrative remedies in accordance with the PLRA does not divest federal courts of jurisdiction. The Second Circuit is unlikely to reach a contrary determination given the court's decision in *Jenkins, 179 F.3d at 28-29*, which characterized the PLRA's exhaustion requirement as an affirmative defense. *See Handberry, 2003 WL 194205, at *3* ("The Second Circuit's ... cases are inconsistent with the position that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

245 F.Supp.2d 527

(Cite as: 245 F.Supp.2d 527)

exhaustion is jurisdictional ..."). As the Second Circuit recently explained, a "district court's subject matter jurisdiction to entertain a suit based on a federal claim ... is not defeated by a defendant's assertion of a position that is properly characterized as an affirmative defense." *In re Stock Exchs. Options Trading Antitrust Litig.* (2d Cir.2003) 317 F.3d 134, 150-51. Since the PLRA's exhaustion requirement is an affirmative defense and not a jurisdictional prerequisite, dismissing an inmate's action for lack of subject matter jurisdiction where he failed to exhaust his administrative remedies would be inappropriate. As such, to the extent that the motion at bar is brought pursuant to Rule 12(b)(1), it is denied.

## II. Motion To Dismiss For Failure To State A Claim Upon Which Relief Can Be Granted

[6][7] In addition to their Rule 12(b)(1) challenge, the defendants also contend that the plaintiff's action must be dismissed pursuant to Rule 12(b)(6). Rule 12(b)(6) provides for the dismissal of a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). Under that rule, the Court "must accept all factual allegations in the complaint as true and draw inferences from those allegations in the light most favorable to the plaintiff." *Jaghory v. New York State Dep't of Educ.* (2d Cir.1997) 131 F.3d 326, 329. Dismissal of a complaint pursuant to Rule 12(b)(6) is proper " 'only where it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim that would entitle him to relief.' " *Scotto v. Almenas* (2d Cir.1998) 143 F.3d 105, 109-110 (quoting *Branham v. Meachum* (2d Cir.1996) 77 F.3d 626, 628 (citation omitted)). Furthermore, where, as here, we are considering a motion to dismiss the claims of a litigant proceeding *pro se,* we must construe that litigant's pleadings liberally, especially when we are dealing with a complaint alleging civil rights violations. *Weinstein v. Albright* (2d Cir.2001) 261 F.3d 127, 132. See also *Flaherty v. Lang* (2d Cir.1999) 199 F.3d 607, 612.

[8] The defendants argue that the plaintiff's action must be dismissed because he failed to exhaust his administrative remedies. Since the PLRA's exhaustion requirement is an affirmative defense, the defendants "bear [ ] the burden of proving plaintiff's failure to comply with the exhaustion requirement." *Reyes,* 206 F.Supp.2d at 433. *See also Borges v. Adm'r for Strong Mem'l Hosp.*

(W.D.N.Y. Sept. 30, 2002) No. 99-CV-6351 (FE), 2002 WL 31194558, at *3; *535Hallett,* 109 F.Supp.2d at 196; *Gonzalez,* 2000 WL 274184, at *3; *Howard v. Goord* (E.D.N.Y. Dec. 28, 1999) No. 98-CV-7471 (FB), 1999 WL 1288679, at *3.

[9][10] "Ordinarily, plaintiffs pursuing civil rights claims under 42 U.S.C. § 1983 need not exhaust administrative remedies before filing suit in court. Prisoner suits alleging constitutional deprivations while incarcerated once fell within this general rule." *Porter v. Nussle* (2002) 534 U.S. 516, 523, 122 S.Ct. 983, 152 L.Ed.2d 12 (internal citations omitted). "Congress, in enacting the Prison Litigation Reform Act of 1995[ ], Pub.L. No. 104-134, Title VIII, 110 Stat. 1321-66 (1996), carved out an exception to the general rule that exhaustion of state remedies is not a prerequisite to filing suit under 42 U.S.C. § 1983." *Neal v. Goord* (2d Cir.2001) 267 F.3d 116, 119.

[11] The PLRA amended 42 U.S.C. § 1997e(a) so that it now provides:

No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a). *See also Neal,* 267 F.3d at 119. "Under this provision, exhaustion of administrative remedies is now mandatory for Section 1983 actions regarding prison conditions." *Edney v. Karrigan* (S.D.N.Y.1999) 69 F.Supp.2d 540, 543. *See also Porter,* 534 U.S. at 524, 122 S.Ct. 983 ("Once within the discretion of the district court, exhaustion in cases covered by § 1997e(a) is now mandatory.") [FN1] In other words, "[a] prisoner must exhaust all available remedies before bringing an action regarding prison conditions." *Graham,* 121 F.Supp.2d at 321; *Santiago,* 89 F.Supp.2d at 438.

FN1. Congress introduced an exhaustion prescription for suits initiated by state prisoners even before the enactment of the PLRA. *See Porter,* 534 U.S. at 523, 122 S.Ct. 983 (citing the Civil Rights of Institutionalized Persons Act,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

245 F.Supp.2d 527

(Cite as: 245 F.Supp.2d 527)

Pub.L. No. 96-247, § 7, 94 Stat. 352 (1980)) (codified as amended at 42 U.S.C. § 1997e (1994 ed.)). That measure imposed a limited exhaustion requirement for a claim brought by a state prisoner under § 1983. *See McCarthy v. Madigan* (1992) 503 U.S. 140, 150, 112 S.Ct. 1081, 117 L.Ed.2d 291. "Exhaustion under the 1980 prescription was in large part discretionary; it could be ordered only if the State's prison grievance system met specified federal standards, and even then, only if, in the particular case, the court believed the requirement 'appropriate and in the interests of justice.' " *Porter,* 534 U.S. at 523, 122 S.Ct. 983 (citations omitted). The PLRA invigorated the exhaustion prescription, *id.* at 524, 122 S.Ct. 983, and removed court discretion in this area by making exhaustion mandatory in prisoner litigation. *Salahuddin v. Mead* (2d Cir.1999) 174 F.3d 271, 274 n. 1.

[12] The Supreme Court recently clarified that the "PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter,* 534 U.S. at 532, 122 S.Ct. 983. Hence, "claims of every sort relating to conditions and occurrences of prison life-including individual claims of assault or excessive force-must be exhausted before an action can be commenced in this Court pursuant to 42 U.S.C. § 1983." *Dixon v. Goord* (S.D.N.Y.2002) 224 F.Supp.2d 739, 750.

FN2. Before the Supreme Court arrived at its decision in *Porter v. Nussle,* the Second Circuit had concluded "that exhaustion of administrative remedies [was] not required for claims of assault or excessive force brought under § 1983." *Nussle v. Willette* (2d Cir.2000) 224 F.3d 95, 106, *rev'd,* (2002) *Porter,* 534 U.S. at 532, 122 S.Ct. 983. Although Arnold brought his § 1983 action for assault before the Supreme Court announced its decision in *Porter,* " 'the broad exhaustion requirement announced in [*Porter* ] applies with full force' to a litigant ... who brought suit prior to the date of its decision." *Mack v. Artuz* (S.D.N.Y. Dec. 19, 2002) 01 Civ.

11832(JSR)(GWG), 2002 WL 31845087, at *3 n. 2 (quoting *Espinal v. Goord* (S.D.N.Y.July 17, 2002) 01 Civ. 6569 (NRB), 2002 WL 1585549, at *2 n. 3). *See generally Harper v. Virginia Dep't of Taxation* (1993) 509 U.S. 86, 97, 113 S.Ct. 2510, 125 L.Ed.2d 74 ("When [the Supreme] Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate [the] announcement of the rule.")

**536 [13] The plaintiff's § 1983 action, predicated on allegations of assault, falls within the ambit of § 1997e(a). As such, the plaintiff is subject to the exhaustion requirement imposed by the PLRA and cannot proceed with this lawsuit unless he exhausted the available administrative remedies. "Where an inmate fails to satisfy the PLRA's exhaustion requirement[ ] prior to filing his complaint, the court must dismiss the complaint and require the plaintiff to exhaust his remedies before refiling." *Burns v. Moore* (S.D.N.Y. Jan. 24, 2002) No. 99 Civ. 0966(LMM) (THK), 2002 WL 91607, at *3. *See also Boston v. Takos* (W.D.N.Y. Oct. 4, 2002) No. 98-CV-6404 (CJS), 2002 WL 31663510, at *3; *Laureano v. Pataki* (S.D.N.Y. Sept. 29, 2000) No. 99 Civ. 10667 (LAP), 2000 WL 1458807, at *1. However, "the failure to exhaust is not a ground for dismissal unless it is readily apparent from [the] plaintiff's pleadings and/or attachments." *Torrence v. Pesanti* (D.Conn.2003) 239 F.Supp.2d 230, 233.

New York provides an elaborate administrative grievance process for prisoners in New York State correctional facilities such as Green Haven. *See Cruz v. Jordan* (S.D.N.Y.1999) 80 F.Supp.2d 109, 117. *See also* N.Y. Correct. Law § 139; 7 N.Y. Comp.Codes R. & Regs.tit. 7, § 701.1 *et seq.* This process, known as the Inmate Grievance Program ("IGP"), offers inmates several methods to resolve their grievances. *Heath v. Saddlemire* (N.D.N.Y. Oct. 7, 2002) No. 96-CV-1998 (FJS/RF), 2002 WL 31242204, at *4. The IGP sets forth both a formal procedure for all grievances as well as a less elaborate procedure for complaints about "harassment." *See* 7 N.Y.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

245 F.Supp.2d 527

(Cite as: 245 F.Supp.2d 527)

Comp.Codes R. & Regs. tit. 7, §§ 701 .7, 701.11.[FN3] *See also Gadson v. Goord* (N.D.N.Y. May 10, 2002) No. 98-CV-1224 (HGM/DEP), 2002 WL 982393, at *2. The latter procedure allows an inmate to pursue an expedited grievance regarding an assault he suffered at the hands of correctional officers. *Perez v. Blot* (S.D.N.Y.2002) 195 F.Supp.2d 539, 542-543. *See also Morris v. Eversley* (S.D.N.Y.2002) 205 F.Supp.2d 234, 240. Inmates may also comply with the IGP by resolving their grievances through informal channels. *See Marvin v. Goord* (2d Cir.2001) 255 F.3d 40, 43 n. 3 (citing 7 N.Y. Comp.Codes R. & Regs.tit. 7, § 701.1) ("Resolution of the matter through informal channels satisfies the exhaustion requirement, as, under the administrative scheme applicable to New York prisoners, grieving through informal channels is an available remedy.") *See also Heath,* 2002 WL 31242204, at *4-*5; *Gadson,* 2002 WL 982393, at *3; *Perez,* 195 F.Supp.2d at 545-546.

> FN3. In *Cruz,* Judge Hellerstein described the Inmate Grievance Program in exacting detail. *See Cruz,* 80 F.Supp.2d at 117-118. We need not elaborate on his extensive discussion.

According to the plaintiff's Amended Complaint, he never presented the allegations at issue in this lawsuit to the correctional authorities by way of the IGP, even though he appears to have been aware that **\*537** a grievance procedure existed at Green Haven. (*See* Am. Compl. at 2.) The plaintiff apparently failed to follow the grievance procedure "[b]ecause [he] did not know what to do." (Am. Compl. at 3.)

[14] Under certain circumstances, a correctional institution's failure to provide an inmate with sufficient information about the available grievance procedures may excuse his failure to exhaust administrative remedies. *Hall v. Sheahan* (N.D.Ill. Feb. 2, 2001) No.2000 C 1649, 2001 WL 111019, at *1. As the court in *Hall* aptly explained, "an institution cannot keep inmates in ignorance of the grievance procedure and then fault them for not using it. A grievance procedure which is not made known to inmates is not an 'available' administrative remedy." *Id.* at *2 (citing *Johnson v. Garraghty* (E.D.Va.1999) 57 F.Supp.2d 321, 329).

This is a common sense approach to a situation where correctional authorities obstruct an inmate's ability to comply with the exhaustion requirement when they provide him with a grievance procedure but fail to supply him with the materials by which he can secure information about how to avail himself of that process. The approach is derivative of the general principle that an inmate's technical failure to exhaust administrative remedies before commencing a § 1983 action may be excused where officials prevented him from utilizing a grievance procedure. *See Johnson,* 57 F.Supp.2d at 329. *See also Miller v. Norris* (8th Cir.2001) 247 F.3d 736, 740 ("a remedy that prison officials prevent a prisoner from 'utiliz[ing]' is not an 'available' remedy under § 1997e(a)"); *Thomas v. New York State Dep't of Corr. Servs.* (S.D.N.Y. Sept. 30, 2002) No. 00 Civ. 7163(NRB), 2002 WL 31164546, at *3 ("[W]here a prisoner has made a 'reasonable attempt' to file a grievance, and prison officials have prevented the prisoner from filing that grievance, the grievance procedure is not 'available' to the [inmate], and thus the [PLRA] does not preclude the prisoner from suing in federal court."); *O'Connor v. Featherston* (S.D.N.Y. April 29, 2002) No. 01 Civ. 3251(HB), 2002 WL 818085, at *2 (citations omitted) ("[S]everal courts have held that an inmate may nonetheless defeat a motion to dismiss even when the requirements of administrative remedies have not technically been exhausted where ... an inmate makes a 'reasonable attempt' to exhaust his administrative remedies, especially where it is alleged that corrections officers failed to file the inmate's grievances or otherwise impeded or prevented his efforts ..."); *Gonzalez,* 2000 WL 274184, at *3 (refusing to dismiss inmate's § 1983 action where he alleged that the plaintiff attempted to file grievances but was frustrated in these efforts by prison officials). *Cf. Davis v. Milwaukee County* (E.D.Wis.2002) 225 F.Supp.2d 967, 976 (absence of materials about the grievance procedure at the jail prevented the inmate from knowing how to exhaust his administrative remedies and thereby interfered with his access to the courts). In essence, prison officials cannot have it both ways-they cannot obstruct an inmate's pursuit of administrative exhaustion on the one hand and then claim the inmate did not properly exhaust these remedies on the other. *See Gadson,* 2002 WL 982393, at *3.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

245 F.Supp.2d 527

(Cite as: 245 F.Supp.2d 527)

[15][16] Nonetheless, "correctional officials are entitled to the benefit of § 1997e(a) as long as the institution has made a reasonable, good faith effort to make the grievance procedure available to inmates; an inmate may not close his eyes to what he reasonably should have known." *Hall,* 2001 WL 111019, at *2. *Cf. Langford v. Couch* (E.D.Va.1999) 50 F.Supp.2d 544, 550-551 ("Absent any allegations or evidence that he was prevented **538 from complying with ... grievance procedures, plaintiff cannot avoid or evade § 1997e(a)'s exhaustion requirement."). However, when an inmate claims ignorance of the grievance procedure, "it becomes a question of fact whether the grievance procedure was an available administrative remedy he was required to exhaust." *Hall,* 2001 WL 111019, at *1.

Here, the plaintiff was not wholly ignorant of Green Haven's grievance program. His statements in the Amended Complaint suggest an awareness of a grievance procedure at Green Haven. (*See* Am. Compl. at 2.) However, the plaintiff contends that he did not know how to follow that procedure. From the face of his Amended Complaint, we cannot tell whether the plaintiff did not know how to follow that procedure (a) because he failed to take any steps to learn about the procedure or (b) because Green Haven officials failed to provide him with access to materials which might otherwise have informed him about how he could avail himself of that remedy. If the latter proposition is true, then the principles articulated in *Hall* apply with full force. An institution keeps an inmate ignorant of the grievance procedure when correctional officials either fail to inform him of the procedure altogether or fail to provide him with access to materials which could otherwise educate him about the use of that process. *Cf. Hall,* 2001 WL 111019, at *2 ("To be entitled to judgment on [the] grounds of non-exhaustion, defendants would need to establish that the grievance procedure was posted in such a manner that [the plaintiff] could reasonably be expected to see it, or that Jail employees explained the procedure to him."). A prisoner who is told that the Inmate Grievance Program exists, but whose efforts to learn how he can avail himself of the IGP are frustrated by correctional officials, is only marginally less ignorant of the grievance procedure than an inmate wholly unaware of the program. Neither inmate, in effect, has recourse to an available administrative remedy.

In an attempt to clarify the statements he made in his Amended Complaint, we afforded the plaintiff an opportunity to explain what he meant when he indicated that he did not know how to follow the grievance procedure. *See Arnold,* 2002 U.S. Dist. LEXIS 24224, at *2. To date, the plaintiff has offered no such explanation. Nevertheless, his failure to do so does not mean that we must now mechanically dismiss his complaint without further consideration. Rather, we must "make reasonable allowances so that a *pro se* plaintiff does not forfeit rights by virtue of his or her lack of legal training." *Springs v. Clement* (E.D.N.Y.2001) 202 F.R.D. 387, 392 (citing *Traguth v. Zuck* (2d Cir.1983) 710 F.2d 90, 95). Indeed, "we read the pleadings of a *pro se* plaintiff liberally and interpret them 'to raise the strongest arguments that they suggest.' " *McPherson v. Coombe* (2d Cir.1999) 174 F.3d 276, 280 (quoting *Burgos v. Hopkins* (2d Cir.1994) 14 F.3d 787, 790). Moreover, in reviewing a motion to dismiss, we must "resolve all doubts and inferences in favor of the non-moving party." *Mullin v. Rochester Manpower, Inc.* (W.D.N.Y.2002) 192 F.Supp.2d 80, 82. *See also Braxton v. Brown* (E.D.N.Y. Jan. 28, 1997) No. 96-CV-187, 1997 WL 43525, at *1; *McIlwain v. Perez* (E.D.N.Y. Jan. 22, 1997) No. 95-CV-3135, 1997 WL 38085, at *1.

As we have already discussed, the plaintiff's statements in the Amended Complaint lack clarity and raise serious questions about what he meant by them. His explanation suggests that he either made no effort to learn about the grievance procedure or that Green Haven officials might not have provided him with the materials necessary to inform him about the use of the IGP. Since the non-moving party is **539 proceeding *pro se,* we are obligated to resolve existing doubts in the plaintiff's favor and to read his Amended Complaint as raising the strongest argument it suggests (namely, that his lack of sufficient knowledge about the procedure is attributable to correctional officials rather than to himself). Giving the plaintiff the benefit of the doubt in this manner despite his failure to clarify his statements comports with the principle that the defendants bear the burden of proving that he failed to satisfy the PLRA's exhaustion requirement. *See Borges,* 2002 WL 31194558, at *3; *Reyes,* 206 F.Supp.2d at 433; *Hallett,* 109 F.Supp.2d at 196; *Gonzalez,* 2000 WL

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

245 F.Supp.2d 527

(Cite as: 245 F.Supp.2d 527)

274184, at *3.

The defendants have made at least a minimal effort to explain which resources were available to the plaintiff such that he could have educated himself about Green Haven's grievance program. They indicate that "grievance procedures are available to all inmates." (Defs.' Mem. of Law in supp. of Mot. to Dismiss ("Defs.' Brief") at 5.) According to the defendants, the procedures "are outlined in an inmate's standards of inmate behavior booklet, which is provided to an inmate upon his entrance to the corrections system." (Defs.' Brief at 5-6.) Moreover, the prison library purportedly contains copies of the code which describes the IGP. (*See* Defs.' Brief at 6.)

[17] This information presents us with a number of problems. First, the information is not corroborated by any accompanying affidavits; rather, the information consists of nothing more than allegations set forth in the defendants' memorandum of law. In addition, these uncorroborated allegations fall outside the pleadings. *See Fonte v. Bd. of Managers of Cont'l Towers Condo.* (2d Cir.1988) 848 F.2d 24, 25 ("Factual allegations contained in legal briefs or memoranda are also treated as matters outside the pleadings for the purposes of Rule 12(b)."). The defendants have moved to dismiss the plaintiff's action pursuant to Rule 12(b)(6), and that rule "does not give the district court authority to consider matters outside the pleadings; it simply delineates the procedures which must be followed in testing the legal sufficiency of a complaint." *LaBounty v. Adler* (2d Cir.1991) 933 F.2d 121, 123 (citing *Kopec v. Coughlin* (2d Cir.1991) 922 F.2d 152, 155). "If the movant[s] wish[ ] to test the factual underpinnings of the complaint, [they] may submit proper evidence outside the pleadings and move for summary judgment under Rule 56." *Id.*

The information submitted by the defendants also raises troubling factual questions which have not yet been answered. The defendants allege that the "behavior booklet" provided to an inmate upon his "entrance to the corrections system" outlines the available grievance procedures. (*See* Defs.' Brief at 5-6.) However, according to the New York State Department of Correctional Services' ("DOCS") Inmate Population Information Search, Arnold was taken into custody in June 1994. *See*

DOCS' Inmate Population Information Search, *available at http://nysdocs.docs.state.ny.us* (last visited Feb. 4, 2003) (Arnold's relevant information may be accessed by entering his Department Identification Number). Congress had not yet passed the PLRA in 1994. Moreover, the IGP was updated less than two months before Arnold apparently entered the corrections system and the program's most elaborate provision, § 701.7, was further amended in 1998. *See* 7 N.Y. Comp.Codes R. & Regs.tit. 7, §§ 701.1-701.16. As such, it remains unclear whether any booklet which the plaintiff received when he first entered the corrections system outlined the relevant grievance procedures that an inmate could have invoked at the **540** time of the assaults at issue here. Furthermore, while the defendants contend that the prison library contains a copy of the code which describes the IGP process, the Amended Complaint suggests that the plaintiff was escorted to the Special Housing Unit ("SHU") after the defendants purportedly assaulted him. The defendants similarly indicate that he was held in the SHU at the time of the alleged assaults. (*See* Defs.' Brief at 1-2.) The defendants have not assured this Court that the plaintiff had access to the prison library from the SHU, nor that he had the option of perusing these materials once he was released from the SHU.

[18] In sum, the defendants have sought to meet their burden by introducing allegations which (a) we cannot consider in reviewing a Rule 12(b)(6) motion, (b) have not yet been corroborated by way of an affidavit from a knowledgeable official, and (c) raise further troubling factual questions. "When a District Court is provided with materials outside the pleadings in the context of a 12(b)(6) motion to dismiss, it has two options: the court may exclude the additional materials and decide the motion on the complaint alone or convert the motion to one for summary judgment." *Sulton v. Greiner* (S.D.N.Y. Dec. 11, 2000) No. 00 Civ. 727 (RWS), 2000 WL 1809284, at *1. Since the information submitted by the defendants, however deficient at this time, bears on the question of whether the plaintiff had access to resources which he could have used to educate himself about Green Haven's grievance procedure, we will not exclude the materials.

"If a judge looks to additional materials, the motion should be converted into a motion for summary

245 F.Supp.2d 527

(Cite as: 245 F.Supp.2d 527)

judgment." *Hayden v. County of Nassau* (2d Cir.1999) 180 F.3d 42, 54. Where a court "converts a motion to dismiss to one for summary judgment, it must endeavor to provide the parties with adequate notice about the conversion and the consequences of summary judgment." *Howard v. Goord* (E.D.N.Y. Dec. 28, 1999) No. 98-CV-7471 (FB), 1999 WL 1288679, at *3. Because we do not exclude the additional materials submitted by the defendants, we convert the motion to one for summary judgment in accordance with Rule 12(b). *See* Fed.R.Civ.P. 12(b). Our decision today expressly puts the parties on notice of that conversion. However, as these additional materials are deficient for the aforementioned reasons, the defendants are directed to submit further briefing and evidence on the relevant issues. Once these submissions have been filed, the plaintiff will be afforded an opportunity to respond.

[19] Where a court converts the motion to dismiss to one for summary judgment, a non-moving party who is proceeding *pro se* must be advised that all assertions of material fact in the defendants' affidavits and other papers in support of their motion will be taken as true unless the *pro se* litigant contradicts those factual assertions in one or more affidavits made on personal knowledge containing facts that would be admissible in evidence, or by submitting other materials as provided in Rule 56(e) of the Federal Rules of Civil Procedure. *See* McPherson, 174 F.3d at 281. The affidavits and any other documentary evidence submitted by the *pro se* litigant in opposition to the motion for summary judgment must " 'raise a genuine issue of fact as to every material element of the claim [and defense] and thereby preserve the case for trial.' " *Howard*, 1999 WL 1288679, at *3 (quoting McPherson, 174 F.3d at 281).

Accordingly, we put the plaintiff on the following specific notice:

*541 We exercise our power to convert the defendants' Rule 12(b)(6) motion to dismiss this action on the grounds of exhaustion to a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. This means that we may decide this issue, without a trial, based on written materials, including affidavits, submitted in support of the motion. THE

CLAIMS YOU ASSERT IN YOUR COMPLAINT MAY BE DISMISSED WITHOUT A TRIAL IF YOU DO NOT RESPOND TO THIS MOTION by filing your own sworn affidavits or other papers as required by Rule 56(e). An affidavit is a sworn statement of fact based on personal knowledge that would be admissible in evidence at trial. The full text of Rule 56 is set out at the end of this order.

In short, Rule 56 provides that you may NOT oppose summary judgment simply by relying upon the allegations in your complaint. Rather, you must submit evidence, such as witness statements or documents, countering the facts asserted by the defendants and raising issues of fact for trial. Any witness statements, which may include your own statements, must be in the form of affidavits. You may submit affidavits that were prepared specifically in response to the defendants' motion for summary judgment.

Any issue of fact that you wish to raise in opposition to the motion for summary judgment must be supported by affidavits or by other documentary evidence contradicting the facts asserted by the defendants. If you do not respond to the motion for summary judgment on time with affidavits or documentary evidence contradicting the facts asserted by the defendants, we may accept the defendants' factual assertions as true. Judgement may then be entered in the defendants' favor without a trial.

If you have any questions, you may direct them to the Pro Se Office.

### *CONCLUSION*

For the foregoing reasons, we hereby DENY the defendants' motion to dismiss the plaintiff's action for lack of subject matter jurisdiction pursuant to Rule 12(b)(1). The defendants' remaining motion to dismiss the plaintiff's action pursuant to Rule 12(b)(6) for failure to exhaust administrative remedies is hereby CONVERTED to a motion for summary judgment. Within 21 days of the entry of this order on the docket, the defendants shall file an answer which includes their affirmative defenses. If the defendants assert an affirmative defense in that answer which is predicated on the plaintiff's purported failure to exhaust his administrative remedies, the defendants shall, within 60 days of filing their answer, file and serve (a) a supplemental memorandum of law in support of their

245 F.Supp.2d 527

(Cite as: 245 F.Supp.2d 527)

motion for summary judgment in accordance with the requirements set forth in Rule 56 of the Federal Rules of Civil Procedure; (b) a statement of material facts as to which they contend there is no genuine issue of fact to be tried in compliance with Local Civil Rule 56.1; (c) the necessary affidavits, made on personal knowledge, and any other evidence which supports their motion for summary judgment; and (d) as a precaution, the appropriate notice to the *pro se* plaintiff in conformance with Local Civil Rule 56.2. Within 60 days of the date that the defendants' submissions are filed, the plaintiff may respond to their motion for summary judgment in accordance with the express notice set forth above. If the plaintiff submits opposition papers, the defendants shall file a supplemental memorandum of law in reply thereto, and any necessary accompanying documents, within 30 days **542** of the date that the plaintiff's papers are filed.

**SO ORDERED.**

### Summary Judgment

*Federal Rule of Civil Procedure 56*

(a) For Claimant. A party seeking to recover upon a claim, counterclaim, or cross-clam or to obtain a declaratory judgment may, at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party, move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof.

(b) For Defending Party. A party against whom a claim, counterclaim, or cross-claim is asserted or a declaratory judgment is sought may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof.

(c) Motion and Proceedings Thereon. The motion shall be served at least 10 days before the time fixed for the hearing. The adverse party prior to the day of hearing may serve opposing affidavits. The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. A summary

judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages.

(d) Case Not Fully Adjudicated on Motion. If on motion under this rule judgment is not rendered upon the whole case or for all the relief asked and a trial is necessary, the court at the hearing of the motion, by examining the pleadings and the evidence before it and by interrogating counsel, shall if practicable ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted. It shall thereupon make an order specifying the facts that appear without substantial controversy, including the extent to which the amount of damages or other relief is not in controversy, and directing such further proceedings in the action as are just. Upon the trial of the action the facts so specified shall be deemed established, and the trial shall be conducted accordingly.

(e) Form of Affidavits; Further Testimony; Defense Required. Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

(f) When Affidavits Are Unavailable. Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance**543** o permit affidavits to be obtained or depositions to be taken or discovery to be had or may

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

245 F.Supp.2d 527

(Cite as: 245 F.Supp.2d 527)

make such other order as is just.

**(g) Affidavits Made in Bad Faith.** Should it appear to the satisfaction of the court at any time that any of the affidavits presented pursuant to this rule are presented in bad faith or solely for the purpose of delay, the court shall forthwith order the party employing them to pay to the other party the amount of the reasonable expenses which the filing of the affidavits caused the other party to incur, including reasonable attorney's fees, and any offending party or attorney may be adjudged guilty of contempt.

### Statements of Material Facts on Motion for Summary Judgment

*Local Civil Rule 56.1*
    (a) Upon any motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, there shall be annexed to the notice of motion a separate, short and concise statement of the material facts as to which the moving party contends there is no genuine issue to be tried. Failure to submit such a statement may constitute grounds for denial of the motion.

    (b) The papers opposing a motion for summary judgment shall include a separate, short and concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried.

    (c) All materials set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party.

    (d) Each statement of material fact by a movant or opponent must be followed by citation to evidence which would be admissible, set forth as required by Federal Rule of Civil Procedure 56(e).

S.D.N.Y.,2003.

Arnold v. Goetz
245 F.Supp.2d 527
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Page 1

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

**H**
Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
William MINGUES, Plaintiff,
v.
C.O NELSON and C.O. Berlingame, Defendants.
**No. 96 CV 5396(GBD).**

Feb. 20, 2004.

**Background:** Inmate brought a § 1983 action asserting, inter alia, claims of excessive force during his wife's visit with him at the correctional facility.

**Holding:** On a defense motion to dismiss, the District Court, Daniels, J., held that the record established that the action was filed after the effective date of the Prison Litigation Reform Act (PLRA).
Motion granted.

West Headnotes

Civil Rights 78 ☞ 1395(7)

78 Civil Rights
    78III Federal Remedies in General
        78k1392 Pleading
            78k1395 Particular Causes of Action
                78k1395(7) k. Prisons and Jails; Probation and Parole. Most Cited Cases
Record established that inmate's § 1983 action was filed after the effective date of the Prison Litigation Reform Act of 1996 (PLRA), such that the inmate's failure to exhaust his administrative remedies precluded relief; examination of the initial complaint itself, on its face, unequivocally demonstrated that the inmate's subsequent allegation in his amended complaint that he filed the complaint in April of

1996 was patently false; there was no explanation offered that could reasonably support and account for the existence of May dates on the complaint. 42 U.S.C.A. § 1983; Civil Rights of Institutionalized Persons Act, § 7(a), 42 U.S.C.A. § 1997e(a).

*MEMORANDUM DECISION AND ORDER*

DANIELS, J.

**\*1** This § 1983 action was originally commenced by the plaintiff,[FN1] a prisoner in New York State custody, and his wife claiming their civil rights were violated during the wife's visit with plaintiff at the correctional facility. Discovery in this matter has concluded. Previously, all claims asserted by plaintiff's wife were dismissed for failure to prosecute. Additionally, defendants' summary judgment motion was denied with respect to plaintiff's claims of excessive force,[FN2] and summary judgment was granted dismissing all of plaintiff's other claims. Defendants now seek to dismiss the remaining excessive force claims on the grounds they are barred by the Prisoner Litigation Reform Act of 1996 ("PLRA"), 42 U.S.C. § 1997e(a), as plaintiff failed to exhaust his administrative remedies.

> FN1. Plaintiff and his wife were proceeding *pro se* when they filed the complaint and amended complaint. Thereafter, plaintiff obtained legal representation.

> FN2. In the amended complaint, plaintiff alleges he was beaten, kicked and punched. (Am.Compl. § 6). In his original complaint, he had also claimed that he was whipped." (Compl. at 7, 8). Plaintiff testified at his deposition that he was slapped once in the face, punched about four or five times in the lower back, and a correctional officer then laid on top of him. (Mingues Dep. at 78-81). The incident, which took approximately thirty to forty seconds, caused plaintiff to suffer from back pain for an unspecified period of time. (*Id.* at 81, 86).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

Subdivision (a) of § 1997e provides, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." This provision became effective on April 26, 1996. *Blisset v. Casey,* 147 F.3d 218, 219 (2d Cir.1998). The PLRA's exhaustion requirement does not apply retroactively to actions pending when the Act was signed into law. *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003).

There is no dispute that plaintiff did not avail himself of the existing and available prison grievance procedure. Plaintiff, however, argues he was not required to exhaust his administrative remedies because, as alleged in his amended complaint, "petitioners (sic) had already filed in April 10-12 of 1996," prior to the PLRA's April 26, 1996 enactment date.[FN3] (Am.Compl. § 2). In order to determine the date that the instant action was commenced, the date of the filing of the amended complaint relates back to the filing date of the original complaint. Fed.R.Civ.P. 15(c). The original complaint was signed and dated by plaintiff's wife on May 8, 1996; it was stamped received by the Pro Se Office on May 10, 1996; and plaintiff's signature is dated May 13, 1996.[FN4]

FN3. The amended complaint reads as follows:

That the original complaint filed under and pursuant to Title 42 section 1983 and 1985 was made and submitted before this court in April of 1996, before the application of the Prisoner Litigation Reform Act of 1996 was signed into law. The Act was signed into law April 26, 1996 and petitioners had already filed in April 10-12 of 1996. (Am.Compl. § 2).

FN4. Plaintiff's wife application for *in forma pauperis* relief was signed and dated May 8, 1996, and it is stamped as received by the Pro Se Office on May 10, 1996. Plaintiff's signature, on his initial application for appointment of counsel, is dated May 13, 1996, and it is stamped as

received by the Pro Se Office on May 10, 1996. Attached to plaintiff's application, is his signed Affirmation of Service, dated May 13, 1996, wherein plaintiff declared under penalty of perjury that he served his application upon the Pro Se Office. Plaintiff alleges that "between April 17, 1996 until October 7, 1996," all visitation was suspended between him and his wife and that their "only form of communications was correspondence ." (Am.Compl. § 7).

The matter was referred to Magistrate Judge Pitman for a Report and Recommendation ("Report"). Although the magistrate judge found that the three earliest possible dates that the evidence demonstrates the complaint could have been filed, *i.e.,* May 8th, 10th, and 13th of 1996, were all beyond the PLRA enactment date, he nevertheless recommended that the motion to dismiss be denied based on plaintiff's allegation in the amended complaint that he filed the original complaint April 10-12 of 1996, prior to the April 26, 1996 enactment date. The magistrate judge found that, "[i]n light of the express allegation in the Amended Complaint that plaintiff commenced the action before April 26, 1996 and the absence of a clear record to the contrary, the requirement that disputed factual issues be resolved in plaintiff's favor for purposes of this motion requires that the motion be denied." (Report at 12-13).

**\*2** Defendants object to the Report's conclusion that there is a material issue of fact regarding the date the action was filed. Plaintiff's attorney did not file any objections.[FN5] The Court must make a *de novo* determination as to those portions of the Report to which there are objections. Fed.R.Civ.P. 72(b); 28 U.S.C. § 636(b)(1)(C). It is not required that the Court conduct a *de novo* hearing on the matter. *United States v. Raddatz,* 447 U.S. 667, 676, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980). Rather, it is sufficient that the Court "arrive at its own, independent conclusion" regarding those portions to which the objections were made. *Nelson v. Smith,* 618 F.Supp. 1186, 1189-90 (S.D.N.Y.1985) (quoting *Hernandez v. Estelle,* 711 F.2d 619, 620 (5th Cir.1983)). Accordingly, the Court, in the exercise of sound judicial discretion, must determine the extent, if any, it should rely upon the magistrate judge's proposed findings and recommendations. *Raddatz,* 447 U.S. at 676. The Court may accept, reject or modify, in whole or in part, the findings and recommendations set forth within the Report. Fed.R.Civ.P. 72(b); 28 U.S.C. §

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

636(b)(1)(C). Where there are no objections, the Court may accept the Report provided there is no clear error on the face of the record. *Nelson v. Smith,* 618 F.Supp. at 1189; *see also Heisler v. Kralik,* 981 F.Supp. 830, 840 (S.D.N.Y.1997), *aff'd sub nom. Heisler v. Rockland County,* 164 F.3d 618 (2d Cir.1998).

> FN5. Plaintiff himself filed objections which was not adopted by his counsel. Plaintiff objects to the magistrate judge's finding that an issue exists as to when plaintiff filed the complaint because plaintiff asserts he gave it to prison officials to be mailed in April. Additionally, plaintiff objects to the magistrate judge's suggestion that the defendants convert their motion to one for summary judgment asserting the same theory as set forth in the present motion. Since this Court finds that the instant motion is meritorious, the propriety of plaintiff personally submitting his own objections need not be address as those objections are moot.

Upon a *de novo* review, the Report's recommendation that the motion be denied is rejected by the Court. Section 1997e (a) requires that inmates exhaust all available administrative remedies prior to the commencement of a § 1983 action concerning prison conditions, and failure to do so warrants dismissal of the action. *Porter v. Nussel,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); *Scott,* 344 F.3d at 290. The exhaustion of one's administrative remedies, however, is not a jurisdictional requirement under the PLRA. *Richardson v. Goord,* 347 F.3d 431 (2d Cir.2003). A defendant may assert a non-exhaustion claim as an affirmative defense. *Jenkins v. Haubert,* 179 F.3d 19, 28-29 (2d Cir.1999). Since it is an affirmative defense, defendants bear the burden of proof in this regard. *See, McCoy v. Goord,* 255 F.Supp.2d 233, 248 (S.D.N.Y.2003); *Arnold v. Goetz,* 245 F.Supp.2d 527, 534-35 (S.D.N.Y.2003); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002). A motion to dismiss, pursuant to Fed.R.Civ.P. 12(b)(6), is an appropriate vehicle to be used by a defendant where the failure to exhaust is clear from the face of the complaint as well as any written instrument attached as an exhibit and any statements or documents incorporated by reference into the complaint. *See, Scott v. Gardner,* 287 F.Supp.2d 477, 485 (S.D.N.Y.2003) (citation omitted); *McCoy,* 255 F.Supp.2d at 249.

In the amended complaint, plaintiff alleges, in a conclusory manner, that he filed the original complaint before the effective date of the PLRA, sometime between April 10th and April 12th of 1996.[FN6] On a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the court must accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inference in plaintiff's favor. *Resnick v. Swartz,* 303 F.3d 147, 150-51 (2d Cir.2002) (citation omitted); *Bolt Elec., Inc. v. City of New York,* 53 F.3d 465, 469 (2d Cir.1995). Dismissal is only warranted where it appears without doubt that plaintiff can prove no set of facts supporting his claims that would entitle him to relief. *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999). The court's consideration is not limiting solely to the factual allegations set forth in the amended complaint. Rather, the court may also consider documents attached to the complaint as exhibits or incorporated in it by reference, matters of which judicial notice may be taken, or to documents either in plaintiff's possession or of which he has knowledge of and relied on in bringing the action. *Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 150 (2d Cir.1993) (citation omitted). The court is not bound to accept as true a conclusory allegation where the pleadings are devoid of any specific facts or circumstances supporting such an assertion. *DeJesus v. Sears, Roebuck & Co., Inc.,* 87 F.3d 65, 70 (2d Cir.1996). Nor must the court "ignore any facts alleged in the complaint that undermine the plaintiff's claim." *Roots Partnership v. Lands' End, Inc.,* 965 F.2d 1411, 1416 (7th Cir.1992) (citation omitted).

> FN6. In response to then Chief Judge Thomas P. Griesa's 1996 order dismissing this action, plaintiff filed an Application for Reconsideration, dated October 28, 1996, wherein he claims that "on April 12, 1996 this petitioner filed a 1983 civil suit ..." (Pl.'s Mot. for Recons. at 1).

*3 Plaintiff fails to allege any factual basis in support of his claim that he filed the initial complaint between April 10-12, 1996. The Court is not required to accept this statement as a well-pleaded factual allegation in light of the existing record which clearly demonstrates that such an allegation is not only factually unsupported by the clear evidence, but is factually impossible. Generally, an

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

amended complaint supersedes the original complaint, and renders it of no legal effect. *In re. Crysen/Montenay Energy Co.,* 226 F.3d 160, 162 (2d Cir.2000). In plaintiff's amended complaint, he states that he is submitting the amended complaint in support of his original complaint. Hence, the original complaint is incorporated by reference in the amended complaint, and may be considered by the Court. Even if the initial complaint was not so incorporated, given the circumstances of this case, the Court would nevertheless consider it as it relates to the original date of filing. An examination of the initial complaint itself, on its face, unequivocally demonstrates that plaintiff's subsequent allegation in his amended complaint that he filed the complaint between April 10th and 12th of 1996 is patently false.

The original complaint refers to plaintiff's prison disciplinary hearing arising out of the same incident forming the basis of the present lawsuit. Generally, the disciplinary charges against plaintiff were in connection with an alleged conspiracy by him and his wife to commit grand larceny against inmate Robert Cornell. That began on April 16, 1996, and concluded on April 19, 1996. (Defs.' Notice of Mot. for Summ. J. Ex. N, Transcript of Disciplinary Hr'g, conducted on April 16, 18-19, 1996). Specifically, in the original complaint, plaintiff refers to the testimony given by this fellow inmate.[FN7] (Compl. at 8). That inmate testified on April 19th. (Hr'g. Tr. at 53-54, 57). Thus, plaintiff's claim that he filed the complaint between April 10-12, 1996, is absolutely impossible as the initial complaint refers to events occurring after that time period. Merely because plaintiff boldly alleges in his amended complaint that he filed the original complaint between April 10th and 12th does not require this Court to turn a blind eye to plaintiff's prior pleadings demonstrating the absurdity of his claim.[FN8] *See, Silva Run Worlwide Ltd. v. Gaming Lottery Corp.,* 2001 WL 396521, *1 (S.D.N.Y. April 19, 2001) (citations omitted) (A court should not "accept allegations that are contradicted or undermined by other more specific allegations in the complaint or by written materials properly before the court.").

FN7. In the complaint, plaintiff alleges "that at his S.H.U. hearing petitioner called as a witness Robert Cornell who stated that this petitioner Mingues nor his wife (co-petitioner) Narvaez ever took any money from him. (Compl. at 8).

FN8. At his deposition, plaintiff testified that he filed the initial complaint "[a]pproximately around June of 1996." (Mingues Dep. at 37-38).

Lawsuits by inmates represented by counsel are commenced when the complaint is filed with the court. *See,* Fed.R.Civ.P. 3, 5(e). For *pro se* litigants, who are not imprisoned and have been granted *in forum pauperis* relief, their complaints are deemed filed when received by the Pro Se Office. *See, Toliver v. County of Sullivan,* 841 F.2d 41 (2d Cir.1998). The complaint of a *pro se* prisoner, however, is deemed filed when he or she gives the complaint to prisoner officials to be mailed. *Houston v. Lack,* 487 U.S. 266, 270, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988); *Dory v. Ryan,* 999 F.2d 679, 682 (2d Cir.1993), *modified on other grounds,* 25 F.3d 81 (2d Cir.1994). The "prison mailbox" rule is designed to combat inmate litigants' dependence on the prison facility's mail system and their lack of counsel so as to assure the timely filing of their legal papers with the court. *Noble v. Kelly,* 246 F.3d 93, 97 (2d Cir.2001) (citations omitted). Given the difficulty in determining when a prisoner relinquishes control of the complaint to prison personnel, the date the plaintiff signed the original complaint is presumed to be the date plaintiff gave the complaint to prison officials to be mailed. *See e.g., Forster v. Bigger,* 2003 WL 22299326, *2 (S.D.N.Y. Oct.7, 2003); *Hosendove v. Myers,* 2003 WL 22216809, *2 (D.Conn. Sept.19, 2003); *Hayes v. N .Y.S. D.O.C. Officers,* 1998 WL 901730, *3 (S.D.N.Y. Dec.28, 1998); *Torres v. Irvin,* 33 F.Supp.2d 257, 270 (S.D.N.Y.1998) (cases cited therein).

*4 In response to the Report and Recommendation, plaintiff asserts that, in April, the original complaint "was placed in the facility mail box." (Pl.'s Objection to Report at 1). However, it is uncontested that plaintiff's wife signed the complaint on May 8th; it was received by the Pro Se Office on May 10th; and plaintiff's signature is dated May 13th. There is no explanation offered that could reasonably support and account for the existence of these May dates on a complaint which plaintiff falsely claims to have deposited to be mailed during the period of April 10th and April 12th. Had plaintiff mailed the complaint directly to the court prior to April 26th, it would have been impossible for the plaintiff's wife to have signed the document two

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

days prior to the date that the Pro Se Office stamped it received on May 10th.[FN9] Moreover, absent evidence to the contrary, applying the mailbox rule would presume that plaintiff gave his complaint to prison officials on May 13, 1996, the date he signed it. *See, Johnson v. Coombe,* 156 F.Supp.2d 273, 277 (S.D.N.Y.2001) (quoting *Torres,* 33 F.Supp.2d at 270). Even if the Court gave plaintiff the benefit of the date plaintiff's wife signed the complaint, *i.e.,* the earliest date reflected on the filed complaint, it was still after the effective date of the PLRA. Hence, plaintiff is legally obligated to have pursued his prison grievance procedures prior to filing the instant action. The plaintiff has offered no explanation for the initial complaint's reference to events that occurred after the date he claims he filed it, the two May dates on which he and his former co-plaintiff wife signed the complaint, or the May date stamped received by the Pro Se Office. As the magistrate Judge observed:

> FN9. The benefit of the mailbox rule does not apply where the plaintiff delivers the complaint to someone outside the prison system to forward to the court. *Knickerbocker v. Artuz,* 271 F.3d 35, 37 (2d Cir.2001).

Apart from the allegation that certain events giving rise to the claims occurred on April 9, 1996, the Original Complaint contains no mention of dates in April, 1996. Mingues no where explains the contradiction between the signature dates on the Original Complaint and the allegations contained in Amended Complaint. (Report at 12).

New York state law provides a three tier grievance procedure applicable to plaintiff's claims of excessive force. *See,* N.Y. Correct. Law § 139 (McKinnney's 2003); N.Y. Comp.Codes R. & Regs. tit. 7, § 701.7 (2003); *Mendoz v. Goord,* 2002 WL 31654855 (S.D.N.Y. Nov.21, 2002); *Rodriguez v. Hahn,* 209 F.Supp.2d 344 (S.D.N.Y.2002). Plaintiff has not denied knowledge of the grievance procedure at his institution, nor claimed that anything or anyone caused him not to file a grievance and completely pursue it through the administrative process.[FN10] The magistrate judge's determination that the defendants' Rule 12(b) motion should be denied because of an "absence of a clear record" contrary to plaintiff's express allegation in the amended complaint that he

commenced the action before April 26, 1996 is erroneous. The Court could have *sua sponte* dismiss this action as the record is unmistakably clear that an appropriate administrative procedure was available to him, that he was required to exhaust his administrative remedies, and that he failed to do so as required by the PLRA. *See, Mojias v. Johnson,* 351 F.3d 606 (2003); *Snider v. Melindez,* 199 F.3d 108, 112-13 (2d Cir.1999). In this case, plaintiff has been afforded notice and given an opportunity to respond to the exhaustion issue and his failure remains clear.

> FN10. In the original complaint, plaintiff stated he did not file a grievance, pursuant to the state's prisoner grievance procedure, "because this matter can not be dealt with by interdepartmental grievances." (Compl. at 2-3). In plaintiff's attorney's memorandum in opposition to the motion to dismiss, counsel contends that plaintiff is not required to file a grievance because the state's prison system provides extremely limited administrative remedies and money damages, which plaintiff seeks, are not available.

**5** Accordingly, it is hereby

ORDERED that the Report and Recommendation is not adopted; and it is further

ORDERED that the defendants' motion to dismiss the complaint is granted.

S.D.N.Y.,2004.
Mingues v. Nelson
Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2000 WL 1809284 (S.D.N.Y.)
(Cite as: 2000 WL 1809284 (S.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Roger SULTON, Plaintiff,
v.
Charles GREINER, Superintendent of Sing Sing Corr.
Fac., Doctor Halko & P.A. Williams of Sing Sing Corr.
Fac. Medical Department, Doctor Lofton, Defendants.
**No. 00 Civ. 0727(RWS).**

Dec. 11, 2000.

Roger Sulton, Wende Correctional Facility, Alden, NY,
Plaintiff, pro se.

Honorable Eliot Spitzer, Attorney General of the State of
New York, New York, NY, By: S. Kenneth Jones,
Assistant Attorney General, for Defendants, of counsel.

*OPINION*

SWEET, J.

**\*1** Defendants Charles Greiner ("Greiner"), past
Superintendent of Sing Sing Correctional Facility ("Sing
Sing") and Dr. Nikulas Halko, ("Halko"), P.A. Williams
("Williams"), and Dr. Lofton ("Lofton"), all of the Sing
Sing Medical Department, (collectively, the
"Defendants"), have moved to dismiss the amended
complaint of *pro se* inmate Roger Sulton ("Sulton"),
pursuant to Fed.R.Civ.P. 12(b)(6) and 12(h)(2) for failure
to exhaust administrative remedies. For the reasons set
forth below, the motion will be granted.

*Prior Proceedings*

Sulton filed the complaint in this action on February 2,
2000, asserting a claim against the Defendants under
Section 1983 for alleged violation of his constitutional
rights under the Eighth Amendment for acting with
deliberate indifference to his serious medical needs.
Sulton filed an amended complaint on May 3, 2000, to
identify additional defendants to his suit. Additionally,
Sulton alleges negligent malpractice by the Sing Sing
medical staff. Sulton seeks monetary damages. The instant
motion was filed on August 9, 2000, and was marked fully
submitted on September 6, 2000.

*Facts*

The Defendants' motion comes in the posture of a motion
to dismiss for failure to state a claim, pursuant to Federal
Rule of Civil Procedure 12(b)(6). However, both the
Defendants and Sulton have submitted materials outside
the pleadings. Where a District Court is provided with
materials outside the pleadings in the context of a 12(b)(6)
motion to dismiss, it has two options: the court may
exclude the additional materials and decide the motion on
the complaint alone or convert the motion to one for
summary judgment. *See* Fed.R.Civ.P. 12(b); *Kopec v.
Coughlin,* 922 F.2d 152, 154 (2d Cir.1991); *Fonte v.
Board of Managers of Continental Towers Condominium,*
848 F.2d 24, 25 (2d Cir.1988). The Court has determined
to treat the instant motion as a motion for summary
judgment. Therefore, the following facts are gleaned from
the parties' submissions, with all inferences drawn in favor
of the non-movant as required on a motion for summary
judgment. They are not findings of fact by the Court.

Sulton is a prison inmate who was incarcerated in Sing
Sing at the time of the incidents in question. Greiner was
Superintendent of Sing Sing at that time. Halko was and is
a doctor on medical staff at Sing Sing. Williams and
Lofton are alleged to be affiliated with the Sing Sing
Medical Department.

According to Sulton, on October 8, 1998, he slipped on a
flight of wet stairs, where there was no "wet floor" sign
posted, and injured his left knee. The next day his knee
was swollen and the pain "was real bad." That same day

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1809284 (S.D.N.Y.)
(Cite as: 2000 WL 1809284 (S.D.N.Y.))

Sulton went to sick call and saw P.A. Williams. Williams ordered x-rays and also ordered "no-work, feed-in cell, pain killers and a cane" for Sulton. The swelling went down, but the pain got stronger.

For four months Sulton complained to the Sing Sing medical staff about his pain. During this time his left knee would give out "at any time." Yet, "nothing was done." However, the Sing Sing Medical Department did send Sulton to the Green Haven Correctional Facility for an M.R.I. and, subsequently, knee surgery was recommended by an attending physician on April 23, 1999. A hinged knee brace was recommended for post-surgery recovery.

**\*2** At some point thereafter, Sulton wrote to Greiner concerning his medical problem and he was placed on "a call-out" to see Halko. Halko then informed Sulton that he would not be going for surgery because Correctional Physician Services [FN1] ("CPS") would not allow it. CPS wanted the inmate to undergo physical therapy before they would approve surgery. Sulton continued to be in pain and requested outside medical care from Williams. However, Williams could not do anything about Sulton's surgery until it was approved by CPS.

> FN1. CPS is the health maintenance organization which must pre-approve any outside medical service to be provided to inmates outside of the correctional facility.

In September 1999, Sulton was transferred to Wende Correctional Facility ("Wende"). The medical department there provided him with physical therapy for his left knee, which was "still in constant pain" and was prone to giving out beneath his body weight.

Sulton filed grievance # 14106-99 on November 3, 1999, and on November 24, 1999, he received a response from the Inmate Grievance Resolution Committee (the "IGRC"). Sulton contends that on that same date he indicated his desire to appeal their decision to the Superintendent. Sulton did not appeal his grievance to the highest level of administrative review, the Central Office Review Committee (the "CORC"). In a letter to Wende Superintendent Donnelly ("Donnelly") dated December

17, 2000, Sulton complained that he never received a response to his appeal of the IGRC decision. However, the Defendants have submitted a response from Donnelly dated December 6, 2000, in which Donnelly stated that he concurred with the IGRC's decision.

In January 2000, "plaintiff['s] legs gave out and the right leg took the weight of the body ... causing the plaintiff to suffer ... torn joints in the ankle area." Surgery was performed on the ankle and he was placed on "medical confinement status."

*Discussion*

I. *This Action Will Be Dismissed For Plaintiff's Failure To Comply With The Prison Litigation Reform Act Of 1996*

In his amended complaint, Sulton alleges that he filed a grievance and, although initially the Defendants were unable to identify the grievance, by his opposition to the instant motion Sulton has identified the process he undertook to pursue his grievance.

Section 1997e(a) of the Prison Litigation Reform Act (the "PLRA") provides that:

No action shall be brought with respect to prison conditions under ... 42 U.S.C. § 1983 ... or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

In enacting Section 1997e(a), Congress made exhaustion mandatory. *Salahuddin v. Mead,* 174 F.3d 271, 274-75 (2d Cir.1999). As a result, where an inmate fails to satisfy the PLRA's exhaustion requirement, the complaint must be dismissed. *See, e.g., Santiago v. Meinsen,* 89 F.Supp.2d 435, 439-40 (S.D.N.Y.2000) (citations omitted).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1809284 (S.D.N.Y.)
(Cite as: 2000 WL 1809284 (S.D.N.Y.))

In New York, the relevant administrative vehicle is the Inmate Grievance Program ("IGP"). *See* N.Y. Correct. Law § 139 (directing Commissioner of the Department of Correctional Services to establish a grievance mechanism in each correctional facility under the jurisdiction of the Department); N.Y. Comp.Codes R. & Regs., tit. 7, § 701.1 (instituting IGP). New York inmates can file internal grievances with the inmate grievance committee on practically any issue affecting their confinement. *See In re Patterson,* 53 N.Y.2d 98, 440 N.Y.S.2d 600 (N.Y.1981) (interpreting N.Y. Correct. Law § 139 broadly); N.Y. Comp.Codes R. & Regs., tit. 7, §§ 701.2(a) (inmates may file grievances about the "substance or application of any written or unwritten policy, regulation, procedure or rule of the Department of Correctional Services ...") and 701.7 (procedures for filing, time limits, hearings and appeals).

**\*3** The New York State Department of Correctional Services ("DOCS") has established a grievance program with specific procedures which must be followed in order for a prisoner to exhaust his administrative remedies. *See Petit v. Bender,* No. 99 Civ. 0969. 2000 WL 303280, at \*2- \*3 (S.D.N.Y. March 22, 2000) (holding that prisoner failed to exhaust his administrative remedies where prisoner only partially complied with the grievance procedures established by Section 701 *et seq.*). These procedures include a requirement that an inmate appeal a Superintendent's decision to the CORC by filing an appeal with the Grievance Clerk. *See* N.Y. Comp.Codes R. & Regs., tit. 7, § 701.7(c)(1).

There is, however, an additional issue to be addressed in this case, which is that the administrative remedies available to Sulton do not afford monetary relief. The Second Circuit has not yet ruled on whether the PLRA's exhaustion requirement applies where the available administrative remedies available do not provide the type of relief the prisoner seeks. *Snider v. Dylag,* 188 F.3d 51, 55 (2d Cir.1999) ("We note that it is far from certain that the exhaustion requirement of 42 U.S.C. § 1997e(a) applies to deliberate indifference claims ... under Section 1983, where the relief requested is monetary and where the administrative appeal, even if decided for the complainant, could not result in a monetary award.").

There is disagreement among the district courts within this circuit as to this issue, although there is "clear trend ... to find exhaustion applicable even where the requested relief, money damages, cannot be awarded by the administrative body hearing the complaint." *Santiago v. Meinsen,* 89 F.Supp.2d at 440; *see Snider v. Melindez,* 199 F.3d 108, 114 n. 2 (2d Cir.1999) (noting disagreement among courts as to applicability of exhaustion requirement where administrative remedies are unable to provide the relief that a prisoner seeks in his federal action); *but cf. Nussle v. Willette,* 224 F.3d 95, (2d Cir.2000) (holding that exhaustion not required for excessive force claim because such claim is not "prison conditions" suit and overruling district court decisions applying exhaustion requirement to excessive force claims seeking monetary relief).

Moreover, this Court has previously held that a prisoner must exhaust his administrative remedies before seeking relief in federal court in connection with a prison conditions claim even where a prisoner seeks damages not recoverable under an established grievance procedure. *Coronado v. Goord,* No. 99 Civ. 1674, 2000 WL 52488, at \*2 (S.D.N.Y. Jan. 24, 2000); *Edney v. Karrigan,* No. 99 Civ. 1675, 1999 WL 958921, at \*4 (S.D.N.Y. Oct. 14, 1999). This is the rule that will be applied here.

In his response to the motion to dismiss, Sulton indicates that he filed grievance # 14106-99 on November 3, 1999 and on November 24, 1999 he received a response IGRC and that on the same date Sulton indicated his desire to appeal their decision to the Superintendent. Sulton does not contend that he appealed his grievance to the highest level of administrative review, namely, the CORC. Instead, Sulton has asserted that Superintendent Donnelly never replied to the appeal of the IGRC decision and submits a letter dated December 17, 2000 in which Sulton complains that he never received a response from Donnelly. However, the Defendants have submitted a response from Donnelly dated December 6, 2000, in which Donnelly concurred with the decision of the IGRC denying Sulton relief. There is no evidence in the record that Sulton appealed the grievance to CORC.

**\*4** Accordingly, because Sulton failed to exhaust his administrative remedies by appealing the grievance to the CORC, his claims of medical indifference will be dismissed pursuant to 42 U.S.C. § 1997e. *See Petit,* 2000 WL 303280, at \*3.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1809284 (S.D.N.Y.)
(Cite as: 2000 WL 1809284 (S.D.N.Y.))

*Conclusion*

Therefore, for the reasons set forth above, the Defendants'
motion will be granted and the amended complaint will be
dismissed without prejudice to the action being renewed
once Sulton has exhausted all administrative remedies.

It is so ordered.

S.D.N.Y.,2000.
Sulton v. Greiner
Not Reported in F.Supp.2d, 2000 WL 1809284
(S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2005 WL 1925649 (S.D.N.Y.)

(Cite as: 2005 WL 1925649 (S.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

S.D. New York.
James BROWN, Plaintiff,
v.
Carl J. KOENIGSMANN, M.D., s/h/a Dr. Carl
Koenigsmann, Medical Director of Green Haven
Correctional Facility, Defendants.
No. 01 Civ. 10013(LMM).

Aug. 10, 2005.
*MEMORANDUM AND ORDER*

MCKENNA, J.

1.

**\*1** Plaintiff James Brown, incarcerated at the Green
Haven Correctional Facility ("Green Haven") of the New
York State Department of Correctional Services
("DOCS") from January of 1992 until August 23, 1996,
and from March 14, 2001 to the present, brings this action
under 42 U.S.C. § 1983 against Carl Koenigsmann,
M.D.-employed by DOCS presently as Regional Medical
Director for a number of DOCS facilities in the Sullivan
and Great Meadow regions, and previously, from March
of 1999 to April of 2003, Facility Health Services Director
for Green Haven-alleging deliberate indifference to his
serious medical condition in violation of the Eighth
Amendment to the Constitution of the United States.FN1

> FN1. The State of New York was named as a
> defendant in the original complaint, but was
> dropped in the amended complaint.

Defendant moves, pursuant to Fed.R.Civ.P. 12(b)(6),
for dismissal of the amended complaint, asserting that (i)
plaintiff failed to exhaust available administrative
remedies, (ii) the amended complaint fails to allege
personal involvement by Dr. Koenigsmann in the conduct
claimed to have violated plaintiff's rights, (iii) plaintiff
cannot demonstrate that Dr. Koenigsmann treated plaintiff
with deliberate medical indifference, and (iv) Dr.

Koenigsmann is entitled to qualified immunity. (Def.
Mem. at 1-2.)

The Court earlier denied a motion by defendant
pursuant to Rule 12(b)(6), made on the ground of failure
to exhaust administrative remedies. *See Brown v.
Koenigsmann,* No. 01 Civ. 10013, 2003 WL 22232884
(S.D.N.Y. Sept. 29, 2003), familiarity with which is here
assumed.FN2

> FN2. The cited decision summarizes the
> allegations of the amended complaint and
> plaintiff's efforts to exhaust administrative
> remedies, 2003 WL 22232884, at \*1, sets forth
> the standards governing consideration of a
> motion under Rule 12(b)(6) to dismiss a *pro se*
> complaint, *id.* at \*2, and describes the DOCS
> grievance program. *Id.* at \*3. All of that is
> incorporated herein by reference.

2.

The exhaustion requirement of 42 U.S.C. § 1997e(a)
"applies to all **inmate** suits about prison life," *Porter v.
Nussle,* 534 U.S. 516, 532 (2002), including this one.
Here, plaintiff alleges that he "has made every available
attempt to exhaust his administrative remedies but did not
receive any response when appealing." (Am.Comp.¶II.C.)
In its 2003 decision the Court found that there was an
issue of fact as to exhaustion which prevented dismissal
under 12(b)(6). *Brown,* 2003 WL 22232884, at \*3.

Defendant now raises two exhaustion arguments.
First, he says that, whatever the case may have been in
2003, dismissal for failure to exhaust is required under
*Ziemba v. Wezner,* 366 F.3d 161 (2d Cir.2004). Then he
urges that, whatever the case may be concerning
exhaustion of plaintiff's claim that defendant denied him
surgery for his right eye, plaintiff's claim regarding
unnecessary surgery (Am.Comp.¶ 17) is clearly not
exhausted.FN3

> FN3. Initially, defendant advanced a third
> exhaustion argument, based on a "total

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1925649 (S.D.N.Y.)

(Cite as: 2005 WL 1925649 (S.D.N.Y.))

exhaustion" theory. (Def. Mem. at 15-17.) Defendant has withdrawn that argument. (Def. Reply Mem. at 2 n. 3.)

In *Ziemba,* the Second Circuit, "[a]s a matter of first impression in this circuit," held "that the affirmative defense of exhaustion is subject to estoppel." 366 F.3d at 163.

Here, defendant argues that, "because Dr. Koenigsmann had no involvement in DOCS grievance procedures or plaintiff's efforts to exhaust these procedures, there is no basis for raising the exhaustion defense." (Def. Mem. at 14.)

In this case, there are no allegations in the [amended complaint] that Dr. Koenigsmann himself "prevented" [plaintiff] from exhausting his administrative remedies through threats or any other form of intimidation or misconduct. *See Ziemba* 366 F.3d at 162. Unlike the actions by defendants in *Ziemba,* there was no conduct by Dr. Koenigsmann which can be said to estop him from asserting the exhaustion defense. Accordingly, the Court should **grant** defendant's **motion** to **dismiss** for **failure to exhaust**.

**\*2** (*Id.*)

In the present case, there is evidence that plaintiff initiated a grievance seeking a "new operation" in his remaining eye, the right; that when the **Inmate** Grievance Committee did not address the request for the operation, plaintiff appealed to the Superintendent, and that when the Superintendent did not address the request for the operation, plaintiff filled out the form provided for appeal to the Central Office Review Committee ("CORC"), and sent it to the Grievance Clerk; and that thereafter plaintiff inquired several times of the Grievance Clerk as to the status of the appeal. (Pl. Mem. Exhibits A, A-1, B, C, D, E, F & G; *see also Brown,* 2003 WL 22232884, at *1.) The appeal, it appears, was not acted on. There is certainly an issue of fact as to whether or not the **Inmate** Grievance Program is responsible for plaintiff's failure to obtain a determination at the Program's third and final level, CORC. Plaintiff does not assert that Dr. Koeingsmann personally was responsible for whatever happened to

plaintiff's appeal in the **Inmate** Grievance Program.

Nothing in *Ziemba,* however, requires that the action or inaction which is the basis for the estoppel be that of the particular defendant in the **prisoner's** case. In *Ziemba,* "the district court [was] directed to consider Ziemba's claim that estoppel bars *the State's* assertion of the exhaustion defense." 366 F.3d at 163-64 (emphasis added). In *Wright v. Hollingsworth,* 260 F.3d 357 (5th Cir.2001), the holding of which the Second Circuit adapted in *Ziemba,* 366 F.3d at 163 (quoting *Wright,* 260 F.3d at 358 n. 2), the defendant was a prison nurse. *Ziemba* does not require a showing that Dr. Koenigsmann is personally responsible for plaintiff's failure to complete exhaustion, as long as someone employed by DOCS is. If that reading of *Ziemba* is incorrect, however, *cf. Hemphill v. New York,* 380 F.3d 680, 689 (2d Cir.2004), then the circumstances here must be regarded as special, and as justifying the incompleteness of exhaustion, since a *decision* by CORC is hardly something plaintiff could have accomplished on his own. *See id.,* 380 F.3d at 689 (quoting *Giano v. Goord,* 380 F.3d 670, 676 (2d Cir.2004)).

As to defendant's second argument-that plaintiff has failed to exhaust a claim for unnecessary laser surgery-plaintiff has made it clear that his amended complaint is not intended to assert such a claim. (Pl. Mem. at 6, 44.) [FN4]

> FN4. The Court does not convert the present motion, insofar as it concerns exhaustion, to a Rule 56 motion, *see Ziemba,* 366 F.3d at 164, because of the quite apparent issue of fact, and the consideration that plaintiff has not had discovery.

3.

Defendant next argues that plaintiff has not alleged personal involvement on his part in relation to the laser surgery claim. As already noted, however, plaintiff has made it clear that he makes no such claim. This argument is therefore moot.

4.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1925649 (S.D.N.Y.)

(Cite as: 2005 WL 1925649 (S.D.N.Y.))

Defendant then argues that,

[a]ssuming, *arguendo,* that plaintiff's eye condition meets the standard for an objectively serious medical condition, plaintiff's claims of deliberate indifference against Dr. Koenigsmann must nevertheless fail because plaintiff cannot demonstrate that the defendant had the requisite state of mind that is necessary to satisfy the subjective component of a claim of deliberate medical indifference.

**\*3** (Def. Mem. at 21.) Dr. Koenigsmann's state of mind is a factual question which cannot be resolved on a Rule 12 motion. Defendant's motion, insofar as it is based on this ground, must be denied.[FN5]

> FN5. The Court will not convert defendant's motion, as based on this ground, to a Rule 56 motion, because plaintiff has had no discovery.

5.

Further, defendant seeks dismissal on the ground that he is entitled to qualified immunity. In making this argument, however, defendant appears to misconstrue plaintiff's claim. Defendant, indicating that plaintiff's right eye had been examined by an opthalmologist at Green Haven, and that opthamological evaluations of plaintiff's condition, including visual field testing and treatment at the glaucoma clinic at the Westchester Medical Center, have been performed, then urges: "In essence, plaintiff seeks to hold Dr. Koenigsmann liable for treatment he did not provide, and did not even directly supervise. Because holding Dr. Koenigsmann responsible for the care provided by outside specialists, who are also not defendants in this case, would create a new category of liability, Dr. Koenigsmann is entitled to qualified immunity." (Def. Mem. at 24-25.) [FN6]

> FN6. *See* Koenigsmann Decl., June 10, 2004, ¶¶ 6-18, for a description of plaintiff's medical records; the Koenigsmann Supp. Decl., Apr. 7, 2005, describes subsequent medical events.

The gravamen of the amended complaint, however, is that, after the laser surgery, plaintiff was informed by an opthalmologist that there was a medical procedure available-plaintiff calls it a "Trabeailectomy

Irisecyomy"-which would prevent his right eye from becoming blind and restore 20/20 vision, which DOCS would have to pay for, and that Dr. Koenigsmann delayed or denied the procedure and ignored plaintiff's request to discuss it with a specialist. (Am. Comp. ¶¶ 9-15, 18-21; *see also* Pl. Mem. at 3-5.)

Defendant does not address the question actually raised: whether, if, as claimed by plaintiff, Dr. Koenigsmann denied plaintiff an available medical procedure that would prevent blindness in plaintiff's remaining eye, he would be entitled to dismissal on the ground of qualified immunity. That being the case, defendant's motion insofar as it seeks dismissal on the ground of qualified immunity is denied.[FN7]

> FN7. The use of Rule 12 instead of Rule 56 motions to raise the issue of qualified immunity is discussed in *McKenna v. Wright,* 386 F.3d 432, 435-36 (2d Cir.2004).

6.

Defendant, in his Reply Memorandum, adds a further prong to his motion, seeking dismissal of the amended complaint insofar as it seeks damages against Dr. Koenigsmann in his official capacity. The Court does not understand the amended complaint to seek such relief, however. Paragraphs B, C and D of the *ad damnum* portion of the amended complaint seek damages "against the defendant in his individual and personal capacities" (Am. Comp. at 5), the words "individual" and "personal" both indicating, in context, the opposite of "official." On this understanding of the amended complaint, the motion is denied.[FN8]

> FN8. It is true that in Plaintiff's Memorandum, he says that he is suing Dr. Koenigsmann "in his official capacity." (Pl. Mem. at 39.) Were plaintiff to move to amend his complaint again to assert damage claims against Dr. Koenigsmann in his official capacity, the Court would have to deny the motion. The premise of defendants' argument-that the Eleventh Amendment precludes assertion of a damage claim against Dr. Koenigsmann in his official capacity-is correct. *Britt v. Dep't of Corr.,* No. 99 Civ. 1672,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1925649 (S.D.N.Y.)

(Cite as: 2005 WL 1925649 (S.D.N.Y.))

2004 WL 547955, at *4 (March 19, 2004).

7.

For the reasons set forth above, defendant's motion
for dismissal under Rule 12(b)(6) is denied.
    SO ORDERED.

S.D.N.Y.,2005.

Brown v. Koenigsmann
Not Reported in F.Supp.2d, 2005 WL 1925649
(S.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

**C**

United States District Court,
E.D. New York.
Anthony PRICE, Plaintiff,
v.
Sheriff Edward REILLY, Kim Edwards, RN III, Perry
Intal, Mary Sullivan, RN, Dr. Benjamin Okonta, MD,
and Nassau University Medical Center, Defendants.
**No. 07-CV-2634 (JFB)(ARL).**

March 8, 2010.

**Background:** Pro se inmate, who suffered from end stage
renal disease requiring dialysis, filed § 1983 action against
sheriff, nurse practitioner, physician, and medical center,
alleging violations of the Eighth Amendment for
defendants' failure to provide adequate medical care.
Defendants moved for summary judgment.

**Holdings:** The District Court, Joseph F. Bianco, J., held
that:

(1) there was no evidence that administrative remedy was
available to inmate;

(2) prison medical staff's modification of inmate's
medication dosage did not constitute deliberate
indifference to his medical needs;

(3) prison's failure to provide food with inmate's
medication was not sufficiently serious to satisfy objective
prong of test for deliberate indifference to serious medical
needs;

(4) medical staff did not act with culpable intent to
consciously disregard inmate's serious medical needs;

(5) genuine issue of material fact as to whether prison
medical staff was aware of, and consciously disregarded
inmate's request for a kidney transplant test precluded
summary judgment;

(6) genuine issue of material fact as to whether inmate's
shoulder pain was a serious medical condition precluded
summary judgment;

(7) sheriff was not liable under § 1983; but

(8) genuine issues of material fact precluded summary

judgment on § 1983 liability of registered nurse and
doctor.

Motion granted in part and denied in part.

West Headnotes

**[1] Federal Civil Procedure 170A**    2547.1

170A Federal Civil Procedure
  170AXVII Judgment
    170AXVII(C) Summary Judgment
      170AXVII(C)3 Proceedings
        170Ak2547 Hearing and Determination
          170Ak2547.1 k. In general. Most Cited
Cases
Generally, plaintiffs' failure to respond or contest facts set
forth by defendants in their statement of facts, submitted
in support of summary judgment, constitutes admission of
those facts, and facts are accepted as undisputed under
local rule. U.S.Dist.Ct.Rules S.D.N.Y., Civil Rule 56.1.

**[2] Federal Civil Procedure 170A**    25

170A Federal Civil Procedure
  170AI In General
    170AI(B) Rules of Court in General
      170AI(B)1 In General
        170Ak25 k. Local rules of District Courts.
Most Cited Cases
District court has broad discretion to determine whether to
overlook a party's failure to comply with local court rules.

**[3] Federal Civil Procedure 170A**    2547.1

170A Federal Civil Procedure
  170AXVII Judgment
    170AXVII(C) Summary Judgment
      170AXVII(C)3 Proceedings
        170Ak2547 Hearing and Determination
          170Ak2547.1 k. In general. Most Cited

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

Cases

District court, when analyzing motion for summary judgment by sheriff and medical personnel in inmate's pro se action alleging cruel and unusual punishment, would treat as admitted only those facts in defendants' statement of facts that were supported by admissible evidence and not controverted by other admissible evidence in the record, given that inmate was acting pro se, he failed to file and serve a response to defendant's statement, but he had identified arguments and factual assertions in statement with which he disagreed. U.S.C.A. Const.Amend. 8; U.S.Dist.Ct.Rules S.D.N.Y., Civil Rule 56.1.

[4] Federal Civil Procedure 170A   657.5(1)

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(A) Pleadings in General
            170Ak654 Construction
                170Ak657.5 Pro Se or Lay Pleadings
                    170Ak657.5(1) k. In general. Most Cited Cases
Court must construe pro se complaint broadly, and interpret it to raise the strongest arguments that it suggests.

[5] Attorney and Client 45   62

45 Attorney and Client
    45II Retainer and Authority
        45k62 k. Rights of litigants to act in person or by attorney. Most Cited Cases

Federal Civil Procedure 170A   657.5(1)

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(A) Pleadings in General
            170Ak654 Construction
                170Ak657.5 Pro Se or Lay Pleadings
                    170Ak657.5(1) k. In general. Most Cited Cases

Federal Civil Procedure 170A   2546

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)3 Proceedings
                170Ak2542 Evidence
                    170Ak2546 k. Weight and sufficiency.
Most Cited Cases
Though pro se litigant's pleadings and other submissions are afforded wide latitude, pro se party's conclusory assertions, completely unsupported by evidence, are not sufficient to defeat motion for summary judgment.

[6] Civil Rights 78   1304

78 Civil Rights
    78III Federal Remedies in General
        78k1304 k. Nature and elements of civil actions.
Most Cited Cases
To prevail on a claim under § 1983, a plaintiff must show: (1) deprivation of any rights, privileges, or immunities secured by the Constitution and its laws, (2) by a person acting under the color of state law. 42 U.S.C.A. § 1983.

[7] Prisons 310   317

310 Prisons
    310II Prisoners and Inmates
        310II(H) Proceedings
            310k316 Exhaustion of Other Remedies
                310k317 k. In general. Most Cited Cases
In order to determine if prisoner exhausted his administrative remedies prior to commencement of lawsuit, as required by PLRA, court must first establish from a legally sufficient source that an administrative remedy is applicable, and that the particular complaint does not fall within an exception. Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

[8] Prisons 310   313

310 Prisons

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

310II Prisoners and Inmates
    310II(H) Proceedings
      310k307 Actions and Litigation
        310k313 k. Trial. Most Cited Cases
Whether administrative remedy was available to prisoner in a particular prison or prison system, and whether such remedy was applicable to grievance underlying prisoner's suit, for purpose of PLRA's exhaustion requirement, are not questions of fact; rather, such issues either are, or inevitably contain, questions of law. Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

[9] Civil Rights 78 🗝️ 1319

78 Civil Rights
    78III Federal Remedies in General
      78k1314 Adequacy, Availability, and Exhaustion of State or Local Remedies
        78k1319 k. Criminal law enforcement; prisons. Most Cited Cases
Sheriff and prison medical staff provided no evidence that an administrative remedy was available to inmate who suffered from end state renal disease, and who sought, but did not receive, medical testing to determine if he was a candidate for kidney transplant, and thus inmate's § 1983 action alleging violations of Eighth Amendment would not be dismissed for his failure to exhaust administrative remedies under PLRA; defendants failed to establish procedural framework for grievance resolution at the prison or the availability of any administrative remedies for prisoner's situation. U.S.C.A. Const.Amend. 8; Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

[10] Sentencing and Punishment 350H 🗝️ 1533

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
      350HVII(H) Conditions of Confinement
        350Hk1533 k. Deliberate indifference in general. Most Cited Cases
Test for determining whether prison official's actions or omissions rise to level of "deliberate indifference" in violation of the Eighth Amendment, as will allow recovery by prisoner in federal civil rights action, is twofold: first, prisoner must demonstrate that he is incarcerated under conditions posing substantial risk of serious harm, and second, prisoner must demonstrate that defendant prison officials possessed sufficient culpable intent. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

[11] Sentencing and Punishment 350H 🗝️ 1533

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
      350HVII(H) Conditions of Confinement
        350Hk1533 k. Deliberate indifference in general. Most Cited Cases
Second prong of test for determining whether prison officials acted with deliberate indifference to rights of prisoners in violation of the Eighth Amendment, that of "culpable intent," in turn involves two-tier inquiry; specifically, prison official has sufficient culpable intent if he has knowledge that inmate faces substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate harm. U.S.C.A. Const.Amend. 8.

[12] Sentencing and Punishment 350H 🗝️ 1546

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
      350HVII(H) Conditions of Confinement
        350Hk1546 k. Medical care and treatment. Most Cited Cases
Mere fact that an inmate's underlying disease is a "serious medical condition" does not mean that prison staff's allegedly incorrect treatment of that condition automatically poses an "objectively serious health risk," in violation of Eighth Amendment. U.S.C.A. Const.Amend. 8.

[13] Prisons 310 🗝️ 192

310 Prisons
    310II Prisoners and Inmates
      310II(D) Health and Medical Care
        310k191 Particular Conditions and Treatments
          310k192 k. In general. Most Cited Cases

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

**Sentencing and Punishment 350H** ☞ **1546**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1546 k. Medical care and treatment. Most Cited Cases

Even though inmate's end stage renal disease requiring dialysis was serious medical condition, prison medical staff did not act with deliberate indifference to inmate's medical needs in violation of his Eighth Amendment rights by modifying his medication dosage, since reduction in medication levels posed no objectively serious health risk to inmate; only injury inmate suffered was an increase in phosphorous levels, which was correctable, and a slight rash. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[14] Prisons 310** ☞ **192**

310 Prisons
    310II Prisoners and Inmates
        310II(D) Health and Medical Care
            310k191 Particular Conditions and Treatments
                310k192 k. In general. Most Cited Cases

**Sentencing and Punishment 350H** ☞ **1546**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1546 k. Medical care and treatment. Most Cited Cases

Even though inmate's prescriptions indicated that his medications for renal disease were to be taken with meals, prison officials' failure to provide food with the medication was not sufficiently serious to satisfy objective prong of test for deliberate indifference to inmate's serious medical needs, in violation of Eighth Amendment; inmate did not suffer any harm from taking medicine without food. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[15] Sentencing and Punishment 350H** ☞ **1546**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1546 k. Medical care and treatment. Most Cited Cases

An inmate's mere disagreement with prison officials' prescribed medication dosage is insufficient as a matter of law to establish officials' "deliberate indifference" to his medical needs, in violation of the Eighth Amendment. U.S.C.A. Const.Amend. 8.

**[16] Prisons 310** ☞ **192**

310 Prisons
    310II Prisoners and Inmates
        310II(D) Health and Medical Care
            310k191 Particular Conditions and Treatments
                310k192 k. In general. Most Cited Cases

**Sentencing and Punishment 350H** ☞ **1546**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1546 k. Medical care and treatment. Most Cited Cases

Even though inmate disagreed with medical treatment he received at prison, medical staff did not act with culpable intent to consciously disregard inmate's serious medical needs, in violation of his Eighth Amendment rights, by adjusting the dosage levels of his prescription medication for renal disease; dosage inmate received adequately treated his condition, he suffered no injury from modification of dosage other than increased phosphorous levels, and officials changed dosage to correct those levels. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[17] Federal Civil Procedure 170A** ☞ **2491.5**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2491.5 k. Civil rights cases in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

general. Most Cited Cases
Genuine issue of material fact as to whether prison medical staff was aware of, and consciously disregarded inmate's request for a kidney transplant test, precluded summary judgment in inmate's § 1983 action alleging officials' deliberate indifference to his medical needs, in violation of Eighth Amendment. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[18] Sentencing and Punishment 350H ☞ 1546**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
      350HVII(H) Conditions of Confinement
        350Hk1546 k. Medical care and treatment. Most Cited Cases
An inmate's chronic pain can constitute a "serious medical condition" for purposes of claim of deliberate indifference to a serious medical need under the Eighth Amendment. U.S.C.A. Const.Amend. 8;.

**[19] Federal Civil Procedure 170A ☞ 2491.5**

170A Federal Civil Procedure
    170AXVII Judgment
      170AXVII(C) Summary Judgment
        170AXVII(C)2 Particular Cases
          170Ak2491.5 k. Civil rights cases in general. Most Cited Cases
Genuine issue of material fact as to whether inmate's shoulder pain was a serious medical condition, and whether prison medical staff acted with deliberate indifference by failing to prescribe pain medication or take x-rays, despite inmate's ongoing complaints, precluded summary judgment, in inmate's § 1983 Eighth Amendment claims against medical staff. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[20] Civil Rights 78 ☞ 1355**

78 Civil Rights
    78III Federal Remedies in General
      78k1353 Liability of Public Officials
        78k1355 k. Vicarious liability and respondeat

superior in general; supervisory liability in general. Most Cited Cases
Supervisor liability in § 1983 action can be shown in one or more of the following ways: (1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring. 42 U.S.C.A. § 1983.

**[21] Civil Rights 78 ☞ 1358**

78 Civil Rights
    78III Federal Remedies in General
      78k1353 Liability of Public Officials
        78k1358 k. Criminal law enforcement; prisons. Most Cited Cases
Sheriff was not liable under § 1983 for alleged deliberate indifference to medical needs of inmate related to inmate's end stage renal disease or chronic shoulder pain; there was no showing that sheriff was personally involved in denying medical treatment to inmate, or that there was a custom or policy at prison of allowing alleged constitutional violations. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[22] Federal Civil Procedure 170A ☞ 2491.5**

170A Federal Civil Procedure
    170AXVII Judgment
      170AXVII(C) Summary Judgment
        170AXVII(C)2 Particular Cases
          170Ak2491.5 k. Civil rights cases in general. Most Cited Cases
Genuine issue of material fact as to whether registered nurse on prison medical staff was personally involved in prison's alleged failure to arrange for inmate's kidney transplant test precluded summary judgment in inmate's § 1983 action alleging officials' deliberate indifference to his medical needs, in violation of Eighth Amendment. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

**[23]** Civil Rights 78 🗝   1358

78 Civil Rights
    78III Federal Remedies in General
        78k1353 Liability of Public Officials
            78k1358 k. Criminal law enforcement; prisons.
Most Cited Cases
If prison doctor denies medical treatment to an inmate,
that doctor is "personally involved" in alleged
constitutional violation for purposes of § 1983 liability.
U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[24]** Federal Civil Procedure 170A 🗝   2491.5

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2491.5 k. Civil rights cases in
general. Most Cited Cases
Genuine issue of material fact as to whether doctor denied
medical treatment to inmate suffering from end stage renal
disease, precluded summary judgment in inmate's § 1983
action alleging prison officials' deliberate indifference to
his medical needs, in violation of Eighth Amendment.
U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.
***347** Anthony Price, pro se.

Edward J. Troy, Law Office of Edward J. Troy,
Greenlawn, NY, for the Defendants.

***348** MEMORANDUM AND ORDER

JOSEPH F. BIANCO, District Judge:

Pro se plaintiff Anthony Price (hereinafter "Price" or
"plaintiff") alleges, pursuant to 42 U.S.C. § 1983, that
Sheriff Edward Reilly, Kim Edwards, RN, Perry Intal,
Mary Sullivan, RN, Dr. Benjamin Okonta, and Nassau
University Medical Center (hereinafter "defendants")
violated his Eighth Amendment rights by acting with
deliberate indifference to his serious medical needs while
plaintiff was incarcerated at the Nassau County

Correctional Center (hereinafter "NCCC"). Specifically,
plaintiff alleges that defendants: (1) prescribed an
incorrect dosage of medication for his renal disease; (2)
failed to get him tested for a kidney transplant list; and (3)
failed to adequately treat him for shoulder pain.
Defendants have moved for summary judgment on all of
plaintiffs' claims. For the reasons set forth below,
defendants' motion is granted in part and denied in part.
Specifically, defendants' motion is granted with respect to
plaintiff's claim regarding the dosage of his prescription
medication and with respect to all of plaintiff's claims
against Sheriff Reilly. Defendants' motion is denied in all
other respects.

I. FACTS

**[1][2][3]** The Court has taken the facts set forth below
from the parties' depositions, affidavits, and exhibits, and
from the defendants' Rule 56.1 statement of facts.[FN1] They
are not findings of fact by the Court, but rather are
assumed to be true for the purposes of deciding this
motion. Upon consideration of a motion for summary
judgment, the Court shall construe the facts in the light
most favorable to the non-moving party-here, the plaintiff.
See Capobianco v. City of New York, 422 F.3d 47, 50 n.
1 (2d Cir.2005). Unless otherwise noted, where a party's
56.1 statement or deposition is cited, that fact is
undisputed or the opposing party has pointed to no
evidence in the record to contradict it.

FN1. The Court notes that plaintiff failed to file
and serve a response to defendants' Local Rule
56.1 Statement of Facts in violation of Local
Civil Rule 56.1. Generally, a "plaintiff['s] failure
to respond or contest the facts set forth by the
defendants in their Rule 56.1 statement as being
undisputed constitutes an admission of those
facts, and those facts are accepted as being
undisputed." Jessamy v. City of New Rochelle,
292 F.Supp.2d 498, 504 (S.D.N.Y.2003)
(quoting NAS Elecs., Inc. v. Transtech Elecs.
PTE Ltd., 262 F.Supp.2d 134, 139
(S.D.N.Y.2003)). However, "[a] district court
has broad discretion to determine whether to
overlook a party's failure to comply with local
court rules." Holtz v. Rockefeller & Co., 258
F.3d 62, 73 (2d Cir.2001) (citations omitted); see

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

*also* *Giliani v. GNOC Corp.,* No. 04 Civ. 2935(ILG), 2006 WL 1120602, at *2 (E.D.N.Y. Apr. 26, 2006)* (exercising court's discretion to overlook the parties' failure to submit statements pursuant to Local Civil Rule 56.1). In his opposition papers, plaintiff identifies defendants' arguments and factual assertions with which he disagrees. In the exercise of its broad discretion, and given plaintiff's *pro se* status, the Court will deem admitted only those facts in defendants' Rule 56.1 statement that are supported by admissible evidence and not controverted by other admissible evidence in the record. *See Jessamy,* 292 F.Supp.2d at 504-05. Furthermore, the Court has carefully reviewed all of the parties' submissions, including plaintiff's deposition, to determine if plaintiff has any evidence to support his claims.

A. Arrival at NCCC and Medication

Plaintiff was incarcerated in the Nassau County Correctional Center from January 7, 2007 to December 11, 2007. (Price Dep. at 6, 35.) Plaintiff has end stage renal disease and has been on dialysis since 2004 related to kidney failure. (*Id.* at 10; Defs.' 56.1 ¶ 2.) Plaintiff takes two daily medications, Renagel and PhosLo, for this condition. (Price Dep. at 10.) Before arriving **349** at the NCCC,[FN2] plaintiff was taking two 800 milligram pills of Renagel three times a day and two 667 milligram pills of PhosLo three times a day. (*Id.* at 12-13.)

FN2. Plaintiff was incarcerated at the Elmira correctional facility in 2005 and 2006. (Price Dep. at 7-8.)

When plaintiff arrived at the NCCC, he was interviewed by Perry Intal, a nurse practitioner in the medical intake department. (*Id.* at 21-22.) Plaintiff told Intal about his medical history, including that he was a dialysis patient and that he took medications. (*Id.* at 22.) Plaintiff was given a prescription for one 800 milligram pill of Renagel two times a day and one 667 milligram pill of PhosLo two times a day. (*Id.* at 23-24.) Two or three weeks later, plaintiff went to dialysis treatment and a blood test revealed high phosphorous levels. (*Id.* at 25-26.) As a

result, plaintiff was given an increased dosage of medication. (*Id.* at 25-27.) Thereafter, plaintiff's phosphorous levels decreased and about one month later (*id.* at 30-31), his dosage was decreased to one 800 milligram pill of Renagel three times a day and two 667 milligram pills of PhosLo three times a day. (*Id.* at 31-33.) This was the dosage plaintiff received for the rest of his incarceration at the NCCC.[FN3] (*Id.* at 32-33.) Plaintiff believed that the dosage he was receiving was "wrong" and that it was "hurting" him. (*Id.* at 59-60.) However, the more plaintiff complained about the dosage hurting him, "the more it seemed like the people got aggravated." (*Id.* at 60.) In addition, plaintiff's prescriptions for Renagel and PhosLo indicate that the medications were to be taken with meals. (*See* Defs.' Ex. E.) Plaintiff alleges, however, that the medications were sometimes given to him without food or at times that interfered with his meals. (Price Dep. at 23, 60.)

FN3. Plaintiff testified that, at the time of his deposition, he was receiving two 800 milligram pills of Renagel three times a day and two 667 milligram pills of PhosLo three times a day at the Fishkill correctional facility. (Price Dep. at 11-12.)

Besides receiving medication, plaintiff also received dialysis treatment three times a week at the Nassau University Medical Center. (*Id.* at 30.) On some occasions, plaintiff refused dialysis treatment because he "was feeling good" and "wanted to take a break" from treatment. (*Id.* at 56.) Plaintiff's regular medical treatment at the hospital also included a blood test every 30 days. (*Id.* at 27-28, 30.)

B. Kidney Transplant Request

In February or March 2007, plaintiff spoke with a social worker named "Susan" about getting tested for a kidney transplant. (*Id.* at 76.) A test was required before an inmate could be placed on a waiting list for kidney transplants. (*Id.* at 80-81.) Only two hospitals in the area dealt with such matters: Stony Brook and a hospital in Westchester County. (*Id.* at 75-76.) Susan tried to contact Dr. Benjamin Okonta (hereinafter "Okonta") at Nassau University Medical Center in or about February or March

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

2007 (*id.* at 76-77), but Susan told plaintiff that Okonta did not get back to her.[FN4] (*Id.* at 65-66, 74-78.) Susan also submitted a letter to Okonta in July 2007, stating: "As per our conversation on 7/27/07, I am re-submitting for your review my request [for] your medical services on behalf of our renal dialysis pt., Anthony Price." (*Id.* at 77-78; Defs.' Ex. K.) Plaintiff never received a response from Okonta. (Price Dep. at 82.)

> FN4. Plaintiff never interacted with Okonta except through Susan, the social worker. (Price Dep. at 73-74.)

Susan also submitted a letter to Nurse Mary Sullivan (hereinafter "Sullivan"), the **\*350** day supervisor at the NCCC medical center, stating: "As per our telephone conversation, I am submitting in writing Anthony Price's request for referral and evaluation to a kidney transplant center ... Stonybrook Univ. Medical Ctr." (Def.'s Ex. K.) At some point in time, plaintiff was called down to the NCCC medical center and was told by Sullivan that defendants knew about plaintiff's request to get on the kidney transplant list but that they had "other priorities right now." (Price Dep. at 70.) Plaintiff believed Sullivan was referring to his other health issues. (*Id.* at 70.) Plaintiff did not ask when he would be tested for the kidney transplant list. (*Id.* at 71.)

On September 25, 2007, plaintiff filed a formal grievance regarding his request to be tested for the kidney transplant list.[FN5] (*Id.* at 85.) Plaintiff stated on his grievance form that he had "been waiting to take the test I need to take to get on the kidney transplant list" and that his social worker had told him that she had forwarded the paperwork to the jail, but could not get a response. (Defs.' Ex. F.) Plaintiff requested that he be "given the test to see if I'm a candidate for possibly a kidney transplant." (*Id.*) By interdepartmental memorandum dated September 27, 2007, the Inmate Grievance Coordinator informed plaintiff that the medical grievance "is being discussed with and turned over to the Health Services Administrator. The medical unit will evaluate you. A Grievance Unit Investigator will contact you at a later date to conduct an evaluation of your status and to closeout the paperwork." (*Id.*) In another memo dated October 5, 2007, defendant Kim Edwards,[FN6] informed plaintiff:

> FN5. This was the only formal medical grievance filed by plaintiff. (Price Dep. at 85.)

> FN6. Edwards never wrote medical orders for plaintiff or examined plaintiff. (Price Dep. at 61.) Plaintiff had no interaction with Edwards except her written response to plaintiff's grievance. (*Id.* at 67.)

The social worker can only inform you of treatment options that are available for your medical problem. If you are in need of a "test", documentation must be provided by the attending physician that is responsible for your renal treatment.

(*Id.*) Plaintiff interpreted this response from Edwards to mean that the matter was now in the hands of the medical department, and so he did not further proceed with the grievance and "did not feel it was necessary." (Pl.'s Opp. at 3.)[FN7] Therefore, plaintiff "signed off on the grievance," saying that he had "read it and accepted it." (Price Dep. at 88.)

> FN7. Although plaintiff does not offer this explanation in his deposition, the Court construes the *pro se* plaintiff's sworn "verified rebuttal" to defendants' motion for summary judgment as an evidentiary submission. *See Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d Cir.2004) ("[A] verified pleading, to the extent that it makes allegations on the basis of the plaintiff's personal knowledge, and not merely on information and belief, has the effect of an affidavit and may be relied on to oppose summary judgment."); *see also Hailey v. N.Y. City Transit Auth.,* 136 Fed.Appx. 406, 407-08 (2d Cir.2005) ("The rule favoring liberal construction of *pro se* submissions is especially applicable to civil rights claims.").

Plaintiff did not get the requested test during the remainder of his incarceration at the NCCC. (*Id.* at 90.) Defendants have submitted evidence that they made efforts to get plaintiff tested and, in fact, scheduled plaintiff for a test at Stony Brook University Hospital on November 29, 2007, but that the test had to be cancelled due to "unforeseen circumstances"; the test was

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

re-scheduled for January 10, 2008. (Defs.' Ex. G, Reschke Aff. ¶¶ 6-7.) Plaintiff was not informed about any scheduled test (Pl.'s Opp. at 2), and he was **351 transferred to a different facility in December 2007. (Price Dep. at 35; Reschke Aff. ¶ 7.)

### C. Shoulder Pain

Plaintiff began complaining about shoulder pain to the medical department at the NCCC on January 17, 2007, stating that his right shoulder was "extremely hurting." (Price Dep. at 36; Defs.' Ex. E, Sick Call Request, Jan. 17, 2007.) Plaintiff had received treatment for shoulder pain in the past, including a shot of Cortisone while at the Elmira facility (Price Dep. at 38, 53-54; Defs.' Ex. E, Sick Call Request, Apr. 14, 2007.) After the January 17 complaint, plaintiff was seen a couple of days later and given medication to rub on his shoulder. (Price Dep. at 41.) The medication did not help with the discomfort, and so plaintiff complained again later in January. (Id. at 42-43.) Although defendants gave plaintiff Motrin and Naprosyn for the pain, no x-rays were taken for several months. (Id. at 44, 55; Defs.' Ex. H, Edwards Aff. ¶ 4.) The pain medication continued to be ineffective, and plaintiff continued to complain. (See, e.g., id. at 45, 51.) For instance, in June 2007, plaintiff complained that his right shoulder "hurts really bad." (Def.'s Ex. E, Sick Call Request, June 12, 2007.) Plaintiff never refused medication for his shoulder. (Price Dep. at 56.) When plaintiff eventually was given x-rays, in April and November 2007 (Edwards Aff. ¶ 4), plaintiff was told that nothing was wrong with his shoulder.[FN8] (Price Dep. at 44; see also Defs.' Ex. J, Discharge Summary, November 2007 ("Although no definite evidence of venous thrombosis is seen with Rt. upper extremity, short segment acute thrombosis cannot be reliably excluded, Ultrasound might provide additional information....").) Plaintiff states that, with respect to his right shoulder, he currently wears a brace for carpal tunnel syndrome, has a separated shoulder, and takes shots for the pain. (Pl.'s Opp. at 4.)

FN8. Plaintiff testified that he stopped complaining about his shoulder at some point because he was frustrated that defendants were not helping. (Price Dep. at 54-55.) There is evidence that plaintiff complained about his shoulder at least as late as June 2007, and again

complained in November 2007, which resulted in the taking of additional x-rays. (See Def.'s Ex. E, Sick Call Request, June 21, 2007; Defs.' Ex. J.)

### II. PROCEDURAL HISTORY

On June 28, 2007, plaintiff filed the initial complaint in this action. Plaintiff filed an amended complaint on August 20, 2007 alleging, pursuant to Section 1983, that defendants Sheriff Edward Reilly, Kim Edwards, Perry Intal, and Nassau University Medical Center violated his Eighth Amendment rights with respect to his medication dosage, kidney transplant request, and shoulder pain. On November 14, 2007, plaintiff filed another complaint in a separate action (No. 07-CV-4841) making substantially the same allegations and expanding on his allegations regarding the kidney transplant request. This complaint named Mary Sullivan and Dr. Benjamin Okonta, as well as the Nassau University Medical Center, as defendants. By Order dated July 11, 2008, the Court consolidated both actions (Nos. 07-CV2634 and 07-CV-4841) because the allegations in the two actions were "factually intertwined."

Defendants moved for summary judgment on May 29, 2009.[FN9] Plaintiff submitted**352 an opposition to the motion on August 3 and August 11, 2009.[FN10] Defendants replied on August 20, 2009. Plaintiff submitted a surreply on October 6, 2009. This matter is fully submitted.

FN9. Pursuant to Local Rule 56.1, defendants also served plaintiff with the requisite notice for pro se litigants opposing summary judgment motions. See Irby v. N.Y. City Transit Auth., 262 F.3d 412, 414 (2d Cir.2001) ("And we remind the district courts of this circuit, as well as summary judgment movants, of the necessity that pro se litigants have actual notice, provided in an accessible manner, of the consequences of the pro se litigant's failure to comply with the requirements of Rule 56.").

FN10. Plaintiff submitted his two identical oppositions and a sur-reply to the instant motion not only in this action, but also in the now-consolidated action (No. 07-CV-4841). The

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

Court has considered all of plaintiff's submissions in both actions in deciding the instant motion.

## III. STANDARD OF REVIEW

The standards for summary judgment are well settled. Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is appropriate only if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); Reiseck v. Universal Commc'ns of Miami, Inc., 591 F.3d 101, 104 (2d Cir.2010). The moving party bears the burden of showing that he or she is entitled to summary judgment. See Huminski v. Corsones, 396 F.3d 53, 69 (2d Cir.2005). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 122 (2d Cir.2004); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party " 'must do more than simply show that there is some metaphysical doubt as to the material facts .... [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial.' " Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir.2002) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (emphasis in original)). As the Supreme Court stated in Anderson, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50, 106 S.Ct. 2505 (citations omitted). Indeed, "the mere existence of some alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. Id. at 247-48, 106 S.Ct. 2505 (emphasis in original). Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth " 'concrete particulars' " showing that a trial is needed.

R.G. Group, Inc. v. Horn & Hardart Co., 751 F.2d 69, 77 (2d Cir.1984) (quoting SEC v. Research Automation Corp., 585 F.2d 31, 33 (2d Cir.1978)). Accordingly, it is insufficient for a party opposing summary judgment " 'merely to assert a conclusion without supplying supporting arguments or facts.' " BellSouth Telecomms., Inc. v. W.R. Grace & Co., 77 F.3d 603, 615 (2d Cir.1996) (quoting Research Automation Corp., 585 F.2d at 33).

[4][5] Where the plaintiff is proceeding pro se, the Court must "construe [the complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggest[s]." Weixel v. Bd. of Educ. of the City of N.Y., 287 F.3d 138, 145-46 (2d Cir.2002) (alterations in original) (quoting Cruz v. Gomez, 202 F.3d 593, 597 (2d Cir.2000)). Though a pro se litigant's pleadings and other submissions are afforded wide latitude, a pro se party's conclusory assertions, completely unsupported **353 by evidence, are not sufficient to defeat a motion for summary judgment. Shah v. Kuwait Airways Corp., 653 F.Supp.2d 499, 502 (S.D.N.Y.2009) ("Even a pro se party, however, 'may not rely simply on conclusory allegations or speculation to avoid summary judgment, but instead must offer evidence to show that its version of the events is not wholly fanciful.' " (quoting Auguste v. N.Y. Presbyterian Med. Ctr., 593 F.Supp.2d 659, 663 (S.D.N.Y.2009))).

## IV. DISCUSSION

[6] To prevail on a claim under Section 1983, a plaintiff must show: (1) the deprivation of any rights, privileges, or immunities secured by the Constitution and its laws; (2) by a person acting under the color of state law. 42 U.S.C. § 1983. "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." Sykes v. James, 13 F.3d 515, 519 (2d Cir.1993).

There is no dispute for purposes of this motion that defendants were acting under color of state law. The question presented, therefore, is whether defendants' alleged conduct deprived plaintiff of his Eighth Amendment rights. Plaintiff alleges that his Eighth Amendment rights were violated when defendants: (1) prescribed him an incorrect dosage of medication for his renal disease; (2) failed to get him tested for the kidney

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

transplant list; and (3) failed to adequately treat him for his shoulder pain. For the reasons set forth below, after drawing all reasonable inferences from the facts in favor of plaintiff, the Court concludes that defendants are entitled to summary judgment on plaintiff's claim regarding the dosage of his medication and on all of plaintiff's claims against Sheriff Reilly. Defendants' motion for summary judgment is denied in all other respects.

### A. Exhaustion

As a threshold matter, defendants argue that plaintiff is barred from raising any Eighth Amendment claim with respect to his kidney transplant request because plaintiff has not exhausted his administrative remedies.[FN11] For the reasons set forth below, the Court disagrees and cannot conclude from this record that plaintiff failed to exhaust his administrative remedies.

> FN11. Defendants raise exhaustion only with respect to plaintiff's kidney transplant request, and so the Court does not consider exhaustion with respect to plaintiff's other claims.

### 1. Legal Standard

The Prison Litigation Reform Act of 1995 ("PLRA") states that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "The PLRA exhaustion requirement 'applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.' Prisoners must utilize the state's grievance procedures, regardless of whether the relief sought is offered through those procedures." Espinal v. Goord, 558 F.3d 119, 124 (2d Cir.2009) (quoting Porter v. Nussle, 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002)). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules." Woodford v. Ngo, 548 U.S. 81, 90, 126 S.Ct. 2378, 165 L.Ed.2d 368

(2006). Therefore, the exhaustion inquiry requires a court to "look at the state prison procedures and the prisoner's grievance to determine whether the prisoner has complied with those procedures." *354Espinal, 558 F.3d at 124 (citing Jones v. Bock, 549 U.S. 199, 218, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007) and Woodford, 548 U.S. at 88-90, 126 S.Ct. 2378).

Prior to Woodford, 548 U.S. 81, 126 S.Ct. 2378 (2006), the Second Circuit "recognized some nuances in the exhaustion requirement: (1) administrative remedies that are ostensibly 'available' may be unavailable as a practical matter, for instance, if the inmate has already obtained a favorable result in administrative proceedings but has no means of enforcing that result; (2) similarly, if prison officials inhibit the inmate's ability to seek administrative review, that behavior may equitably estop them from raising an exhaustion defense; (3) imperfect exhaustion may be justified in special circumstances, for instance if the inmate complied with his reasonable interpretation of unclear administrative regulations, or if the inmate reasonably believed he could raise a grievance in disciplinary proceedings and gave prison officials sufficient information to investigate the grievance." Reynoso v. Swezey, 238 Fed.Appx. 660, 662 (2d Cir.2007) (internal citations omitted); see also Davis v. New York, 311 Fed.Appx. 397, 399 (2d Cir.2009) (citing Hemphill v. New York, 380 F.3d 680, 686, 691 (2d Cir.2004)). However, the Second Circuit has not decided whether the above-discussed considerations apply post- Woodford. See, e.g., Reynoso, 238 Fed.Appx. at 662 ("Because we agree with the district court that [plaintiff] cannot prevail on any of these grounds, we have no occasion to decide whether Woodford has bearing on them."); Ruggiero v. County of Orange, 467 F.3d 170, 176 (2d Cir.2006) ("We need not determine what effect Woodford has on our case law in this area, however, because [plaintiff] could not have prevailed even under our pre- Woodford case law.").

As the Supreme Court has held, exhaustion is an affirmative defense: "We conclude that failure to exhaust is an affirmative defense under the PLRA, and that inmates are not required to specially plead or demonstrate exhaustion in their complaints." Jones v. Bock, 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007); see also Key v. Toussaint, 660 F.Supp.2d 518, 523 (S.D.N.Y.2009) ("Failure to exhaust remedies under the PLRA is an affirmative defense, and thus the defendants have the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

burden of proving that [plaintiff's] retaliation claim has not been exhausted." (citations omitted)).

### 2. Application

Defendants argue that plaintiff did not appeal the resolution of his grievance request, i.e., the memo from Edwards dated October 5, 2007, stating that: "If you are in need of a 'test', documentation must be provided by the attending physician that is responsible for your renal treatment." (Defs.' Ex. F.) Therefore, defendants argue, plaintiff has failed to exhaust his administrative remedies under the PLRA. (Defs.' Br. at 25.) Plaintiff argues in response that he did not believe any further action on his grievance was "necessary" because the matter was put into the hands of the medical department. (Pl.'s Opp. at 3.) For the reasons discussed below, the Court concludes that, on this record, defendants have not met their burden of proving that plaintiff failed to exhaust his administrative remedies.

[7][8][9] As discussed above, the PLRA requires exhaustion only with respect to "such administrative remedies as are available." *See* 42 U.S.C. § 1997e(a). Therefore, in order to determine whether plaintiff exhausted his administrative remedies, the Court "must first establish from a legally sufficient source that an administrative remedy is applicable and that the particular complaint does not fall within an exception. Courts should be careful to look at the applicable set of grievance procedures,*355 whether city, state or federal." *Mojias v. Johnson,* 351 F.3d 606, 610 (2d Cir.2003); *see also Espinal,* 558 F.3d at 124 (holding that, when considering exhaustion, courts must "look at the state prison procedures and the prisoner's grievance to determine whether the prisoner has complied with those procedures" (citations omitted)). "Whether an administrative remedy was available to a prisoner in a particular prison or prison system, and whether such remedy was applicable to the grievance underlying the prisoner's suit, are not questions of fact. They are, or inevitably contain, questions of law." *See Snider v. Melindez,* 199 F.3d 108, 113-14 (2d Cir.1999). However, "the existence of the procedure may be a matter of fact." *Id.* at 114.

On the record before the Court on this motion, the Court

is unable to establish from any legally sufficient source that an administrative remedy was available to plaintiff. Defendants have made no submissions to the Court regarding the applicable grievance procedures at the NCCC. *See, e.g., Abney v. County of Nassau,* 237 F.Supp.2d 278, 281 (E.D.N.Y.2002) (noting that the "Inmate Handbook" for the Nassau County Correctional Facility procedure was "annexed to Defendants' moving papers"). Specifically, defendants have not submitted any evidence, by affidavit or otherwise, that NCCC procedures offer a remedy to address the particular situation in this case.[FN12] Therefore, the Court cannot conclude from this record that plaintiff had an available administrative remedy that he failed to exhaust.

FN12. The Court notes that the October 5, 2007 memo from Edwards is unclear as to which party bore the responsibility of obtaining plaintiff's medical records. (Defs.' Ex. F.) Edwards explains in an affidavit that she advised plaintiff that "it would be necessary for his doctors to provide the selected facility with his records before a request for testing would be considered." (Edwards Aff. ¶ 2.) It is unclear whether plaintiff had access to these records or whether the prison would need to obtain them. Thus, there appears to be a factual question as to the implementation of this grievance resolution. A similar situation arose in *Abney v. McGinnis,* 380 F.3d 663 (2d Cir.2004), in which the Second Circuit held that where a prisoner achieved favorable results in several grievance proceedings but alleged that prison officials failed to implement those decisions, that prisoner was without an administrative remedy and therefore had exhausted his claim for purposes of the PLRA. *See id.* at 667-68, 669 ("Where, as here, prison regulations do not provide a viable mechanism for appealing implementation failures, prisoners in [plaintiff's] situation have fully exhausted their available remedies."). The Court recognizes that *Abney,* 380 F.3d 663, was decided before *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006), and that, as discussed above, the Second Circuit has not decided whether the various nuances to the exhaustion requirement apply post- *Woodford.* However, the Court need not decide the applicability of any such nuances to the

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

exhaustion requirement because, as discussed above, defendants have failed to establish the procedural framework for grievance resolution at the NCCC and the availability of *any* administrative remedies.

Although there may be administrative remedies for such a situation under the New York Department of Corrections regulations, *see* 7 N.Y. Comp.Codes R. & Regs. tit. 7, § 701.5(c)(4) ("If a decision is not implemented within 45 days, the grievant may appeal to CORC citing lack of implementation as a mitigating circumstance."), it does not follow that the same procedure applies at the NCCC. *See, e.g., Abney v. County of Nassau,* 237 F.Supp.2d at 283 ("The flaw in Defendants' argument, however, is that the cases relied upon were all decided under the New York State administrative procedure-none were decided in the context of the procedure relied upon-the Nassau County Inmate Handbook procedure.").

B. Plaintiff's Claims of Deliberate Indifference

1. Legal Standard

"[D]eliberate indifference to serious medical needs of prisoners constitutes the **356** 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment" and therefore "states a cause of action under § 1983." *Estelle v. Gamble,* 429 U.S. 97, 104-05, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). As the Second Circuit has explained,

[t]he Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody. Moreover, under 42 U.S.C. § 1983, prison officials are liable for harm incurred by an inmate if the officials acted with "deliberate indifference" to the safety of the inmate. However, to state a cognizable section 1983 claim, the prisoner must allege actions or omissions sufficient to demonstrate deliberate indifference; mere negligence will not suffice.

*Hayes v. N.Y. City Dep't of Corr.,* 84 F.3d 614, 620 (2d Cir.1996) (citations omitted). Within this framework, "[d]eliberate indifference to a prisoner's serious medical needs constitutes cruel and unusual punishment, in violation of the Eighth Amendment, as made applicable to the states through the Fourteenth Amendment." *Bellotto v. County of Orange,* 248 Fed.Appx. 232, 236 (2d Cir.2007). Thus, according to the Second Circuit,

[d]efendants may be held liable under § 1983 if they ... exhibited deliberate indifference to a known injury, a known risk, or a specific duty, and their failure to perform the duty or act to ameliorate the risk or injury was a proximate cause of plaintiff's deprivation of rights under the Constitution. Deliberate indifference is found in the Eighth Amendment context when a prison supervisor knows of and disregards an excessive risk to inmate health or safety .... Whether one puts it in terms of duty or deliberate indifference, prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause.

*Ortiz v. Goord,* 276 Fed.Appx. 97, 98 (2d Cir.2008) (citations and quotation marks omitted); *see also Harrison v. Barkley,* 219 F.3d 132, 137 (2d Cir.2000) ("Deliberate indifference will exist when an official 'knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it.' ") (quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)); *Curry v. Kerik,* 163 F.Supp.2d 232, 237 (S.D.N.Y.2001) (" '[A]n official acts with the requisite deliberate indifference when that official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' ") (quoting *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (internal quotation marks omitted)).

[10][11] In particular, the Second Circuit has set forth a two-part test for determining whether a prison official's actions or omissions rise to the level of deliberate indifference:

The test for deliberate indifference is twofold. First, the plaintiff must demonstrate that he is incarcerated under conditions posing a substantial risk of serious harm.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

Second, the plaintiff must demonstrate that the defendant prison officials possessed sufficient culpable intent. The second prong of the deliberate indifference test, culpable intent, in turn, involves a two-tier inquiry. Specifically, a prison official has sufficient culpable intent if he has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm.

*357 Hayes, 84 F.3d at 620 (internal citation omitted); see also Phelps v. Kapnolas, 308 F.3d 180, 185-86 (2d Cir.2002) (setting forth two-part deliberate indifference test).

In Salahuddin v. Goord, the Second Circuit set forth in detail the objective and subjective elements of a medical indifference claim. 467 F.3d 263 (2d Cir.2006). In particular, with respect to the first, objective element, the Second Circuit explained:

The first requirement is objective: the alleged deprivation of adequate medical care must be sufficiently serious. Only deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation. Determining whether a deprivation is an objectively serious deprivation entails two inquiries. The first inquiry is whether the prisoner was actually deprived of adequate medical care. As the Supreme Court has noted, the prison official's duty is only to provide reasonable care. Thus, prison officials who act reasonably [in response to an inmate-health risk] cannot be found liable under the Cruel and Unusual Punishments Clause, and, conversely, failing to take reasonable measures in response to a medical condition can lead to liability.

Second, the objective test asks whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner. For example, if the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious. Factors relevant to the seriousness of a medical condition include whether a reasonable doctor or patient would find [it] important and worthy of comment, whether the condition significantly affects an inmate's daily activities, and whether it causes chronic and substantial pain. In cases where the inadequacy is in the medical treatment given, the seriousness inquiry is narrower. For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone. Thus, although we sometimes speak of a serious medical condition as the basis for an Eighth Amendment claim, such a condition is only one factor in determining whether a deprivation of adequate medical care is sufficiently grave to establish constitutional liability.

467 F.3d at 279-80 (citations and quotation marks omitted); see also Jones v. Westchester County Dep't of Corr. Medical Dep't, 557 F.Supp.2d 408, 413-14 (S.D.N.Y.2008).

With respect to the second, subjective component, the Second Circuit further explained:

The second requirement for an Eighth Amendment violation is subjective: the charged official must act with a sufficiently culpable state of mind. In medical-treatment cases not arising from emergency situations, the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health. Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law. This mental state requires that the charged official act or fail to act while actually aware *358 of a substantial risk that serious inmate harm will result. Although less blameworthy than harmful action taken intentionally and knowingly, action taken with reckless indifference is no less actionable. The reckless official need not desire to cause such harm or be aware that such harm will surely or almost certainly result. Rather, proof of awareness of a substantial risk of the harm suffices. But recklessness

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

entails more than mere negligence; the risk of harm must be substantial and the official's actions more than merely negligent.

*Salahuddin,* 467 F.3d at 280 (citations and quotation marks omitted); *see also Jones,* 557 F.Supp.2d at 414. The Supreme Court has stressed that

in the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute "an unnecessary and wanton infliction of pain" or to be "repugnant to the conscience of mankind." Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend "evolving standards of decency" in violation of the Eighth Amendment.

*Estelle v. Gamble,* 429 U.S. 97, 105-06, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (internal citations omitted); *see also Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) ("A showing of medical malpractice is therefore insufficient to support an Eighth Amendment claim unless the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces a conscious disregard of a substantial risk of serious harm." (internal quotations omitted)); *Harrison v. Barkley,* 219 F.3d 132, 139 (2d Cir.2000) (a medical practitioner who "delay[s] ... treatment based on a bad diagnosis or erroneous calculus of risks and costs" does not evince the culpability necessary for deliberate indifference).

2. Application

Plaintiff alleges that defendants violated his Eighth Amendment rights by: (1) prescribing an incorrect dosage of his renal disease medication; (2) failing to have him tested for the kidney transplant list; and (3) failing to properly treat his shoulder pain. The Court considers each claim in turn and, for the reasons discussed below, concludes that defendants are entitled to summary

judgment on plaintiff's claim regarding his medication dosage and on all of plaintiff's claims against Sheriff Reilly. Defendants' motion is denied in all other respects.

a. Medication Dosage

Defendants concede that plaintiff's kidney condition is serious (Defs.' Br. at 21), but argue that the dosage of Renagel and PhosLo prescribed for plaintiff did not result in any injury. Defendants also argue that, even if the dosage was incorrect, it was at most "an error in medical judgment." Finally, defendants argue that plaintiff cannot show deliberate indifference because defendants continually tested plaintiff and twice changed the dosage of his medication depending on his phosphorous levels. (Defs.' Br. at 22.) For the reasons set forth below, the Court agrees and concludes that no rational jury could find that defendants acted with deliberate indifference with respect to the prescription**359 of medication for plaintiff's renal disease.

i. Objective Prong

[12][13][14] Plaintiff has failed to present any evidence that the allegedly incorrect medication dosage posed an objectively serious risk to plaintiff's health. As a threshold matter, the mere fact that plaintiff's underlying renal disease is a serious medical condition does not mean that the allegedly incorrect treatment for that condition poses an objectively serious health risk. *See Smith v. Carpenter,* 316 F.3d 178, 186-87 (2d Cir.2003) ("As we noted in *Chance* [*v. Armstrong,* 143 F.3d 698 (2d Cir.1998) ], it's the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes."). Furthermore, plaintiff has failed to produce any evidence that his medication dosage at the NCCC caused him any objectively serious harm. Instead, plaintiff testified merely that the prescribed dosage was "wrong" and was "hurting" him.[FN13] (Price Dep. at 60.) Plaintiff's belief that the medication dosage was incorrect is insufficient to establish the objective prong of the deliberate indifference test.[FN14] *See Fox v. Fischer,* 242 Fed.Appx. 759, 760 (2d Cir.2007) ("[T]he fact that [plaintiff] was provided Claritin as a substitute for Allegra

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

fails to establish deliberate indifference to a serious medical need, because there is no allegation that the change in medication caused harm, if any, sufficiently serious to establish the objective prong of a deliberate indifference claim...."); *Reyes v. Gardner,* 93 Fed.Appx. 283, 285 (2d Cir.2004) ( "[Plaintiff] has offered no evidence ... showing that the prescribed medication regimen deviated from reasonable medical practice for the treatment of his condition."). Although there is evidence that plaintiff's phosphorous levels increased when he was prescribed a lesser dosage of medication upon arriving at the NCCC (*see* Price Dep. at 23-26), that is not by itself enough to support a finding of an objectively serious condition.[FN15] *See Smith,* 316 F.3d at 188-89 ("Although [plaintiff] suffered from an admittedly serious underlying condition, he presented no evidence that the two alleged episodes of missed medication resulted in permanent or on-going harm to his health, nor did he present any evidence explaining why the absence of actual physical injury was not a relevant factor in assessing the severity of his medical need.") (affirming denial of motion for new trial). Thus, plaintiff's medication dosage claim must fail because he cannot show that the complained-of dosage posed an objectively serious health risk.[FN16]

> FN13. Plaintiff does not distinguish between the initial dosage he received at the NCCC and the later dosages he received, instead arguing generally that all of the dosages he received at the NCCC were incorrect.

> FN14. Plaintiff's conclusory testimony that the dosage was "hurting" him also is insufficient to establish the objective prong of the deliberate indifference test. To the extent plaintiff claims that the medication caused him pain, there is no evidence in the record that plaintiff suffered from chronic pain or, indeed, any other objectively serious symptoms in connection with the medication dosage. Although not mentioned in plaintiff's deposition or in his opposition to the instant motion, plaintiff alleges in his amended complaint that the lesser dosage put him at risk of "itching" and "breaking of bones." (Amended Complaint, No. 07-CV-2634, at 4.) There is evidence that plaintiff suffered from a rash and/or itching while at the NCCC and that plaintiff was told at one point that he had

eczema. (*See* Price Dep. at 45-51.) However, there is no evidence to connect those symptoms with the medication dosage for his renal disease. (*See, e.g., id.* at 46 ("Q. Did anyone ever tell you what was causing a rash? A. I kept going to the-I had went to the dermatologist at Bellevue. To me, the doctor had an attitude like it ain't nothing wrong; like it was acne or something.").) Furthermore, there is no evidence that the rash and/or itching was an objectively serious condition. *See Lewal v. Wiley,* 29 Fed.Appx. 26, 29 (2d Cir.2002) (affirming summary judgment and holding that plaintiff's alleged "persistent rash" was not a "serious medical condition"); *see also Benitez v. Ham,* No. 04-CV-1159, 2009 WL 3486379, at *11 (N.D.N.Y. Oct. 21, 2009) ("[T]he evidence shows that Plaintiff suffered from a severe body itch. While this condition was undoubtedly unpleasant, it simply does not rise to the level of an Eighth Amendment violation."). In any event, even if plaintiff did suffer from an objectively serious condition because of the medication dosage, he cannot prove that defendants acted with a subjectively culpable state of mind, as discussed *infra.*

> FN15. In any event, as discussed *infra,* defendants adjusted plaintiff's dosage in response to the increase in phosphorous levels, and there is no evidence from which a rational jury could conclude that defendants acted with deliberate indifference in prescribing plaintiff's medication.

> FN16. Although he does not raise it in any of his pleadings or in his opposition to the instant motion, plaintiff testified at his deposition that he had to take the medication with meals but that sometimes he was given the medication without food or at times that interfered with his meals. (Price Dep. at 23, 60; Defs.' Ex. E.) The record is unclear as to how often this occurred. The Court assumes, as it must on this motion for summary judgment, that on some occasions plaintiff was given his medications not at meal times or at times that interfered with meals. However, plaintiff points to no evidence whatsoever of any harm caused by defendants' alleged conduct in this regard, and, therefore, no

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

rational jury could find that the provision of medication without food on some occasions was objectively serious. *See Gillard v. Kuykendall, 295 Fed.Appx. 102, 103 (8th Cir.2008)* (affirming summary judgment for defendants where defendants, on some occasions, "were late in giving [plaintiff] his medications and did not always administer them with meals as [plaintiff] apparently desired" where there was no evidence of any adverse consequences). Thus, any deliberate indifference claim based on these allegations would fail as well.

### ii. Subjective Prong

[15][16] Plaintiff's claim with respect to his medication dosage also fails because plaintiff cannot show that defendants acted with subjectively culpable intent, i.e., that they were aware of, and consciously disregarded, plaintiff's serious medical needs. Plaintiff's claim is based on his assertion that the prescribed dosage was "wrong." However, mere disagreement with a prescribed medication dosage is insufficient as a matter of law to establish the subjective prong of deliberate indifference. *See Chance v. Armstrong, 143 F.3d 698, 703 (2d Cir.1998)* ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation."); *Sonds v. St. Barnabas Hosp. Corr. Health Servs., 151 F.Supp.2d 303, 312 (S.D.N.Y.2001)* ("[D]isagreements over medications ... are not adequate grounds for a Section 1983 claim. Those issues implicate medical judgments and, at worst, negligence amounting to medical malpractice, but not the Eighth Amendment." (citing *Estelle, 429 U.S. at 107, 97 S.Ct. 285*)); *see also, e.g., Fuller v. Ranney, No. 06-CV-0033, 2010 WL 597952, at *11 (W.D.N.Y. Feb. 17, 2010)* ("Plaintiff's claim amounts to nothing more than a disagreement with the prescribed treatment he received and his insistence that he be prescribed certain medications. Without more, plaintiff's disagreement with the treatment he received does not rise to the level of a constitutional violation of his Eighth Amendment rights."); *Covington v. Westchester County Dep't of Corr., No. 06 Civ. 5369, 2010 WL 572125, at *6 (S.D.N.Y. Jan. 25, 2010)* ("[Plaintiff's] claims that Defendants failed **361 to change or increase his medication and counseling

sessions amount to negligence claims at most, which is insufficient."); *Hamm v. Hatcher, No. 05-CV-503, 2009 WL 1322357, at *8 (S.D.N.Y. May 5, 2009)* ("Plaintiff's unfulfilled demand for a larger dosage of [the medication] represents a mere disagreement over the course of Plaintiff's treatment and is inconsistent with deliberate indifference ....").

The fact that defendants adjusted the dosage of plaintiff's medication in response to plaintiff's phosphorous levels (*see* Price Dep. at 25-27) is also inconsistent with deliberate indifference. *See Bellotto v. County of Orange, 248 Fed.Appx. 232, 237 (2d Cir.2007)* ("The record also shows that mental health professionals responded to [plaintiff's] concerns about his medications and adjusted his prescription as they believed necessary.") (affirming summary judgment for defendants); *see also Jolly v. Knudsen, 205 F.3d 1094, 1097 (8th Cir.2000)* ("[Defendant's] actions in this case cannot reasonably be said to reflect deliberate indifference. The only relevant evidence in the record indicates that [defendant's] actions were aimed at correcting perceived difficulties in [plaintiff's] dosage levels [in response to blood tests]."); *Fuller, 2010 WL 597952, at *11* ("Moreover, a subsequent decision to prescribe plaintiff a certain medication does not indicate that the medication should have been prescribed earlier.")[FN17] Thus, there is no evidence in the record sufficient for a rational jury to find that defendants acted with deliberate indifference regarding the prescription dosage of plaintiff's renal disease medication.

FN17. To the extent plaintiff also argues that that defendants acted with deliberate indifference because he has received different prescriptions at different facilities, the Court rejects that argument as well. *See, e.g., Cole v. Goord, No. 04 Civ. 8906, 2009 WL 1181295, at *8 n. 9 (S.D.N.Y. Apr. 30, 2009)* ("[Plaintiff's] reliance upon the fact that subsequent medical providers have provided him with a different course of medication or treatment ... does nothing to establish that [defendant] violated [plaintiff's] Eighth Amendment rights. Physicians can and do differ as to their determination of the appropriate treatment for a particular patient; that difference in opinion does not satisfy the requirements for a constitutional claim of deliberate indifference."

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

(citing *Estelle,* 429 U.S. at 97, 97 S.Ct. 285)).

In sum, based on the undisputed facts and drawing all reasonable inferences in plaintiff's favor, no rational jury could find that defendants were aware of, and consciously disregarded, plaintiff's objectively serious health needs regarding his medication dosage. Accordingly, defendants' motion for summary judgment is granted with respect to this claim.

### b. Kidney Transplant

[17] Defendants also argue that plaintiff cannot proceed with his deliberate indifference claim regarding his request to be tested for a kidney transplant. Defendants do not dispute the objective seriousness of plaintiff's underlying condition or the requested transplant, and instead argue only that defendants lacked subjective culpability. Specifically, defendants argue that they made reasonable efforts to get plaintiff tested. (Defs.' Br. at 23.) However, construing the facts in the light most favorable to plaintiff, a rational jury could find that defendants were aware of, and consciously disregarded, plaintiff's serious medical needs.

Plaintiff began requesting a kidney transplant test as early as February or March 2007 and still had not received one by the time he left the NCCC in December 2007. (*See* Price Dep. at 76-77, 90.) Requests were sent on plaintiff's behalf to Dr. Okonta at the Nassau University Medical Center and to Nurse Mary Sullivan at the NCCC medical department. (*See* Defs.' Ex. K.) The record indicates that plaintiff received no response from Okonta. (*See* Price Dep. at 82.) When plaintiff asked Sullivan about the test, Sullivan told him that defendants had "other priorities right now." (Price Dep. at 70.) Even after plaintiff filed a formal grievance in September 2007, he still did not receive the requested test. (*See* Defs.' Ex. F.) On these facts, where there was a delay of at least nine months in arranging a kidney transplant test for plaintiff despite plaintiff's repeated requests, and where defendants do not dispute the necessity of the test, a rational jury could find that defendants acted with deliberate indifference to plaintiff's serious medical needs. *See Harrison v. Barkley,* 219 F.3d 132, 138 (2d Cir.2000) (holding summary judgment inappropriate where there

was evidence that, *inter alia,* plaintiff was delayed dental treatment for a cavity for one year); *Hathaway v. Coughlin,* 841 F.2d 48, 50-51 (2d Cir.1988) ("[Plaintiff's] affidavit in opposition to [defendants'] motion for summary judgment alleged that a delay of over two years in arranging surgery ... amounted to deliberate indifference to his serious medical needs. We believe this is a sufficient allegation to survive a motion for summary judgment under *Archer* [v. Dutcher, 733 F.2d 14 (2d Cir.1984) ] because it raises a factual dispute ...."); *see also Lloyd v. Lee,* 570 F.Supp.2d 556, 569 (S.D.N.Y.2008) ("A reasonable jury could infer deliberate indifference from the failure of the doctors to take further steps to see that [plaintiff] was given an MRI. The argument that the doctors here did not take [plaintiff's] condition seriously is plausible, given the length of the delays. Nine months went by after the MRI was first requested before the MRI was actually taken.").

Defendants point to evidence in the record that they were, in fact, attempting to get plaintiff tested throughout the time in question, but were unsuccessful in their efforts. (*See* Defs.' Br. at 23; Reschke Aff. ¶ 3.) However, defendants' proffered explanation for the delay, i.e., the difficulty of finding a hospital because of transportation and security concerns, raises questions of fact and does not, as a matter of law, absolve them of liability. *See Johnson v. Bowers,* 884 F.2d 1053, 1056 (8th Cir.1989) ("It is no excuse for [defendants] to urge that the responsibility for delay in surgery rests with [the hospital]."); *Williams v. Scully,* 552 F.Supp. 431, 432 (S.D.N.Y.1982) (denying summary judgment where plaintiff "was unable to obtain treatment ... for five and one half months, during which time he suffered considerable pain" despite defendants' "explanations for the inadequacy of [the prison's] dental program"), *cited approvingly in Harrison v. Barkley,* 219 F.3d 132, 138 (2d Cir.2000). Thus, whether defendants' efforts were reasonable over the nine month period at issue is a question of fact for the jury.

In sum, on this record, drawing all reasonable inferences in plaintiff's favor, the Court concludes that a rational jury could find that defendants acted with deliberate indifference regarding plaintiff's request for a kidney transplant test. Accordingly, defendants' motion for summary judgment on this claim is denied.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

c. Shoulder

Defendants argue that summary judgment is warranted on the claim relating to the alleged shoulder injury because plaintiff's complained-of shoulder pain was not objectively serious and plaintiff has failed to show subjectively culpable intent by defendants. For the reasons set forth below, the Court disagrees and concludes that a rational jury could find that defendants acted with deliberate indifference **363** regarding plaintiff's shoulder pain. Thus, summary judgment on this claim is denied.

i. Objective Prong

[18][19] Defendants argue that plaintiff cannot satisfy the objective element of the deliberate indifference test regarding his shoulder because plaintiff alleges only that he had pain in his shoulder and not that he had "a condition of urgency, one that might produce death, deterioration or extreme pain." (Defs.' Br. at 22.) However, plaintiff did complain to the medical department that his right shoulder was "extremely hurting." (Defs.' Ex. E, Sick Call Request, Jan. 17, 2007.) Furthermore, plaintiff states that he now has a separated shoulder and wears a brace for carpal tunnel syndrome. (Pl.'s Opp. at 4.) In any event, chronic pain can be a serious medical condition. *See* Brock v. Wright, 315 F.3d 158, 163 (2d Cir.2003) ("We will no more tolerate prison officials' deliberate indifference to the chronic pain of an inmate than we would a sentence that required the inmate to submit to such pain. We do not, therefore, require an inmate to demonstrate that he or she experiences pain that is at the limit of human ability to bear, nor do we require a showing that his or her condition will degenerate into a life-threatening one."); Hathaway v. Coughlin, 37 F.3d 63, 67 (2d Cir.1994); *see also* Sereika v. Patel, 411 F.Supp.2d 397, 406 (S.D.N.Y.2006) ( "[Plaintiff's] allegation that he experienced severe pain as a result of the alleged delay in treatment, together with his allegation that the alleged delay in treatment resulted in reduced mobility in his arm and shoulder, raise issues of fact as to whether his shoulder injury constitutes a sufficiently serious medical condition to satisfy the objective prong of the deliberate indifference standard.") (denying summary judgment). Thus, the Court cannot conclude at the summary judgment stage that plaintiff did not suffer from a serious medical condition.

ii. Subjective Prong

Defendants also argue that plaintiff cannot meet the subjective prong of the deliberate indifference test because plaintiff was seen repeatedly by the medical department and was given pain medication. (Defs.' Br. at 22.) Defendants also point to the fact that when x-rays were ultimately taken, they were negative.[FN18] However, construing the facts most favorably to plaintiff, a rational jury could find that defendants were aware of, and consciously disregarded, plaintiff's serious medical needs. Plaintiff repeatedly complained to defendants over a period of several months, beginning in January 2007, about the pain in his shoulder (*see* Defs.' Ex. E), and further complained that the pain medication he was being given was ineffective. [FN19] (*See, e.g.,* Price Dep. at 45, 51.) In June 2007, for instance, plaintiff was still complaining that his right shoulder "hurts really bad," and that he had been "complaining of that for months." (Def.'s Ex. E, Sick Call Requests, June 12 and June 17, 2007.) Thus, it is uncontroverted that defendants were aware of plaintiff's alleged chronic shoulder pain.

FN18. The November 2007 x-ray records indicate that "short segment acute thrombosis cannot be reliably excluded, Ultrasound might provide additional information ...." (*See* Defs.' Ex. J, Discharge Summary, November 2007.) Defendants point to no evidence in the record that they followed up on that x-ray report.

FN19. Plaintiff also informed defendants that he had been given a Cortisone shot for his shoulder at his previous place of incarceration. (*See* Price Dep. at 38, 53-54; Defs.' Ex. E, Sick Call Request, Apr. 14, 2007.)

Despite plaintiff's complaints, however, plaintiff was not given an x-ray exam for several months (Price Dep. at 44; Def.'s **364** Ex. J), and was not given any pain medication besides Motrin and Naprosyn. (Price Dep. at 55.) Although defendants argue that the treatment for plaintiff's shoulder pain was reasonable under the circumstances, there are factual questions in this case that preclude

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

summary judgment. *See Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998) ("Whether a course of treatment was the product of sound medical judgment, negligence, or deliberate indifference depends on the facts of the case.") (reversing grant of motion to dismiss). Drawing all reasonable inferences from the facts in favor of plaintiff, a rational jury could find that defendants acted with deliberate indifference by not changing plaintiff's pain medication despite his continued complaints that it was ineffective, by failing to take x-rays for several months, and by failing to follow-up on a November 2007 x-ray report indicating that further tests might be needed (*see* Defs.' Ex. J, Discharge Summary, November 2007). *See Brock,* 315 F.3d at 167 ("It is not controverted that [defendant] was aware that [plaintiff] was suffering some pain from his scar. The defendants sought to cast doubt on the truthfulness of [plaintiff's] claims about the extent of the pain he was suffering and, also, to put into question DOCS' awareness of [plaintiff's] condition. But at most, defendants' arguments and evidence to these effects raise issues for a jury and do not justify summary judgment for them."); *Hathaway,* 37 F.3d at 68-69 (holding that, *inter alia,* two-year delay in surgery despite plaintiff's repeated complaints of pain could support finding of deliberate indifference). The fact that defendants offered some treatment in response to plaintiff's complaints does not as a matter of law establish that they had no subjectively culpable intent. *See Archer v. Dutcher,* 733 F.2d 14, 16 (2d Cir.1984) ("[Plaintiff] received extensive medical attention, and the records maintained by the prison officials and hospital do substantiate the conclusion that [defendants] provided [plaintiff] with comprehensive, if not doting, health care. Nonetheless, [plaintiff's] affidavit in opposition to the motion for summary judgment does raise material factual disputes, irrespective of their likely resolution.... [Plaintiff's] assertions] do raise material factual issues. After all, if defendants did decide to delay emergency medical-aid-even for 'only' five hours-in order to make [plaintiff] suffer, surely a claim would be stated under *Estelle.*"). Specifically, given the factual disputes in this case, the Court cannot conclude as a matter of law that defendants did not act with deliberate indifference when they allegedly declined to change their treatment for plaintiff's shoulder pain despite repeated complaints over several months that the pain persisted. *See, e.g., Lloyd,* 570 F.Supp.2d at 569 ("[T]he amended complaint plausibly alleges that doctors knew that [plaintiff] was experiencing extreme pain and loss of mobility, knew that the course of treatment they prescribed was ineffective, and declined to do anything to attempt to improve

[plaintiff's] situation besides re-submitting MRI request forms.... Had the doctors followed up on numerous requests for an MRI, the injury would have been discovered earlier, and some of the serious pain and discomfort that [plaintiff] experienced for more than a year could have been averted."). Thus, there are factual disputes that prevent summary judgment on defendants' subjective intent.

In sum, on this record, drawing all reasonable inferences from the facts in favor of plaintiff, a rational jury could find that defendants acted with deliberate indifference to plaintiff's shoulder pain. Accordingly, defendants' motion for summary judgment on this claim is denied.

**\*365** C. Individual Defendants

Defendants also move for summary judgment specifically with respect to plaintiff's claims against three of the individual defendants: Sheriff Edward Reilly (hereinafter "Reilly"), Edwards, and Okonta. For the reasons set forth below, the Court grants defendants' motion with respect to Reilly, and denies it with respect to Edwards and Okonta.

1. Legal Standard

[20] "It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under Section 1983." *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (citation and quotation marks omitted). In other words, "supervisor liability in a § 1983 action depends on a showing of some personal responsibility, and cannot rest on respondeat superior." *Id.* Supervisor liability can be shown in one or more of the following ways: "(1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring." *Id.* at 145 (citation omitted).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

2. Application

[21] Although plaintiff alleges in the complaint that Reilly was aware of plaintiff's condition and failed to assist,[FN20] there is no mention whatsoever of Reilly in plaintiff's deposition or in any of the parties' evidentiary submissions. Because there is no evidence in the record that Reilly was personally involved in any of the alleged constitutional violations or that there was a custom or policy of allowing such constitutional violations (and that Reilly allowed such custom or policy to continue), no rational jury could find Reilly liable for any of plaintiff's deliberate indifference claims. *See Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) ("[M]ere linkage in the prison chain of command is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim."); *see also Mastroianni v. Reilly,* 602 F.Supp.2d 425, 438-39 (E.D.N.Y.2009) ("[T]he plaintiff cannot establish that Sheriff Reilly was grossly negligent in failing to supervise subordinates because the medical care of inmates at the NCCC was delegated to the Nassau Health Care Corporation and plaintiff provides no evidence that Reilly was otherwise personally involved in his treatment."). Therefore, defendants' motion for summary judgment with respect to plaintiff's claims against Sheriff Reilly is granted.

> FN20. Plaintiff actually refers in the complaint to "Sheriff Edwards," but the Court determines, liberally construing the complaint, that this allegation refers to Sheriff Reilly.

[22] With respect to plaintiff's claims against Edwards and Okonta, however, there are disputed issues of fact that preclude summary judgment. Defendants argue that Edwards was not personally involved in the alleged constitutional violations because she did not treat plaintiff and merely responded to his grievance request. (Defs.' Br. at 24-25.) However, plaintiff testified that, although Edwards never physically treated him, she "takes care of appointments and makes sure you get to certain specialists" and that "she was in a position to make sure that I get the adequate care that I needed." (Price Dep. at 61-62.) Plaintiff also testified that he submitted a grievance request to **366 Edwards in order to be tested for the kidney transplant list, but that Edwards failed to get him on the list. (Price Dep. at 62-63.) Drawing all

reasonable inferences in favor of plaintiff, a rational jury could find that Edwards was personally involved in the alleged constitutional violations because she was in a position to get plaintiff tested for the kidney transplant list and failed to do so. *See McKenna v. Wright,* 386 F.3d 432, 437-38 (2d Cir.2004) ("Although it is questionable whether an adjudicator's rejection of an administrative grievance would make him liable for the conduct complained of, [defendant] was properly retained in the lawsuit at this stage, not simply because he rejected the grievance, but because he is alleged, as Deputy Superintendent for Administration at [the prison], to have been responsible for the prison's medical program." (citation omitted)). Thus, plaintiff has presented sufficient evidence of Edwards's personal involvement in the alleged constitutional violations to raise a genuine issue of material fact as to whether Edwards is liable for the alleged Eighth Amendment violations.

[23][24] Defendants also argue that Okonta was not personally involved in the alleged constitutional violations because he did not actually treat plaintiff. (Defs.' Br. at 24-25.) This argument misses the mark. It is plaintiff's allegation that Okonta violated plaintiff's constitutional rights precisely by not treating him. Plaintiff has presented evidence that he received no response from Okonta regarding his requests to be tested for the kidney transplant list. Where a prison doctor denies medical treatment to an inmate, that doctor is personally involved in the alleged constitutional violation. *See McKenna,* 386 F.3d at 437 (finding "personal involvement" where medical defendants were alleged to have participated in the denial of treatment); *see also Chambers v. Wright,* No. 05 Civ. 9915, 2007 WL 4462181, at *3 (S.D.N.Y. Dec. 19, 2007) ("Prison doctors who have denied medical treatment to an inmate are 'personally involved' for the purposes of jurisdiction under § 1983." (citing *McKenna,* 386 F.3d at 437)). Although defendants argue that they were in fact making efforts to get plaintiff tested (Defs.' Br. at 25), the reasonableness of those efforts, as discussed above, is a factual question inappropriate for resolution on summary judgment.

In sum, defendants' motion for summary judgment on plaintiff's claims against Reilly is granted. Defendants' motion with respect to Edwards and Okonta is denied.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

### V. CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part defendants' motion for summary judgment. Specifically, the Court grants defendants' motion with respect to plaintiff's claim regarding the dosage of his renal disease medication and with respect to all of plaintiff's claims against Sheriff Reilly. Defendants' motion is denied in all other respects. The parties to this action shall participate in a telephone conference on Monday, April 5, 2010 at 3:30 p.m. At that time, counsel for defendants shall initiate the call and, with all parties on the line, contact Chambers at (631) 712-5670.

SO ORDERED.

E.D.N.Y.,2010.
Price v. Reilly
697 F.Supp.2d 344

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Karus LAFAVE, Plaintiff,
v.
CLINTON COUNTY, Defendants.
**No. CIV.9:00CV0744DNHGLS.**

April 3, 2002.

Karus Lafave, Plaintiff, Pro Se, Plattsburgh, for the Plaintiff.

Maynard, O'Connor Law Firm, Albany, Edwin J. Tobin, Jr., Esq., for the Defendants.

**REPORT-RECOMMENDATION** [FN1]

FN1. This matter was referred to the undersigned for Report-Recommendation by the Hon. David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b)(1)(B) and L.R. 72.3(c).

SHARPE, Magistrate J.

**I. INTRODUCTION**

*1 Plaintiff, *pro se,* Karus LaFave ("LaFave") originally filed this action in Clinton County Supreme Court. The defendant filed a Notice of Removal because the complaint presented a federal question concerning a violation of LaFave's Eighth Amendment rights (Dkt. No. 1). Currently before the court is the defendant's motion to dismiss made pursuant to Rule 12(b)(6) and in the alternative, pursuant to Rule 56(b) of the Federal Rules of Civil Procedure (Dkt. No. 5). LaFave, in response, is requesting that the court deny the motion, excuse his inability to timely file several motions, and to permit the

matter to be bought before a jury [FN2]. After reviewing LaFave's claims and for the reasons set forth below, the defendant's converted motion for summary judgment should be granted.

FN2. It should be noted that the date for dispositive motions was February 16, 2001. The defendant's motion to dismiss was filed on September 29, 2000. On January 9, 2001, this court converted the defendant's motion to dismiss to a motion for summary judgment, and gave LaFave a month to respond. On April 16, 2001, after three months and four extensions, LaFave finally responded.

**II. BACKGROUND**

LaFave brings this action under 42 U.S.C. § 1983 claiming that the defendant violated his civil rights under the Eighth Amendment [FN3]. He alleges that the defendant failed to provide adequate medical and dental care causing three different teeth to be extracted.

FN3. LaFave does not specifically state that the defendant violated his Eighth Amendment rights but this conclusion is appropriate after reviewing the complaint.

**III. FACTS** [FN4]

FN4. While the defendant provided the court with a "statement of material facts not in issue" and LaFave provided the court with "statement of material facts genuine in issue," neither provided the court with the exact nature of the facts.

Between January and July of 1999, LaFave, on several occasions, requested dental treatment because he was experiencing severe pain with three of his teeth. After being seen on several occasions by a Clinton County

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

Correctional Facility ("Clinton") doctor, he was referred to a dentist. Initially, LaFave's mother had made an appointment for him to see a dentist, but he alleges that Nurse LaBarge ("LaBarge") did not permit him to be released to the dentist's office [FN5]. Subsequently, he was seen by Dr. Boule, D.D.S ., on two occasions for dental examinations and tooth extractions.

> FN5. This appears to be in dispute because the medical records show that LaFave at first stated that his mother was going to make arrangements, but later requested that the facility provide a dentist.

### IV. DISCUSSION

A. *Legal Standard*

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc ., 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); accord F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994). The moving party has the burden of demonstrating that there is no genuine issue of material fact. *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).* Once this burden is met, it shifts to the opposing party who, through affidavits or otherwise, must show that there is a material factual issue for trial. Fed.R.Civ.P. 56(e); *see Smythe v. American Red Cross Blood Services Northeastern New York Region,* 797 F.Supp. 147, 151 (N.D.N.Y.1992).

Finally, when considering summary judgment motions, *pro se* parties are held to a less stringent standard than attorneys. *Estelle v. Gamble, 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976); Haines v. Kerner, 404 U.S. 519, 520-21, 92 S.Ct. 594, 596, 30 L.Ed.2d 652 (1972).* Any ambiguities and inferences drawn from the facts must be viewed in the light most favorable to the non-moving party. *Thompson v. Gjivoje, 896 F.2d 716, 720 (2d Cir.1990).* With this standard in mind, the court

now turns to the sufficiency of LaFave's claims.

B. *Eighth Amendment Claims*

**\*2** LaFave alleges that his Eighth Amendment rights were violated when the defendant failed to provide adequate medical care for his dental condition. The Eighth Amendment does not mandate comfortable prisons, yet it does not tolerate inhumane prisons either, and the conditions of an inmate's confinement are subject to examination under the Eighth Amendment. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1975, 128 L.Ed.2d 811 (1994). Nevertheless, deprivations suffered by inmates as a result of their incarceration only become reprehensible to the Eighth Amendment when they deny the minimal civilized measure of life's necessities. *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 2324, 115 L.Ed.2d 271 (1991) (*quoting Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981)).

Moreover, the Eighth Amendment embodies "broad and idealistic concepts of dignity, civilized standards, humanity, and decency ..." against which penal measures must be evaluated. See *Estelle v. Gamble,* 429 U.S. 97, 102, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976). Repugnant to the Amendment are punishments hostile to the standards of decency that " 'mark the progress of a maturing society." ' *Id.* (*quoting Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958) (plurality opinion)). Also repugnant to the Amendment, are punishments that involve " 'unnecessary and wanton inflictions of pain." ' *Id.* at 103,97 S.Ct. at 290 (*quoting Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976)).

In light of these elementary principles, a state has a constitutional obligation to provide inmates adequate medical care. See *West v. Atkins,* 487 U.S. 42, 54, 108 S.Ct. 2250, 2258, 101 L.Ed.2d 40 (1988). By virtue of their incarceration, inmates are utterly dependant upon prison authorities to treat their medical ills and are wholly powerless to help themselves if the state languishes in its obligation. *See Estelle,* 429 U.S. at 103, 97 S.Ct. at 290. The essence of an improper medical treatment claim lies in proof of "deliberate indifference to serious medical

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

needs." *Id.* at 104, 97 S.Ct. at 291. Deliberate indifference may be manifested by a prison doctor's response to an inmate's needs. *Id.* It may also be shown by a corrections officer denying or delaying an inmate's access to medical care or by intentionally interfering with an inmate's treatment. *Id.* at 104-105, 97 S.Ct. at 291.

The standard of deliberate indifference includes both subjective and objective components. The objective component requires the alleged deprivation to be sufficiently serious, while the subjective component requires the defendant to act with a sufficiently culpable state of mind. See *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). A prison official acts with deliberate indifference when he " 'knows of and disregards an excessive risk to inmate health or safety.' " *Id.* (*quoting Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979). However, " 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." ' *Id.*

**\*3** However, an Eighth Amendment claim may be dismissed if there is no evidence that a defendant acted with deliberate indifference to a serious medical need. An inmate does not have a right to the treatment of his choice. See *Murphy v. Grabo,* 1998 WL 166840, at \*4 (N.D.N.Y. April 9, 1998) (*citation omitted* ). Also, mere disagreement with the prescribed course of treatment does not always rise to the level of a constitutional claim. See *Chance,* 143 F.3d at 703. Moreover, prison officials have broad discretion to determine the nature and character of medical treatment which is provided to inmates. See *Murphy,* 1998 WL 166840, at \*4 (*citation omitted* ).

While there is no exact definition of a "serious medical condition" in this circuit, the Second Circuit has indicated what injuries and medical conditions are serious enough to implicate the Eighth Amendment. See *Chance,* 143 F.3d at 702-703. In *Chance,* the Second Circuit held that an inmate complaining of a dental condition stated a serious medical need by showing that he suffered from great pain for six months. The inmate was also unable to chew food and lost several teeth. The Circuit also recognized that dental conditions, along with medical conditions, can vary in severity and may not all be severe. *Id.* at 702. The court acknowledged that while some injuries are not serious enough to violate a constitutional right, other very similar

injuries can violate a constitutional right under different factual circumstances. *Id.*

The Second Circuit provided some of the factors to be considered when determining if a serious medical condition exists. *Id.* at 702-703. The court stated that " '[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain' " are highly relevant. *Id.* at 702-703 (*citation omitted* ). Moreover, when seeking to impose liability on a municipality, as LaFave does in this case, he must show that a municipal "policy" or "custom caused the deprivation." *Wimmer v. Suffolk County Police Dep't,* 176 F.3d 125, 137 (2d Cir.1999).

In this case, the defendant maintains that the medical staff was not deliberately indifferent to his serious medical needs. As a basis for their assertion, they provide LaFave's medical records and an affidavit from Dr. Viqar Qudsi [FN6], M.D, who treated LaFave while he was incarcerated at Clinton. The medical records show that he was repeatedly seen, and prescribed medication for his pain. In addition, the record shows that on various occasions, LaFave refused medication because "he was too lazy" to get out of bed when the nurse with the medication came to his cell (*Def. ['s] Ex. A, P. 4)* .

FN6. Dr. Qudsi is not a party to this action.

According to the documents provided, Dr. Qudsi, examined LaFave on January 13, 1999, after LaFave reported to LaBarge that he had a headache and discomfort in his bottom left molar (*Qudsi Aff., P. 2*). Dr. Qudsi noted that a cavity was present in his left lower molar. *Id.* He prescribed Tylenol as needed for the pain and 500 milligrams ("mg") of erythromycin twice daily to prevent bacteria and infection. *Id.* On January 18, 19, and 20, 1999, the medical records show that LaFave refused his erythromycin medication (*Def. ['s] Ex. B, P. 1).*

**\*4** Between January 20, and April 12, 1999, LaFave made no complaints concerning his alleged mouth pain. On

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

April 12, 1999, LaFave was examined by LaBarge due to a complaint of pain in his lower left molar (*Def. ['s] Ex. A, P. 4* ). Dr. Qudsi examined him again on April 14, 1999. *Id.* He noted a cavity with pulp decay and slight swelling with no discharge. *Id.* He noted an abscess in his left lower molar and again prescribed 500 mg erythromycin tablets twice daily and 600 mg of Motrin three times daily for ten days with instructions to see the dentist. *Id.* On the same day, LaBarge made an appointment for LaFave to see an outside dentist that provides dental service to facility inmates, Dr. Boule *(Qudsi Aff., P. 3).*

On May 3, 1999, LaBarge was informed by LaFave that his mother would be making a dental appointment with their own dentist and that the family would pay for the treatment (*Def. ['s] Ex. A, P. 4* ). On that same day, Superintendent Major Smith authorized an outside dental visit. *Id.* On May 12, 1999, he was seen by LaBarge for an unrelated injury and he complained about his lower left molar (*Def .['s] Ex. A, P. 5* ). At that time, LaFave requested that LaBarge schedule a new appointment with Dr. Boule because the family had changed their mind about paying an outside dentist. *Id.* LaBarge noted that he was eating candy and informed him of the deleterious effects of candy on his dental condition. *Id.* Thereafter, LaBarge scheduled him for the next available date which was June 24, 1999, at noon. *Id.*

On June 2, 1999, LaFave again requested sick call complaining for the first time about tooth pain in his upper right molar and his other lower left molar (*Def. ['s] Ex. A, P. 6* ). He claimed that both molars caused him discomfort and bothered him most at night. *Id.* LaFave confirmed that he had received treatment from Dr. Boule for his first lower left molar one week before. *Id.* The area of his prior extraction was clean and dry. *Id.* There was no abscess, infection, swelling, drainage or foul odor noted. *Id.* LaBarge recommended Tylenol as needed for any further tooth discomfort. *Id.*

On June 21, 1999, LaFave again requested a sick call and was seen by LaBarge (*Def. ['s] Ex. A, P. 6* ). No swelling, drainage or infection was observed. *Id.* However, LaBarge noted cavities in LaFave's lower left molar and right lower molars. *Id.* LaBarge made arrangements for Dr. Qudsi to further assess LaFave. *Id.* On June 23, 1999, Dr. Qudsi examined his right lower molar and noted cavitation with

decay in that area (*Def. ['s] Ex. A, P. 7* ). In addition, he noted that LaFave had a cavity in his second left lower molar. *Id.* He prescribed 500 mg of erythromycin twice daily for 10 days and 600 mg of Motrin three times daily for 10 days, with instructions to see a dentist. *Id.*

On June 30, 1999, Officer Carroll reported that LaFave was again non-compliant with his medication regimen as he refused to get up to receive his medication (*Def. ['s] Ex. A, P. 8* ). On July 7, 1999, he again requested sick call complaining of a toothache in his lower right molar (*Def. ['s] Ex. A, P. 9* ). Again, LaFave was non-compliant as he had only taken his erythromycin for five days instead of the ten days prescribed. *Id.* During the examination, Dr. Qudsi informed LaFave that extraction of these teeth could be necessary if he did not respond to conservative treatment. *Id.* At that time, LaFave informed Dr. Qudsi that he was going to be transferred to another facility. *Id.* Dr. Qudsi advised LaFave to follow-up with a dentist when he arrived at the new facility. *Id.* Dr. Qudsi prescribed 500 mg Naproxin twice daily for thirty days with instructions to follow-up with him in two weeks if the pain increased. *Id.* The following day, LaFave requested sick call complaining to LaBarge that he had taken one dose of Naproxin and it was not relieving the pain. *Id.* He was advised that he needed to take more than one dose to allow the Naproxin to take effect. *Id.*

**\*5** On July 17, 1999, LaFave was again seen by Dr. Qudsi and he indicated that he did not believe he was benefitting from the prescribed course of conservative treatment with medication (*Def. ['s] Ex. A, P. 10* ). Subsequently, LaBarge made a dental appointment for him on July 23 [FN7], 1999, at 3:15 p.m. *Id.* On July 23, 1999, a second extraction was conducted. *Id.* On July 28, 1999, he was again seen by Dr. Qudsi, for an ulceration at the left angle of his mouth for which he prescribed bacitracin ointment. *Id.* At this time, LaFave continued to complain of tooth pain so he was prescribed 600 mg of Motrin three times daily. *Id.*

FN7. The medical records contain an error on the July 17, 1999, note which indicted that an appointment was set for June 23, 1999, however, it should have been recorded as July 23, 1999.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

On August 4, 1999, he was seen for feeling a sharp piece of bone residing in the area of his lower left molar (*Def. ['s] Ex. A, P. 11* ). Dr. Qudsi recommended observation and to follow-up with dental care if his condition continued. *Id.* The defendant maintains that given all of the documentation that he was seen when he requested to be seen and prescribed numerous medications, the medical staff was not deliberately indifferent to his serious medical needs. The defendant contends that at all times, professional and contentious dental and medical treatment were provided in regards to his various complaints.

In his response, LaFave disagrees alleging that the county had a custom or policy not to provide medical treatment to prisoners. However, LaFave does not allege in his complaint that the county had a "custom or policy" which deprived him of a right to adequate medical or dental care. In his response to the motion for summary judgment, for the first time, LaFave alleges that the county had a policy which deprived him of his rights. He maintains that his continued complaints of pain were ignored and although he was prescribed medication, it simply did not relieve his severe pain.

This court finds that the defendant was not deliberately indifferent to his serious dental and medical needs. Moreover, even if this court construed his complaint to state a viable claim against the county, LaFave has failed to show that the county provided inadequate medical and dental treatment. As previously stated, an inmate does not have the right to the treatment of his choice. The record shows that he was seen numerous times, and referred to a dentist on two occasions over a six month period. While LaFave argues that the dental appointments were untimely, the record shows that the initial delay occurred because he claimed that his mother was going to make the appointment but later changed her mind. In addition, the record demonstrates that he did not adhere to the prescribed medication regime. On various occasions, LaFave failed to get out of bed to obtain his medication in order to prevent infection in his mouth. Although it is apparent that LaFave disagreed with the treatment provided by Clinton, the record does not show that the defendant was deliberately indifferent to his serious medical needs. Accordingly, this court recommends that the defendant's motion for summary judgment should be granted.

**\*6** WHEREFORE, for the foregoing reasons, it is hereby

RECOMMENDED, that the defendant's motion for summary judgment (Dkt. No. 5) be GRANTED in favor of the defendant in all respects; and it is further

ORDERED, that the Clerk of the Court serve a copy of this Report-Recommendation upon the parties by regular mail.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2002.
Lafave v. Clinton County
Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2009 WL 385413 (N.D.N.Y.)

(Cite as: 2009 WL 385413 (N.D.N.Y.))

H

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Anthony D. AMAKER, Plaintiff,
v.
T. KELLEY, J. Landry, P.T. Justine, O. Mayo, T.G.
Egan, D.A. Senkowski, M. Allard, R. Girdich, G.S.
Goord, J. Wood, Doctor I. Ellen, J. Mitchell, H.
Worley, Doctor L.N. Wright, S. Nye, M. McKinnon, M.
Rivers, L. Coryer, A. Pavone, L. Cayea, D. Armitage, J.
Carey, P.W. Annetts, R. Rivers, E. Aiken, S.Gideon, R.
Lincoln, D. Linsley, C.O. Gordon, J. Reyell, D.
Champagne, J. Kelsh, W. Carter, F. Bushey, Cho
Phillip, Cho Drom, A.J. Annucci, L.J. Leclair, D.
Laclair, T.L. Ricks, A. Boucaud, H. Perry, B. Baniler,
R. Lamora, E. Liberty, G. Ronsom, R. Maynard, C.
Daggett, D. Selksky, K.M. Lapp, R. Sears, J. Babbie,
Sgt. Champagne, Doctor K. Lee, R. Vaughan, and M.
Nisoff,[FN1] Defendants.

> FN1. Plaintiff filed an amended complaint
> purporting to add the New York State Senate and
> New York State Assembly as Defendants, *see*
> Dkt. No. 78; however, in its May 13, 2002
> Order, the Court, while granting Plaintiff leave to
> amend, denied Plaintiff leave to add these
> entities as defendants, *see* Dkt. No. 75.

No. 9:01-CV-877 (FJS/DEP).

Feb. 9, 2009.
Anthony D. Amaker, Wallkill, NY, pro se.

Hon. Andrew M. Cuomo, Office of the Attorney General
State of New York, David B. Roberts, Esq., Assistant
Attorney General, of Counsel, Albany, NY, for
Defendants.

**ORDER**

SCULLIN, Senior District Judge.

**\*1** In a Report and Recommendation dated September
9, 2008, Magistrate Judge Peebles recommended that this
Court grant Defendants' motion for summary judgment on
all claims and that the Court deny Defendant Rivera's
motion to dismiss as moot. *See* Dkt. No. 249. Plaintiff
filed objections to those recommendations. *See* Dkt. No.
251.

Plaintiff makes two objections that have nothing to do
with the merits of his claims,. He objects to the fact that
Magistrate Judge Peebles did not attach unpublished cases
cited in the Report and Recommendation to it and to the
recommendation that the Court dismiss Defendants who
have not answered or otherwise opposed the complaint.
*See id.* 1-2. Plaintiff also objects, generally, to the
application of preclusion and other legal doctrines to his
claims. Plaintiff's remaining objections, for the most part,
are not actually objections, but consist of further legal
argument regarding his claims. *See id.* at 2-6. The Court's
review of Magistrate Judge Peebles' Report and
Recommendation, in light of Plaintiff's objections,
demonstrates that Magistrate Judge Peebles correctly
applied the appropriate law and that Plaintiff's objections
are without merit.[FN2]

> FN2. The Court notes that, in addition to
> Magistrate Judge Peebles' reasoning regarding
> Plaintiff's complaint about Defendants' allegedly
> retaliatory searches of his cell, cell searches,
> even if retaliatory, do not offend the Constitution
> and are not actionable. *See Bumpus v. Canfield,
> 495 F.Supp.2d 316, 327 (W.D.N.Y.2007)* (citing
> *Hudson v. Palmer, 468 U.S. 517, 530, 104 S.Ct.
> 3194, 82 L.Ed.2d 393 (1984)*) (other citation
> omitted).

Therefore, after carefully considering Magistrate
Judge Peebles' Report and Recommendation, Plaintiff's
objections thereto, as well as the applicable law, and for
the reasons stated herein and in Magistrate Judge Peebles'
Report and Recommendation, the Court hereby

**ORDERS** that Magistrate Judge Peebles' September
9, 2008 Report and Recommendation is **ADOPTED** in its

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 385413 (N.D.N.Y.)

(Cite as: 2009 WL 385413 (N.D.N.Y.))

entirety; and the Court further

**ORDERS** that Defendants' motion for summary judgment is **GRANTED;** and the Court further

**ORDERS** that Defendant Rivera's motion to dismiss is **DENIED** as moot; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment for Defendants and close this case.

**IT IS SO ORDERED.**

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

Plaintiff Anthony D. Amaker, a New York State prison inmate who is proceeding *pro se* and *in forma pauperis,* has commenced this action pursuant to 42 U.S.C. § 1983, claiming deprivation of his civil rights. Plaintiff's complaint, as amended, contains an amalgamation of claims based upon a series of events alleged to have occurred at the two correctional facilities in which he was housed during the relevant period, naming in excess of fifty individuals as well as the New York State Senate and Assembly as defendants, and seeking both injunctive and monetary relief.

Currently pending before the court are two motions brought by the defendants. In the first, defendants seek the entry of summary judgment dismissing plaintiff's claims on a variety of grounds, principally on the merits, though additionally urging their entitlement to qualified immunity from suit. One of the named defendants, Rafael Rivera, a corrections officer, has additionally moved requesting dismissal of plaintiff's claims against him for failure to state a claim upon which relief may be granted, arguing that plaintiff's allegations are facially insufficient to support a cognizable claim against him. For the reasons set forth below I recommend that defendants' summary judgment motion be granted, and in light of that recommendation find it unnecessary to address defendant Rivera's separate motion.

I. *BACKGROUND*

***2** Plaintiff is a prison inmate entrusted to the care

and custody of the New York State Department of Correctional Services (the "DOCS"). Amended Complaint (Dkt. No. 78) ¶ 3. Plaintiff's incarceration results from a 1989 conviction for murder in the second degree, for which he was sentenced to a period of imprisonment of between twenty-five years and life. Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 229-2) ¶ 1. At the times relevant to his claims plaintiff was designated initially to the Clinton Correctional Facility ("Clinton"), where he was housed beginning in June of 1998, and later the Upstate Correctional Facility ("Upstate"), into which he was transferred on or about October 31, 2001.[FN1] Amended Complaint (Dkt. No. 78) ¶¶ 3, 5, 21.

> FN1. Upstate is a maximum security prison comprised exclusively of special housing unit ("SHU") cells in which inmates are confined, generally though not always for disciplinary reasons, for twenty-three hours each day. *See Samuels v. Selsky,* No. 01 CIV. 8235, 2002 WL 31040370, at *4 n. 11 (S.D.N.Y. Sept. 12, 2002).

In his amended complaint plaintiff has interposed a wide range of claims, many of which are unrelated and some of which, as will be seen, were included in a subsequent action brought by the plaintiff in this court, based upon events occurring at Clinton, and later at Upstate, between June, 1998 and January of 2002. One of the more prominent claims now asserted by the plaintiff concerns efforts by DOCS authorities to obtain a Deoxyribonucleic Acid ("DNA") sample from him as authorized under New York's DNA Indexing Statute, N.Y. Executive Law Art. 49-B, as well as disciplinary action taken by prison officials based upon his refusal to comply with that request. Plaintiff also alleges, *inter alia,* that defendants were deliberately indifferent to his serious medical needs, and that he was 1) exposed to inhumane conditions of confinement; 2) denied meaningful access to the law library facilities and deprived of court papers; 3) retaliated against for exercising his right to file grievances and seek other forms of redress; 4) subjected to unlawful racial discrimination and cell searches; and 5) unlawfully required to pay for food and spices required to enjoy meals consonant with his religious beliefs.[FN2]

> FN2. The specifics of plaintiff's various causes of action will be discussed in more detail in the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 385413 (N.D.N.Y.)

(Cite as: 2009 WL 385413 (N.D.N.Y.))

portions of this report addressing each grouping of claims.

II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on June 1, 2001, Dkt. No. 1, and on June 6, 2002 filed a second amended complaint-the operative pleading currently before the court.[FN3] Dkt. No. 78. In his amended complaint, plaintiff asserts a variety of constitutional and statutory claims against fifty-five named defendants, including the Commissioner of the DOCS and many of the agency's employees.[FN4] *Id.*

FN3. In addition to this action, plaintiff has commenced two other suits in this court. The first, *Anthony D. Amaker v. Glenn S. Goord, et al.,* Civil Action No. 03-CV-1003 (NAM/DRH) (N.D.N.Y., filed 2003) (*"Amaker II"* ), addresses incidents occurring at Upstate as well as subsequent to plaintiff's transfer into the Downstate Correctional Facility, and later to the Great Meadow Correctional Facility. A review of the relevant pleadings from that case reflects significant overlap between the claims asserted in that action and those now before the court. The other action, commenced by plaintiff on March 22, 2006 and encaptioned *Anthony D. Amaker, et al. v. Glenn S. Goord, et al.,* Civil Action No. 06-CV-0369 (GLS/RFT) (N.D.N.Y., filed 2006) (*"Amaker III"* ), was transferred to the Western District of New York on July 6, 2006, pursuant to 28 U.S.C. § 1404(a).

FN4. Also named as defendants in plaintiff's amended complaint were the New York State Senate and the New York State Assembly. *See* Dkt. No. 78. Those entities, which are clearly not parties amenable to suit, have not been formally joined as defendants in the action, however, in light of the issuance of an order on May 13, 2002 denying plaintiff's application for leave to amend to the extent that he sought permission to add them as defendants. *See* Dkt. No. 75.

Since its inception some seven years ago, this case has developed a tortured procedural history which has

included the filing of more than one motion for interim injunctive relief and various interlocutory appeals, all of which have been dismissed. Now that discovery has been completed, by motion filed on February 13, 2007 defendants have moved for summary judgment dismissing plaintiff's claims on a variety of grounds. Dkt. No. 229. In addition, Corrections Officer R. Rivera, a named defendant who has yet to answer plaintiff's complaint, has also moved seeking dismissal of plaintiff's claims against him pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief may be granted as against him. Dkt. No. 237. Plaintiff has since responded to defendants' summary judgment motion by the filing on May 25, 2007 of a memorandum, affidavit, and various other materials, Dkt. No. 240, but has not opposed defendant Rivera's dismissal motion.[FN5]

FN5. Among plaintiff's submissions in opposition to the pending motions is a request that the court strike an affirmation submitted by defendants' counsel, Jeffrey P. Mans, Esq., as well as declarations of Dr. Vonda Johnson and James Bell, from the record. Dkt. No. 240-03. Having reviewed the Johnson and Bell declarations, I discern no basis to strike them from the record. Turning to Attorney Mans' declaration, I find that it appears to be offered principally to describe the exhibits being submitted in connection with defendants' motion and to set forth legal argument to supplement their memorandum. While the inclusion of legal argument in such an attorney's affidavit is ordinarily not appropriate, *Donahue v. Uno Restaurants, LLC,* No. 3:06-CV-53, 1006 WL 1373094, at *1 n. 1 (N.D.N.Y. May 16, 2006) (McAvoy, J.), and it is doubtful that defendants' attorney is positioned to include in an affidavit assertions of fact beyond his personal knowledge, *Housing Works, Inc. v. Turner,* No. 00 Civ. 1122, 2003 WL 22096475, at *1 (S.D.N.Y. Sept. 9, 2003), I have chosen not to strike the affidavit, and instead to consider it solely for the limited purpose for which it is being offered.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 385413 (N.D.N.Y.)

(Cite as: 2009 WL 385413 (N.D.N.Y.))

**\*3** Defendants' motions, which are now ripe for determination, have been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed.R.Civ.P. 72(b).

III. *DISCUSSION*

A. *Standards of Review*

1. *Dismissal Motion Standard*

A motion to dismiss a complaint, brought pursuant to Rule 12(b) (6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading, utilizing as a backdrop a pleading standard which is particularly unexacting in its requirements. Rule 8 of the Federal Rules of Civil Procedure requires only that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Absent applicability of a heightened pleading requirement such as that imposed under Rule 9, a plaintiff is not required to plead specific factual allegations to support the claim; rather, "the statement need only 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " *Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 2200 (2007) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1964 (2007) (other quotations omitted)); *cf. Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007) (acknowledging that a plaintiff may properly be required to illuminate a claim with some factual allegations in those contexts where amplification is necessary to establish that the claim is "plausible"). Once the claim has been stated adequately, a plaintiff may present any set of facts consistent with the allegations contained in the complaint to support his or her claim. *Twombly,* 127 S.Ct. at 1969 (observing that the Court's prior decision in *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99 (1957), "described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival").

In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true, and draw all inferences in favor of the non-moving party. *Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1722, 1734 (1964); *Miller v. Wolpoff & Abramson, LLP,* 321 F.3d 292, 300 (2d Cir.), *cert. denied,* 540 U.S. 823, 124 S.Ct. 153 (2003); *Burke v. Gregory,* 356 F.Supp.2d 179, 182 (N.D.N.Y.2005) (Kahn, J.). The burden undertaken by a party requesting dismissal of a complaint under Rule 12(b)(6) is substantial; the question presented by such a motion is not whether the plaintiff is likely ultimately to prevail, " 'but whether the claimant is entitled to offer evidence to support the claims.' " *Log On America, Inc. v. Promethean Asset Mgmt. L.L.C.,* 223 F.Supp.2d 435, 441 (S.D.N.Y.2001) (quoting *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995) (other quotations omitted)). Accordingly, a complaint should be dismissed on a motion brought pursuant to Rule 12(b)(6) only where the plaintiff has failed to provide some basis for the allegations that support the elements of his or her claim. *See Twombly,* 127 S.Ct. at 1969, 1974; *see also Patane v. Clark,* 508 F.3d 106, 111-12 (2d Cir.2007) ("In order to withstand a motion to dismiss, a complaint must plead 'enough facts to state a claim for relief that is plausible on its face.' ") (quoting *Twombly* ). "While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiffs'] claims across the line from conceivable to plausible.' " *In re Elevator Antitrust Litig.,* 502 F.3d 47, 50 (3d Cir.2007) (quoting *Twombly,* 127 S.Ct. at 1974).

**\*4** When assessing the sufficiency of a complaint against this backdrop, particular deference should be afforded to a *pro se* litigant whose complaint merits a generous construction by the court when determining whether it states a cognizable cause of action. *Erickson,* 127 S.Ct. at 2200 (" '[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.' ") (quoting *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 292 (1976) (internal quotations omitted)); *Davis v. Goord,* 320 F.3d 346, 350 (2d Cir.2003) (citation omitted); *Donhauser v. Goord,* 314 F.Supp.2d 119, 121 (N.D.N.Y.2004) (Hurd, J.). In the event of a perceived deficiency in a *pro se* plaintiff's complaint, a court should not dismiss without granting leave to amend at least once if there is any indication that a valid claim might be stated. *Branum v. Clark,* 927 F.2d 698, 704-05 (2d Cir.1991); *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 385413 (N.D.N.Y.)

(Cite as: 2009 WL 385413 (N.D.N.Y.))

when justice so requires").

2. *Summary Judgment Standard*

Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 250; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When the entry of summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511.

**\*5** When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." *Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

B. *DNA Testing*

In or about September of 2001, prison officials at Upstate initiated efforts to obtain a DNA sample from the plaintiff. Amended Complaint (Dkt. No. 78) ¶ ¶ 18-19. Plaintiff's refusal to cooperate with those efforts led to the issuance by Corrections Sergeant Cayea of a misbehavior report charging Amaker with failing to obey an order. *Id.; see also* Mans Aff. (Dkt. No. 229-14) Exh. B. A Tier II hearing was convened to address the charges lodged in the misbehavior report, resulting in a finding of guilt and the imposition of a penalty which included thirty days of keeplock confinement, with a corresponding loss of privileges.[FN6,FN7] *Id.*

> FN6. The DOCS conducts three types of inmate disciplinary hearings. Tier I hearings address the least serious infractions, and can result in minor punishments such as the loss of recreation privileges. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the Special Housing Unit (SHU). Tier III hearings concern the most serious violations, and could result in unlimited SHU confinement and the loss of "good time" credits. *See Hynes v. Squillace,* 143 F.3d 653, 655 (2d Cir.), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246 (1998).

> FN7. Keeplock is a form of confinement restricting an inmate to his or her cell, separating the inmate from others, and depriving him or her of participation in normal prison activities. *Gittens v. LeFevre,* 891 F.2d 38, 39 (2d Cir.1989); *Warburton v. Goord,* 14 F.Supp.2d

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 385413 (N.D.N.Y.)

(Cite as: 2009 WL 385413 (N.D.N.Y.))

289, 293 (W.D.N.Y.1998) (citing *Gittens* ); *Tinsley v. Greene,* No. 95-CV-1765, 1997 WL 160124, at *2 n. 2 (N .D.N.Y. Mar. 31, 1997) (Pooler, D.J. & Homer, M.J.) (citing, *inter alia,* *Green v. Bauvi,* 46 F.3d 189, 192 (2d Cir.1995)). Inmate conditions while keeplocked are substantially the same as in the general population. *Lee v. Coughlin,* 26 F.Supp.2d 615, 628 (S.D.N.Y.1998). While on keeplock confinement an inmate is confined to his or her general population cell for twenty-three hours a day, with one hour for exercise. *Id.* Keeplocked inmates can leave their cells for showers, visits, medical exams and counseling, and can have cell study, books and periodicals, *Id.* The primary difference between keeplock and the general population confinement conditions is that keeplocked inmates do not leave their cells for out-of-cell programs, and are usually allowed less time out of their cells on the weekends. *Id.*

On October 10, 2001 plaintiff was again directed to provide a DNA sample, but similarly refused to honor the request. Amended Complaint (Dkt. No. 78) ¶ 20. A second misbehavior report was issued to Amaker as a result of that failure to comply with the directive of prison staff, resulting in a finding of guilt, following a Tier III hearing, and the imposition of a penalty which included six months of disciplinary confinement in a special housing unit ("SHU"), again with a corresponding loss of privileges.[FN8] *Id.; see also* Mans Aff. (Dkt. No. 229-14) Exh. C.

> FN8. In New York, SHU cells are utilized for segregating prisoners from general population areas for various reasons including, predominantly, disciplinary purposes. *Lee v. Coughlin,* 26 F.Supp.2d 615, 618 (S.D.N.Y.1998) (citing 7 NYCRR pts. 253, 254, and 301). The conditions typically experienced by inmates confined in an SHU include two showers per week; one hour of outdoor exercise per day; unlimited legal visits; one non-legal visit per week; access to counselors; access to sick call; cell study programs; and access to library books. *Husbands v. McClellan,* 990 F.Supp. 214,

218 (W.D.N.Y.1998) (citing 7 NYCRR pt. 304).

On December 26, 2001 the DOCS Deputy Commissioner for Correctional Facilities, Lucien J. LeClaire, Jr., wrote to the plaintiff to inform him that in the event of an inmate's refusal to provide requested DNA samples corrections officials were authorized to obtain the required sample through the use of reasonable force, and that "appropriate additional disciplinary sanctions" could be imposed, further noting that upon investigation into the matter, apparently based upon a complaint lodged by the plaintiff, it was determined that in the course of their dealings with him corrections staff had "acted appropriately and in accordance with policies and procedures set by the [DOCS] governing DNA testing." Amended Complaint (Dkt. No. 78) Exh. A-5; *see also* Mans Aff. (Dkt. No. 229-14) Exh. D. Despite that letter, Amaker persisted in his refusal to provide the required DNA sample, leading to further disciplinary action against him.[FN9] Amended Complaint (Dkt. No. 78) ¶¶ 23-26.

> FN9. The subsequent disciplinary proceedings necessitated by virtue of plaintiff's refusal to provide a DNA sample are chronicled in a report and recommendation issued in another action brought by plaintiff Amaker. *See Amaker II,* Dkt. No. 160, slip op. at pp. 3-4.

Among the claims interposed by the plaintiff in his second amended complaint are those surrounding the requirement that he provide a DNA sample pursuant to New York's Statutory DNA database regime and the imposition of the discipline based upon his repeated refusals to comply with directives to that effect. In asserting those claims plaintiff does not chart a new path, but instead raises claims similar to those which have previously been raised by him and other fellow inmates, and uniformly rejected by the courts.

**\*6** On the heels of the decision by the New York Court of Appeals in *People v. Wesley,* 83 N.Y.2d 417, 611 N.Y.S.2d 97, 633 N.E.2d 451 (1994) holding, *inter alia,* that DNA evidence is admissible in a criminal trial, the New York Legislature enacted a series of provisions aimed at the creation of a DNA databank. *Zarie v. Beringer,* No. Civ. 9:01-CV-1865, 2003 WL 57918, at *3

Slip Copy, 2009 WL 385413 (N.D.N.Y.)

(Cite as: 2009 WL 385413 (N.D.N.Y.))

(N.D.N.Y. Jan. 7, 2003) (Sharpe, M.J.). Among those was a statute authorizing the gathering of DNA samples from individuals convicted of certain offenses after January 1, 1996. *See* 1994 N.Y. Laws, ch. 737, §§ 1, 3; *see also Nicholas v. Goord,* 430 F.3d 652, 654 n. 1 (2d Cir.2005). In 1999 that provision was amended to apply to any person convicted of certain prescribed offenses, including murder, prior to the statute's effective date, provided that at the time of amendment he or she was still serving a prison sentence imposed in connection with the earlier offense. 1999 N.Y. Laws, ch 560, § 9; *see Nicholas,* 430 F.3d at 654 n. 1.

Since its enactment New York's DNA indexing provision, like similar provisions from other jurisdictions, has withstood various challenges, including to its constitutionality. *See, e.g., United States v. Amerson,* 483 F.3d 73, 75 (2d Cir.2007); *Nicholas,* 430 F.3d at 672. In response to one such challenge, the Second Circuit has held that the DNA indexing provision is lawful, concluding that special needs of the state giving rise to enactment of the statute trump the relatively minimal privacy interests and intrusion associated with a DNA sampling requirement. *Nicholas,* 430 F.3d at 671-72; *see also Roe v. Marcotte,* 193 F.3d 72, 78-80 (2d Cir.1999) (upholding a Connecticut DNA indexing statute substantially similar to New York's DNA provisions).

The basis for plaintiff's challenge in this case to the constitutionality of the DNA collection requirement is not entirely clear from his amended complaint and motion opposition papers. This uncertainty is of no moment, however, since the validity of New York's DNA indexing statute has been upheld by courts, including in this circuit, "over almost every conceivable constitutional challenge." *Jackson v. Ricks,* No. 9:02-CV-00773, 2006 WL 2023570, at *23 (N.D.N.Y. July 18, 2006) (Sharpe, D.J. and Lowe, M.J.) (collecting cases); *see also Doe v. Moore,* 410 F.3d 1337, 1349-50 (11th Cir.2005) (upholding Florida's sex offender DNA collection statute in the face of equal protection and due process challenges).

In challenging New York's DNA enactment plaintiff appears to be crafting an argument which is based upon alleged non-compliance with its statutory empowering provisions, under which the Division of Criminal Justice

Services ("DCJS") is tasked with establishing the required notification procedures. That argument, however, appears to present questions of compliance with state law and regulation which are not cognizable under section 1983. *See Pollnow v. Glennon,* 757 F.2d 496, 501 (2d Cir.1985).

**\*7** Regardless of the nature of his challenge to New York's indexing provision, Amaker is now precluded from pursuing that claim by virtue of a prior decision from this court addressing a similar challenge by him. Among the claims which he raised in *Amaker II* were those addressed to the efforts of DOCS employees, including corrections officials at Upstate, to collect a DNA sample from him. Plaintiff's challenge in that action to the constitutionality of New York's DNA indexing provisions was resolved against him based upon the issuance on November 30, 2007 of a report and recommendation by United States Magistrate Judge David R. Homer, and approval of that report, in pertinent part, by Chief Judge Norman A. Mordue on July 10, 2008. *See Amaker II,* Dkt. Nos. 160, 167.

Since the arguments now asserted in connection with the DNA challenge were or could have been raised by Amaker in his prior action, he is precluded from now relitigating those claims. *See Akhenaten v. Najee, LLC,* 544 F.Supp.2d 320, 327-28 (S.D.N.Y.2008). Accordingly, the portion of plaintiff's amended complaint which challenges the testing requirements under the DNA identification indexing law lacks merit, and is subject to dismissal.

C. *The Torture Victim Protection Act of 1991*

Among the claims set forth in plaintiff's complaint, as amended, is a cause of action under the Torture Victim Protection Act of 1991, (the "TVPA"), Pub.L. No. 102-256, 106 S. Stat. 73 (1992), based upon defendants' actions toward him. Amended Complaint (Dkt. No. 78) ¶¶ 28, 34, 36. In their motion, defendants also seek summary dismissal of this claim, as a matter of law.

The TVPA provides, in relevant part, that

[a]n individual who, under actual or apparent authority, or color of law, *of any foreign nation* (1) subjects an individual to torture shall, in a civil action, be liable for

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 385413 (N.D.N.Y.)

(Cite as: 2009 WL 385413 (N.D.N.Y.))

damages to that individual; ...

Pub.L. No. 105-256, § 2(a), 106 Stat. at 73 (emphasis added). As can be seen, by its express terms the TVPA applies only to those who act under the authority of a foreign nation. *See In re: Agent Orange Product Liability Litig.,* 373 F.Supp.2d 7, 110-13 (E.D.N.Y.2005); *see also Arar v. Ashcroft,* 414 F.Supp.2d 250, 264 (E.D.N.Y.2006), *aff'd,* 532 F.3d 157 (2d Cir.2008). Since Amaker plainly cannot meet this requirement, his cause of action under the TVPA is deficient as a matter of law, and thus subject to dismissal.

D. *Property Loss*

Although the portion of his complaint in which he summarizes his claims does not reference such a cause of action, elsewhere in that pleading Amaker alleges that certain of his property was withheld by defendants Perry and Baniler, and later destroyed by defendant LaClair.[FN10] Amended Complaint (Dkt. No. 78) ¶ 21. Defendants also seek dismissal of this potential claim as being without merit.

> FN10. To some extent there is overlap between plaintiff's property loss claims and his contention that through confiscation or destruction of documents and other materials related to his ongoing litigation, he has been deprived of access to the courts. The property loss at issue in connection with this claim could also potentially serve as adverse action alleged by the plaintiff in connection with his retaliation claim. Both of these claims are addressed elsewhere in this report. *See* pp. 21-26, and 42-48, *post.*

It is well-settled that no constitutionally cognizable cause of action exists for the destruction or loss of a prison inmate's property, provided that an adequate remedy is afforded by the state courts for such deprivation. *Griffin v. Komenecky,* No. 95-CV-796, 1997 WL 204313, at *2 (N.D.N.Y. Apr. 14, 1997) (Scullin, J.). In this instance, plaintiff was entitled to avail himself of the mechanism prescribed under section nine of the New York Court of Claims Act to redress his loss of property claim. *See id.; see also Brooks v. Chappius,* 450 F.Supp.2d 220, 226-27 (W.D.N.Y.2006). Accordingly, plaintiff's loss of property

cause of action is without merit, and subject to dismissal as a matter of law. *See Brooks,* 450 F.Supp.2d at 227.

E. *Eleventh Amendment/Sovereign Immunity*

**\*8** Plaintiff's claims in this action are brought against the various named defendants, both as individuals and in their official capacities. *See, e.g.,* Amended Complaint (Dkt. No. 78) ¶ 1. Noting that plaintiff's claims against the defendants in their official capacities are tantamount to those against the State, defendants seek their dismissal.

The Eleventh Amendment protects a state against suits brought in federal court by citizens of that state, regardless of the nature of the relief sought. *Alabama v. Pugh,* 438 U.S. 781, 782, 98 S.Ct. 3057, 3057-58 (1978). This absolute immunity which states enjoy under the Eleventh Amendment extends both to state agencies, and in favor of state officials sued for damages in their official capacities when the essence of the claim involved seeks recovery from the state as the real party in interest.[FN11] *Richards v. State of New York Appellate Division, Second Dep't,* 597 F.Supp. 689, 691 (E.D.N.Y.1984) (citing *Pugh* and *Cory v. White,* 457 U.S. 85, 89-91, 102 S.Ct. 2325, 2328-29 (1982)). "To the extent that a state official is sued for damages in his official capacity ... the official is entitled to invoke the Eleventh Amendment immunity belonging to the state." [FN12] *Hafer v. Melo,* 502 U.S. 21, 25, 112 S.Ct. 358, 361 (1991); *Kentucky v. Graham,* 473 U.S. 159, 166-67, 105 S.Ct. 3099, 3105 (1985).

> FN11. In a broader sense, this portion of defendants' motion implicates the sovereign immunity enjoyed by the State. As the Supreme Court has reaffirmed relatively recently, the sovereign immunity enjoyed by the states is deeply rooted, having been recognized in this country even prior to ratification of the Constitution, and is neither dependent upon nor defined by the Eleventh Amendment. *Northern Ins. Co. of New York v. Chatham County,* 547 U.S. 189, 193, 126 S.Ct. 1689, 1693 (2006).

> FN12. By contrast, the Eleventh Amendment does not establish a barrier against suits seeking to impose individual or personal liability on state officials under section 1983. *See Hafer,* 502 U.S.

Slip Copy, 2009 WL 385413 (N.D.N.Y.)

(Cite as: 2009 WL 385413 (N.D.N.Y.))

at 30-31, 112 S.Ct. at 364-65.

Since plaintiff's damage claims against the named defendants in their official capacities are in reality claims against the State of New York, thus exemplifying those against which the Eleventh Amendment protects, they are subject to dismissal. *Daisernia v. State of New York,* 582 F.Supp. 792, 798-99 (N.D.N.Y.1984) (McCurn, J.). I therefore recommend that this portion of defendants' motion be granted, and that plaintiff's damage claim against the defendants in their capacities as state officials be dismissed.

*F. Plaintiff's Court Access Claims*

Scattered intermittently throughout plaintiff's complaint are allegations that through their actions defendants denied him access to the courts, in violation of his rights under the First Amendment. Plaintiff's court access denial claims are based principally upon his contention that prison law library facilities available to him were inadequate, and additionally that through their actions corrections workers precluded him from accessing those materials. *See* Amended Complaint (Dkt. No. 78) ¶¶ 7, 16, 32. Defendants seek dismissal of those claims based principally upon plaintiff's failure to demonstrate the existence of any injury or prejudice experienced as a result of their actions.

An inmate's constitutional right to "meaningful" access to the courts is well-recognized and firmly established. *Bounds v. Smith,* 430 U.S. 817, 823, 97 S.Ct. 1491, 1495 (1977) (citations and internal quotation marks omitted). Although in *Bounds* the Supreme Court held that this right of access requires prison authorities "to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law[,]" *id.* at 828, 97 S.Ct. at 1498, the Court later clarified that

**\*9** prison law libraries and legal assistance programs are not ends in themselves, but only the means for ensuring a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts. Because *Bounds* did not create an abstract, freestanding right to a law library or legal assistance, an inmate cannot establish relevant actual injury simply by

establishing that his prison's law library or legal assistance program is subpar in some theoretical sense.

*Lewis v. Casey,* 518 U.S. 343, 351, 116 S.Ct. 2174, 2180 (1996) (internal quotations and citations omitted). Instead, an inmate "must go one step further and demonstrate that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim." *Id.* In other words, to establish a violation of the right of access to the courts, a plaintiff must demonstrate that defendants' interference caused him or her actual injury-that is, that a "nonfrivolous legal claim had been frustrated or was being impeded" as a result of defendants' conduct.[FN13] *Id.* at 353, 116 S.Ct. at 2181.

FN13. Among the court access arguments asserted by plaintiff is the claim that on one occasion on September 10, 1998 plaintiff gave legal mail of an unspecified nature to Corrections Officer R. Lincoln, who never delivered it. Amended Complaint (Dkt. No. 78) ¶ 7. Since neither plaintiff's complaint nor the record now before the court discloses, however, that plaintiff suffered any prejudice as a result of that failure, this claim lacks merit. *See Govan v. Campbell,* 289 F.Supp.2d 289, 297-98 (N.D.N.Y.2003) (Sharpe, M.J .). Moreover, to the extent that the failure to promptly deliver that mail might be proven to have legal consequences, it is noted that that significance is substantially ameliorated by the prison mailbox rule which provides, in essence, that court papers are deemed filed when delivered by a prison inmate to corrections officials. *See Houston v. Lack,* 487 U.S. 266, 270-72, 108 S.Ct. 2379, 2382-83 (1988); *Mingues v. Nelson,* No. 96 CV 5396, 2004 WL 324898, at \*3 (S.D.N.Y. Feb. 20, 2004).

In support of his court access claim plaintiff maintains that he was denied law library access between January 2, 2001 and January 18, 2001, and again from the filing of a second grievance related to library access on February 26, 2001 until March 5, 2001. Amended Complaint (Dkt. No. 78) ¶ 16. Plaintiff contends that this lack of access effectively precluded him from filing a motion to compel-presumably related to discovery-in a pending

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

federal court action.[FN14] *Id.*

FN14. As defendants note, many of plaintiff's allegations regarding library access denial fail to identify any particular defendant to whom the denial can be fairly attributed. Since personal involvement in a constitutional deprivation is an essential requirement of a civil rights claim under 42 U.S.C. § 1983, *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995), this failure thus provides an additional, independent basis for dismissal of at least portions of plaintiff's court access claims.

Plaintiff's library access claims are addressed in a declaration given by Michael McKinnon, the DOCS employee charged with oversight of the law library at Clinton. *See* McKinnon Decl. (Dkt. No. 229-4) ¶¶ 1-2. In that declaration McKinnon describes the law library facilities and procedures at Clinton, including the established protocol for requesting library access. *Id.* ¶¶ 2-3. McKinnon notes that despite plaintiff's allegations to the contrary, *see* Amended Complaint (Dkt. No. 78) ¶ 7, he never denied library services to the plaintiff or any other inmate when faced with a court imposed deadline. *Id.* ¶ 6. McKinnon also notes that over the four month period during which the plaintiff could have commenced a proceeding under New York Civil Practice Law and Rules Article 78 to challenge the disciplinary action initiated in June of 1998, one of the potential legal proceedings for which he could have requested access to library facilities, he was granted library access on seven occasions during July, eleven times in August, five times in September and on six occasions in October of 1998, and that in the following months he was permitted use of the library facilities on approximately ten days in November of 1998 and nine times in December of that year. *Id.* ¶ 6. According to that declaration, records at Clinton also show that between June of 1999 and September, 2001, plaintiff was scheduled for more than four hundred library call outs, and was granted special access status on February 24, 2001 in light of an impending March 26, 2001 court deadline. *Id.* ¶ 9.

***10** The existence of prejudice is an essential element of a First Amendment court access denial claim. *Lewis,* 518 U.S. at 353, 116 S.Ct. at 2181. It is true that in his amended complaint plaintiff does claim, although in general and conclusory terms, that he was prejudiced by defendants' actions, allegedly having missed a court ordered deadline on more than one occasion, causing adverse consequences in connection with his legal actions. *See, e.g.,* Amended Complaint (Dkt. No. 78) ¶¶ 16, 32. Faced with defendants' motion raising lack of prejudice, however, plaintiff has failed to offer any specifics regarding those claims and to adduce proof from which a reasonable factfinder could conclude that he did indeed experience prejudice by virtue of defendants' failure to provide him with library access, and to mail court documents, leaving instead only his conclusory allegations without underlying evidentiary support.

In sum, the record now before the court neither supports plaintiff's claim that he was denied access to adequate library facilities while at Clinton, nor does it establish the existence of prejudice suffered as a result of any such deprivation, if indeed it did occur. Accordingly, I recommend dismissal of plaintiff's court access claims as a matter of law.

G. *Plaintiff's RICO Cause of Action*

In broad and conclusory terms devoid of specifics, plaintiff alleges that various of the defendants named in the action have violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.* Amended Complaint (Dkt. No. 78) ¶¶ 26, 35. Plaintiff's RICO claim appears to be predicated upon an alleged mail fraud scheme engaged in by corrections workers and "approved by Comm. Goord, Supt. Senkowski" to steal inmate mail, and includes his request that the court refer the matter to the United States Attorney for prosecution. *Id.* at ¶¶ 26, 35, 39. Interpreting plaintiff's complaint as seeking criminal prosecution for the alleged violation, and noting that the prerequisite for establishing a claim under that provision cannot be met in this instance, defendants seek dismissal of plaintiff's RICO claim. Despite his submission of comprehensive materials in opposition to defendants' motion, including a thirty-eight page affidavit and a twenty-one page memorandum of law, plaintiff does not address this portion of defendants' motion.

The substantive prohibitions under RICO are set forth

Slip Copy, 2009 WL 385413 (N.D.N.Y.)

(Cite as: 2009 WL 385413 (N.D.N.Y.))

principally in 18 U.S.C. § 1962(a)-(c); subdivision (d) of that provision prohibits parties from conspiring to violate one or more of those substantive provisions. In relevant part, section 1962 provides that

> [i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

**\*11** 18 U.S.C. § 1962(c); see Salinas v. United States, 522 U.S. 52, 62, 118 S.Ct. 469, 476 (1997).

In addition to providing for potential criminal prosecution, RICO also affords a civil right of action for violation of its provisions, authorizing recovery of treble damages as well as costs of the action, including reasonable attorneys' fees, in the event of an established violation 18 U.S.C. § 1964(c). See Klehr v. A.O. Smith Corp., 521 U.S. 179, 183, 117 S.Ct. 1984, 1987-88 (1997). To plead a cognizable civil RICO claim, a party must allege "(1) conduct, (2) of an enterprise, (3) through a pattern, (4) of racketeering activity," as well as "injury to business or property as a result of the RICO violation." Anatian v. Coutts Bank (Switzerland) Ltd., 193 F.3d 85, 88 (2d Cir.1999).

The pleading of a civil RICO violation is subject to the heightened requirement that its supporting allegations must be pleaded with particularity. See Fed.R.Civ.P. 9(b); see also Anatian, 193 F.3d at 88-89. Additionally, the court's local rules require that when a civil RICO claim is asserted before this court, a RICO statement containing certain specified information must be filed by the party raising the claim. N.D.N.Y.L.R. 9.2. A review of the record in this case reveals that neither of these critical requirements has been met, thereby providing a threshold basis for dismissal of plaintiff's RICO claim. See Spoto v. Herkimer County Trust, No. 99-CV-1476, 2000 WL 533293, at \*3 n. 2 (N.D.N.Y. Apr. 27, 2000) (Munson, J.).

Turning to the merits, it is clear that the record falls considerably short of establishing a basis upon which a reasonable factfinder could conclude that the requisite

elements of a RICO claim have been established. While plaintiff alleges in conclusory fashion the existence of mail fraud at the prison facilities in which he was housed, and mail fraud potentially qualifies as racketeering activity, see Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 454, 125 S.Ct. 1991, 1995 (2006), the record fails to disclose the existence of a conspiracy of two or more persons, lacks evidence of two or more acts constituting a pattern of racketeering activity, does not identify the relevant "enterprise", fails to demonstrate how the conspirators, through the pattern of racketeering activity, conducted the enterprise, and alleges no injury to business or property resulting from defendants' actions. See Amended Complaint (Dkt. No. 78) ¶¶ 26, 35. Since the record fails to disclose evidence from which a reasonable factfinder in this case could conclude that the requisite elements to sustain a civil RICO claim have been met, I recommend dismissal of that cause of action on the merits.[FN15]

> FN15. In light of this finding I also recommend against referral of this matter to the United States Attorney, a matter which, while within the court's inherent authority in the event of a perceived criminal violation, see, e.g., ACLI Govn't Sec., Inc. v. Rhoades, 989 F.Supp. 462, 467 (S.D.N.Y.1997), does not appear to be warranted. This determination, of course, does not preclude the plaintiff from filing a complaint with the United States Attorney or other appropriate federal authorities.

H. Deliberate Medical Indifference

One of the central themes presented in plaintiff's prolix, narrative-styled amended complaint is his claim that certain of the defendants have failed to properly treat his various medical conditions, many of which are not specified with any degree of particularity. Defendants contend that based upon the record now before the court they are entitled to dismissal of that claim as a matter of law, arguing that plaintiff neither suffers from a serious medical need, nor were the named defendants subjectively and deliberately indifferent to any such need.

**\*12** The Eighth Amendment's prohibition of cruel and unusual punishment encompasses punishments that involve the "unnecessary and wanton infliction of pain"

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 385413 (N.D.N.Y.)

(Cite as: 2009 WL 385413 (N.D.N.Y.))

and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076, 1084 (1986) (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400 (1981)).

A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement-the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference." *See Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (citing *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321 (1991)); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M .J.); *see also, generally, Wilson,* 501 U.S. 294, 111 S.Ct. 2321. Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1978; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer* ); *Waldo,* 1998 WL 713809, at *2 (same).

In order to state a medical indifference claim under the Eighth Amendment, a plaintiff must allege a deprivation involving a medical need which is, in objective terms, " 'sufficiently serious' ". *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (citing *Wilson,* 501 U.S. at 298, 111 S.Ct. at 2324); *Foote v. Hathaway,* 513 U.S. 1154, 115 S.Ct. 1108 (1995). A medical need is serious for constitutional purposes if it presents " 'a condition of urgency' that may result in 'degeneration' or 'extreme pain'." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (citations omitted). A serious medical need can also exist where " 'failure to treat a prisoner's condition could result in

further significant injury or the unnecessary and wanton infliction of pain' "; since medical conditions vary in severity, a decision to leave a condition untreated may or may not be unconstitutional, depending on the facts. *Harrison v. Barkley,* 219 F.3d 132, 136-37 (2d Cir.2000) (quoting, *inter alia, Chance* ). Relevant factors in making this determination include injury that a " 'reasonable doctor or patient would find important and worthy of comment or treatment' ", a condition that " 'significantly affects' " a prisoner's daily activities, or causes " 'chronic and substantial pain.' " *Chance,* 43 F.3d at 701 (citation omitted); *LaFave v. Clinton County,* No. CIV. 9:00CV774, 2002 WL 31309244, at *2-3 (N.D.N.Y. Apr. 3, 2002) (Sharpe, M.J.).

**\*13** Deliberate indifference, in a constitutional sense, exists if an official knows of and disregards an excessive risk to inmate health or safety; the official must "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer* ); *Waldo,* 1998 WL 713809, at *2 (same). It is well-established, however, that mere disagreement with a prescribed course of treatment, or even a claim that negligence or medical malpractice has occurred, does not provide a basis to find a violation of the Eighth Amendment. *Estelle,* 429 U.S. at 105-06, 97 S.Ct. at 201-02; *Chance,* 143 F.3d at 703; *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.), *cert. denied,* 506 U.S. 1040, 113 S.Ct. 828 (1992). The question of what diagnostic techniques and treatments should be administered to an inmate is a "classic example of a matter for medical judgment"; accordingly, prison medical personnel are vested with broad discretion to determine what method of care and treatment to provide to their patients. *Estelle,* 429 U.S. at 107, 97 S.Ct. at 293; *Chance,* 143 F.3d at 703; *Rosales v. Coughlin,* 10 F.Supp.2d 261, 264 (W.D.N.Y.1998).

Plaintiff's medical indifference claims, while referenced elsewhere, are summarized in paragraph twenty-seven of his amended complaint, and augmented in considerably greater detail in his summary judgment submissions including, notably, his affidavit. Plaintiff's medical concerns appear to center upon disagreement over

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 385413 (N.D.N.Y.)

(Cite as: 2009 WL 385413 (N.D.N.Y.))

the course of defendants' treatment of his diminished eyesight; chronic back pain, diagnosed as degenerative disc disease; and pain, "clicking and popping" in his knee. Amended Complaint (Dkt. No. 78) ¶¶ 12, 27. Generally speaking, plaintiff's medical indifference claim recites a litany of instances in which plaintiff did not receive desired medication, medical equipment, physical therapy, or treatment for his conditions.FN16 See Amended Complaint (Dkt. No. 78) ¶ 27.

> FN16. From a comparison of plaintiff's medical indifference claims in this case with those rejected in Amaker II, it appears that there is considerable overlap.

1. Serious Medical Needs

In their motion, defendants maintain that none of the conditions upon which plaintiff's medical indifference claims are predicated rise to a level of constitutional significance. In Amaker II the court found that plaintiff's claims regarding his vision and delay in eye treatment did not establish the existence of a serious medical need or injury. See Report and Recommendation in Amaker II (Dkt. No. 160) at pp. 15-16 and Memorandum-Decision and Order (Dkt. No. 167) at pp. 3, 6. Similarly, the Amaker II court concluded that in complaining regarding the treatment of his knee, including denial of magnetic resonance imaging ("MRI") testing and knee braces, plaintiff also failed to make the threshold requirement of establishing a serious physical injury or need. Id. at 16-17. Likewise, while noting a division among the courts regarding this issue, the court in that case nonetheless concluded that plaintiff's claim of abdominal pain, as drafted, did not successfully present a material issue of fact regarding serious medical need. Id. at 17.

*14 Having carefully reviewed the record now presented, like the court in Amaker II I doubt plaintiff's ability to establish, at trial, the existence of a serious medical condition of constitutional significance to which the defendants were deliberately indifferent. Because I find that Amaker cannot establish indifference on the part of defendants to any of his medical needs, regardless of whether they were sufficiently serious to trigger protections of the Eighth Amendment, and defendants do not appear to press the issue, I nonetheless find it

unnecessary to address the sufficiency of plaintiff's allegations in this regard.

2. Deliberate Indifference

Turning to the subjective element of the deliberate indifference inquiry I find, as did the court in Amaker II, that rather than disclosing any indifference on the part of prison medical officials to plaintiff's medical needs, the record instead reflects a comprehensive and at times intense pattern of treatment for plaintiff's various medical conditions which, though plainly not to his complete liking, easily fulfills constitutionally mandated minimal requirements.

Plaintiff's medical indifference claim appears to relate to treatment received at both of the correctional facilities at issue in this case, although the vast majority of those allegations relate to his complaints regarding medical attention received while at Clinton. To the extent that plaintiff's claims involve the sufficiency of medical treatment administered at Upstate, similar claims were carefully reviewed by the court in Amaker II, resulting in a finding that the defendants were not deliberately indifferent to his serious medical needs during the time of his incarceration at Upstate. See Report and Recommendation in Amaker II (Dkt. No. 160) at pp. 15-17. That determination is dispositive of the portion of plaintiff's medical indifference claim in this action related to his medical care at Upstate.FN17 See Akhenaten, 544 F.Supp.2d at 327-28.

> FN17. Plaintiff's medical indifference claims carry forward to his time at Upstate, following a transfer into that facility on October 31, 2001. In his complaint, as amended, plaintiff asserts that during the course of that transfer he was "made to walk in waist chain hurting his herniated discs in his lower back causing his legs to go numbed [sic] [and that he] never was send [sic] to a medical doctor ...." Amended Complaint (Dkt. No. 78) ¶¶ 21, 24. This claim is contradicted by plaintiff's medical records, however, which reveal that upon his arrival at Upstate he was medically examined, screened and orientated, with no indication of any complaints of pain or numbness at that time; in fact, according to his

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 385413 (N.D.N.Y.)

(Cite as: 2009 WL 385413 (N.D.N.Y.))

medical records, plaintiff denied having any injury or current medical complaint when questioned during that process. *See* Mans Aff. (Dkt. No. 229-14) Exh. A, 10/31/08 Entrance Exam Form, Screening and Physical Assessment Form, Inmate Orientation Form, and Incoming Draft Form. Despite plaintiff's further claim that he was not seen by medical officials at Upstate, the records once again reveal otherwise, reflecting that prior to the time of his transfer out of that facility on April 22, 2002, he was seen by medical personnel at Upstate more than forty times, with various complaints being registered by him along the way.

Turning to plaintiff's medical treatment while at Clinton, medical records of plaintiff's care at that facility reflect that between June 8, 1999 and December 1, 1999-the period covered by his complaints regarding medical care at Clinton-he was seen on approximately one hundred occasions regarding complaints concerning his back, knee, and neck pain, chronic headaches, and various other symptoms by an array of health care providers which included prison doctors, outside specialists, physician assistants, therapists and nurses. *See* Mans Aff. (Dkt. No. 229-14) Exh. A (filed under seal); *see also* Johnson Decl. (Dkt. No. 229-3) ¶ 7. During that time plaintiff was provided with medical examinations, consultations, physical therapy, knee braces and supports, and various medications, and additionally was the subject of x-rays and magnetic resonance imaging ("MRI") testing. *Id.*

One of the conditions of which plaintiff complains relates to chronic back pain. Plaintiff's medical records reveal that he has been diagnosed as suffering from degenerative disc disease. Mans Aff. (Dkt. No. 229-14) Exh. A; *see also* Johnson Decl. (Dkt. No. 229-3) ¶ 7. According to Dr. Vonda Johnson, the Medical Director at Clinton, while certain treatment regimens may afford some measure of relief for that condition, depending upon the particular patient, it cannot necessarily be "fixed" through surgery, medication, or physical therapy. Johnson Decl. (Dkt. No. 229-3) ¶ 9. In any event, plaintiff's health records reveal that plaintiff was provided considerable testing and treatment, including physical therapy, in an effort to address that condition. *See generally* Mans Aff.

(Dkt. No. 229-14) Exh. A; Johnson Decl. (Dkt. No. 229-3) ¶ 11. Evaluations arranged by prison officials regarding plaintiff's back condition have included MRI testing as well as an EMG study/ nerve conduction study on November 1, 1999, ordered by Dr. Ellen. Johnson Decl. (Dkt. No. 229-3) ¶ 11.

**\*15** Another of plaintiff's complaints relates to treatment received for his knee. Plaintiff's medical records reveal that a bilateral physical examination of Amaker's knees was conducted on November 15, 1999 by Dr. Ellen. Manns Aff. (Dkt. No. 229-14) Exh. A, 11/1/99, 11/8/99, 11/15/99 Entries; Johnson Decl. (Dkt. No. 229-3) ¶ 11. Neither the results of Dr. Ellen's examination nor anything contained in plaintiff's records was viewed as indicating the need to perform MRI testing on his knees. *Id.*

The specifics of plaintiff's complaints regarding his knee condition include allegations that prison medical personnel failed to provide him with proper knee braces, failed to order MRI testing, and denied his requests to see a specialist to address the pain, clicking and popping being experienced in both knees. Plaintiff's conclusory allegations of not being provided with a knee brace are belied by the record. On April 13, 1999 one neoprene right knee brace was received at the facility for the plaintiff, with an indication that the other was back-ordered. *See* Mans Aff. (Dkt. No. 229-14) Exh. A, 4/13/99 entry. In any event upon receipt of the special neoprene knee braces, they were refused by the plaintiff. *Id.,* 1/6/00 Interdepartmental Communication.

Plaintiff's medical records reflect that medical officials at Clinton were in fact fully cognizant of plaintiff's complaints regarding knee pain, and took measures to address that condition. On November 8, 1999 a neurological examination of plaintiff's lower extremities was conducted, followed by a physical examination of both of plaintiff's knees on November 15, 1999. Johnson Decl. (Dkt. No. 229-3) ¶ 11; Mans Aff. (Dkt. No. 229-14) Exh. A, 11/1/99, 11/8/99, 11/15/99 entries. The results of those examinations by Dr. Ellen revealed nothing to indicate the need for MRI testing. While plaintiff challenges this determination, unsupported by any evidence suggesting that the opinions of Dr. Ellen were not medically appropriate, his claim in this regard

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 385413 (N.D.N.Y.)

(Cite as: 2009 WL 385413 (N.D.N.Y.))

represents nothing more than disagreement over a chosen course of treatment, and is insufficient to support a claim of indifference. *Estelle,* 429 U.S. at 105-06, 97 S.Ct. at 201-02; *Chance,* 143 F.3d at 703; *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.3d 296 (2d Cir.), *cert. denied,* 506 U.S. 1040, 113 S.Ct. 828 (1992).

Another of plaintiff's medical complaints stems from the claim that while at Clinton he was denied treatment by Dr. Lee for a period of three months. Amended Complaint (Dkt. No. 78) ¶ 8. Neither plaintiff's complaint nor his motion submission, however, contains specifics regarding the time period involved. Moreover, while there may well have been periods of such a duration over which he was not seen by a doctor, a review of plaintiff's medical records fails to disclose any three month interval during which he was not medically treated by any DOCS medical personnel at Clinton. *See* Mans Aff. (Dkt. No. 229-14) Exh. A. Despite plaintiff's apparent belief to the contrary, the Eighth Amendment does not guarantee a prison inmate unfettered access to a prison physician at his or her insistence. *See Harrison v. Barkley,* 219 F.3d 132, 142 (2d Cir.2000) (" '[S]ociety does not expect that prisoners will have unqualified access to health care ....' ") (quoting *Hudson v. McMillian,* 503 U.S. 1, 9, 112 S.Ct. 995 (1992)).

**\*16** The vast majority of plaintiff's medical complaints surround the belief that he was not provided with adequate physical therapy, his disagreement over being told that he would have to pay for replacement of his broken eyeglasses, and the denial of appropriate shower and gym passes.[FN18] These complaints fall well short of establishing deliberate medical indifference of constitutional proportions on the part of prison officials at Clinton and Upstate. As the Second Circuit has noted,

> FN18. According to his health records, plaintiff was seen at Clinton by Nurse Rizoff on June 16, 1998, claiming that his eyeglasses were broken and requesting an eye examination and new glasses. *See* Mans Aff. (Dkt. No. 229-14) Exh. A, 6/16/98. Nurse Rizoff inquired as to how the glasses were broken, and advised the plaintiff that pursuant to the DOCS health services policy regarding vision care services he might be held

accountable for the cost of any replacement that occurred within two years of his last eye examination and the issuance of glasses. *See id.,* Interdepartmental Communications from Dr. Lee to Plaintiff Regarding DOCS Policy for Eyeglasses, dated February 25, 1999. Plaintiff's records reveal that his eyes were subsequently examined on July 8, 1998, at which time he received a pair of glasses, and that he was retested on April 26, 1999 after complaining of eye pain. *See Id.,* 7/9/98 and 4/26/99 Entries. While there is considerable question as to whether plaintiff's eye condition constitutes a serious medical need for purposes of the Eighth Amendment, particularly in view of the lack of allegations that his condition degenerated or he experienced severe pain as a result of the delay in providing him with an eye examination and glasses, *see Koehl v. Dalsheim,* 85 F.3d 86, 88 (2d Cir.1996); *Abdush-Shahid v. Coughlin,* 933 F.Supp. 168, 181 (N.D.N.Y.1996) (Koeltl, J.), it is clear that the defendants were not, as alleged, indifferent to his vision impairment.

[i]t must be remembered that the State is not constitutionally obligated, much as it may be desired by inmates, to construct a perfect plan for [medical] care that exceeds what the average reasonable person would expect or avail herself of in life outside the prison walls. [A] correctional facility is not a health spa, but a prison in which convicted felons are incarcerated. Common experience indicates that the great majority of ... prisoners would not in freedom or on parole enjoy the excellence in [medical] care which the plaintiffs understandably seek .... We are governed by the principle that the objective is not to impose upon a state prison a model system of [medical] care beyond average needs but to provide the minimum level of [medical] care required by the Constitution. The Constitution does not command that inmates be given the kind of medical attention that judges would wish to have for themselves.... The essential test is one of medical necessity and not one simply of desirability.

*Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986) (internal quotations and citations omitted).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 385413 (N.D.N.Y.)

(Cite as: 2009 WL 385413 (N.D.N.Y.))

Plaintiff's ambulatory health record, which is both extensive and comprehensive, has been reviewed by Dr. Vonda Johnson, the Medical Director at Clinton. Based upon her professional judgment, Dr. Johnson opines that the plaintiff neither suffered from any acute medical condition requiring immediate medical care and treatment or which resulted in harm to his health or well-being, nor was he denied appropriate treatment by medical and nursing staff both at Clinton and Upstate, as well as by any outside specialists required under the circumstances. Johnson Decl. (Dkt. No. 299-3) ¶¶ 14-15. Having engaged in a careful review of plaintiff's medical records, informed by plaintiff's arguments as well as Dr. Johnson's opinions, I am of the view that no reasonable factfinder could conclude that defendants were deliberately indifferent to any serious medical condition suffered by the plaintiff, and therefore recommend dismissal of plaintiff's deliberate indifference claims as a matter of law.

I. *Retaliation*

In his amended complaint, although with the same degree of indefiniteness that has plagued his submissions in other substantive areas, plaintiff also asserts claims of violation of his First Amendment rights based upon retaliation for having engaged in protected activity, including the filing of grievances. Defendants also seek dismissal of plaintiff's retaliation claim as fatally nebulous and unsupported.

**\*17** When adverse action is taken by prison officials against an inmate, motivated by the inmate's exercise of a right protected under the Constitution, including the free speech provisions of the First Amendment, a cognizable retaliation claim under 42 U.S.C. § 1983 lies. *See Franco v. Kelly,* 854 F.2d 584, 588-90 (2d Cir.1988). As the Second Circuit has repeatedly cautioned, however, such claims are easily incanted and inmates often attribute adverse action, including the issuance of misbehavior reports, to retaliatory animus; courts must therefore approach such claims "with skepticism and particular care." *Dawes v. Walker,* 239 F .3d 489, 491 (2d Cir.2001) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002); *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (same).

In order to state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that 1) the conduct at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576 (1977); *Dillon v. Morano,* 497 F.3d 247, 251 (2d Cir.2007); *Dawes,* 239 F.3d at 492 (2d Cir.2001). If the plaintiff carries this burden, then to avoid liability the defendants must show by a preponderance of the evidence that they would have taken action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy,* 429 U.S. at 287, 97 S.Ct. at 576. If taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

Analysis of retaliation claims thus requires careful consideration of the protected activity in which the inmate plaintiff has engaged, the adverse action taken against him or her, and the evidence tending to link the two. When such claims, which are exceedingly case specific, are alleged in only conclusory fashion, and are not supported by evidence establishing the requisite nexus between any protected activity and the adverse action complained of, a defendant is entitled to the entry of summary judgment dismissing plaintiff's retaliation claims. *Flaherty,* 713 F.2d at 13.

It should also be noted that personal involvement of a named defendant in any alleged constitutional deprivation is a prerequisite to an award of damages against that individual under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 385413 (N.D.N.Y.)

(Cite as: 2009 WL 385413 (N.D.N.Y.))

F.2d 260, 263 (2d Cir.1986). As is true of other types of claims, this principle applies to causes of action claiming unlawful retaliation. *See* Abascal v. Hilton, No. 04-CV-1401, 2008 WL 268366, at *10 (N.D.N.Y. Jan. 30, 2008) (Kahn, D.J. and Lowe, M.J.).

**\*18** Analysis of plaintiff's retaliation cause of action is complicated by virtue of his failure in most instances to state, with any modicum of clarity, what specific protected activity triggered the retaliatory response and what the resulting adverse action was, including to articulate the timeframe involved. Among the actions apparently attributed by Amaker to retaliatory animus are searches of his cell, conducted on March 22 and 23, 1999. Amended Complaint (Dkt. No. 78) ¶ 10. Defendants' submissions, however, reveal that the first of those two searches was based upon suspicion that the plaintiff, one of several inmates present in the law library at the time a corrections officer's handcuff key case was discovered missing, could be in possession of that contraband.[FN19] Bell Decl. (Dkt. No. 229-10) ¶ 6. The second of those searches was a routine search performed in accordance with DOCS directives requiring periodic random cell searches. *Id.* ¶¶ 6-8. Since it therefore appears that both of those actions were taken for independent and legitimate reasons, they cannot form the basis of a retaliation claim. *Mount Healthy City Bd. of Ed.,* 429 U.S. at 287, 97 S.Ct. at 576; *see also* Lowrence v. Achtyl, 20 F.3d 529, 535 (2d Cir.1994).

>    FN19. It is well-established that as a prison inmate plaintiff has no Fourth Amendment right to privacy which would preclude a search of his cell, accomplished for legitimate reasons. Hudson v. Palmer, 468 U.S. 517, 525-26, 104 S.Ct. 3194, 3200 (1984). A cell search motivated out of retaliatory animus, however, could be found to support a claim of unlawful retaliation provided that all of the prerequisites for establishing a First Amendment claim were met. *See* H'Shaka v. Drown, No. 9:03-CV-937, 2007 WL 1017275, at *12 (N.D.N.y. Mar. 30, 2007) (Kahn, D.J. and Treece, M.J.).

Although it is far from clear, plaintiff also appears to assert that the requirement imposed by prison officials that

he pay for spices and food consumed in connection with his celebration of Ramadan was retaliatory. Amended Complaint (Dkt. No. 78) ¶ 13. It is doubtful that a reasonable factfinder could conclude that this requirement rose to a level sufficient to constitute an adverse action. *Cf.* Kole v. Lappin, 551 F.Supp.2d 149, 155 (D.Conn.2008) (dismissing plaintiff's retaliation claim based on her complaint that the prison reduced the number of items sold as kosher-for Passover for inmates in response to her filing a grievance regarding the one hundred dollar spending limit). In any event, more importantly, there is no evidence among any of plaintiff's submissions which would establish the requisite nexus between the imposition of that requirement and plaintiff having engaged in protected activity.

Undeniably, it appears that the plaintiff in this case frequently avails himself of his First Amendment right to complain, by instituting litigation, filing grievances, and pursuing other channels, regarding prison conditions and his treatment as a DOCS inmate. It is also clear that the plaintiff has been subject to disciplinary action by prison officials with some regularity. While these two circumstances could suffice to establish two of the three requisite elements to establish a claim of unlawful retaliation, at least at the summary judgment stage, the record is wholly lacking in evidence from which a reasonable factfinder could conclude that the third and critical element, linking one or more of the adverse actions to plaintiff's protected activity, has been satisfied. Accordingly, I recommend dismissal of plaintiff's retaliation claim as a matter of law.

### J. *Equal Protection*

**\*19** Plaintiff's complaint, as amended, also makes passing reference to the denial by defendants of his right to equal protection. *See, e.g.,* Amended Complaint (Dkt. No. 78) ¶ 28, 33.

The Equal Protection Clause directs state actors to treat similarly situated people alike. *See* City of Cleburne, Texas v. Cleburne Living Ctr., 473 U.S. 432, 439, 105 S.Ct. 3249, 3254 (1985). To prove a violation of the Equal Protection Clause, a plaintiff must demonstrate that he or she was treated differently than others similarly situated as a result of intentional or purposeful discrimination

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 385413 (N.D.N.Y.)

(Cite as: 2009 WL 385413 (N.D.N.Y.))

directed at an identifiable or suspect class. *See Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir.1995) (citing, *inter alia, McCleskey v. Kemp,* 481 U.S. 279, 292, 107 S.Ct. 1756, 1767 (1987)). The plaintiff must also show that the disparity in treatment "cannot survive the appropriate level of scrutiny which, in the prison setting, means that he must demonstrate that his treatment was not reasonably related to [any] legitimate penological interests." *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005) (quoting *Shaw v. Murphy,* 532 U.S. 223, 225, 121 S.Ct. 1475 (2001) (internal quotation marks omitted)).

In this instance neither plaintiff's complaint, as amended, nor the record now before the court provides specifics to flesh out plaintiff's equal protection claim. Presumably, the claim is rooted in the alleged differentiation of prison officials in their treatment of him, based upon his race. To be sure, plaintiff's submissions indicate the use of at least one racial epithet by prison officials. The record, however, is otherwise devoid of evidence from which a reasonable factfinder could conclude that the defendants discriminated as against the plaintiff based upon his race or some other protected criteria. Instead, plaintiff's allegations fall within the category of those observed by the Second Circuit to be insufficient, the court noting that "complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning." *Barr v. Abrahams,* 810 F.2d 358, 363 (2d Cir.1987). Discerning no basis upon which a reasonable factfinder could conclude that the defendants have violated Amaker's right to equal protection under the Fourteenth Amendment, I similarly recommend dismissal of that claim.

K. *Procedural Due Process*

Plaintiff's amended complaint also asserts, once again in wholly conclusory fashion, that his right to due process was violated by the defendants. Conspicuously absent from plaintiff's submissions, however, is an indication of what cognizable liberty interests are implicated in this cause of action, as well as illumination as to the reasons for his claim that due process was not afforded.

To successfully state a claim under 42 U.S.C. § 1983

for the denial of procedural due process arising out of a disciplinary hearing, a plaintiff must show that he or she 1) possessed an actual liberty interest, and 2) was deprived of that interest without being afforded sufficient process. *See Tellier v. Fields,* 280 F.3d 69, 79-80 (2d Cir.2000) (citations omitted); *Hynes,* 143 F.3d at 658; *Bedoya v. Coughlin,* 91 F.3d 349, 351-52 (2d Cir.1996). The procedural safeguards to which a prison inmate is entitled before being deprived of a constitutionally cognizable liberty interest are wellestablished, the contours of the requisite protections having been articulated in *Wolff v. McDonnell,* 418 U .S. 539, 564-67, 94 S.Ct. 2963, 2978-80 (1974). Under Wolff, the constitutionally mandated due process requirements, include 1) written notice of the charges; 2) the opportunity to appear at a disciplinary hearing and present witnesses and evidence, subject to legitimate safety and penological concerns; 3) a written statement by the hearing officer explaining his or her decision and the reasons for the action being taken; and 4) in some circumstances, the right to assistance in preparing a defense. *Wolff,* 418 U.S. at 564-67, 94 S.Ct. at 2978-80; *see also Eng v. Coughlin,* 858 F .2d 889, 897-98 (2d Cir.1988). In order to pass muster under the Fourteenth Amendment, hearing officer's disciplinary determination must garner the support of at least "some evidence". *Superintendent v. Hill,* 472 U.S. 445, 105 S.Ct. 2768 (1985).

**\*20** Having carefully searched the record now before the court, I am unable to find that Amaker experienced the deprivation of a constitutionally cognizable liberty interest sufficient to trigger the protections afforded under the Fourteenth Amendment. Moreover, even assuming *arguendo* the existence of such a liberty interest, plaintiff's submissions do not disclose any failure to comply with the constitutional mandates of the Fourteenth Amendment, including those articulated by the Supreme Court in *Wolff.* Accordingly, I recommend dismissal of plaintiff's procedural due process cause of action, as a matter of law.

IV. *SUMMARY AND RECOMMENDATION*

Plaintiff's amended complaint, though rambling and consisting of varied and wide-ranging claims based upon acts allegedly occurring at both Clinton and Upstate, when boiled down to its essence asserts claims of medical

Slip Copy, 2009 WL 385413 (N.D.N.Y.)

(Cite as: 2009 WL 385413 (N.D.N.Y.))

indifference, constitutional violations based on DNA testing, retaliation, and denial of access to the courts. Having carefully considered the record now before the court I conclude that no factfinder could find in plaintiff's favor on any of these claims, and that defendants are thus entitled to dismissal of all claims against them, as a matter of law.[FN20] Accordingly, it is hereby

> FN20. Based upon this finding I have opted not to address the defendants' additional arguments of lack of personal involvement and entitlement to qualified immunity. *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151 (2001). Similarly, I have chosen not to address the motion filed on behalf of defendant R. Rivera seeking dismissal for failure to state a cause of action in light of my recommendation regarding defendants' summary judgment motion.

RECOMMENDED that defendants' motion for summary judgment dismissing plaintiff's complaint (Dkt. No. 229) be GRANTED, and that plaintiff's complaint be DISMISSED in its entirety; and it is further hereby

RECOMMENDED that in light of this disposition the motion of defendant R. Rivera to dismiss plaintiff's claims against him for failure to state a cause of action upon which relief may be granted (Dkt. No. 237) be DENIED as moot.

NOTICE: pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report-recommendation. Any objections shall be filed with the clerk of the court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is further ORDERED that the Clerk of the Court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

N.D.N.Y.,2009.

Amaker v. Kelley
Slip Copy, 2009 WL 385413 (N.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Jerome WALDO, Plaintiff,
v.
Glenn S. GOORD, Acting Commissioner of New York
State Department of Correctional Services; Peter J.
Lacy, Superintendent at Bare Hill Corr. Facility;
Wendell Babbie, Acting Superintendent at Altona Corr.
Facility; and John Doe, Corrections Officer at Bare Hill
Corr. Facility, Defendants.
**No. 97-CV-1385 LEK DRH.**

Oct. 1, 1998.

Jerome Waldo, Plaintiff, pro se, Mohawk Correctional
Facility, Rome, for Plaintiff.

Hon. Dennis C. Vacco, Attorney General of the State of
New York, Albany, Eric D. Handelman, Esq., Asst.
Attorney General, for Defendants.

DECISION AND ORDER

KAHN, District J.

**\*1** This matter comes before the Court following a
Report-Recommendation filed on August 21, 1998 by the
Honorable David R. Homer, Magistrate Judge, pursuant to
28 U.S.C. § 636(b) and L.R. 72.3(c) of the Northern
District of New York.

No objections to the Report-Recommendation have been
raised. Furthermore, after examining the record, the Court
has determined that the Report-Recommendation is not
clearly erroneous. *See* Fed.R.Civ.P. 72(b), Advisory

Committee Notes. Accordingly, the Court adopts the
Report-Recommendation for the reasons stated therein.

Accordingly, it is

ORDERED that the Report-Recommendation is
APPROVED and ADOPTED; and it is further

ORDERED that the motion to dismiss by defendants is
GRANTED; and it is further

ORDERED that the complaint is dismissed without
prejudice as to the unserved John Doe defendant pursuant
to Fed.R.Civ.P. 4(m), and the action is therefore dismissed
in its entirety; and it is further

ORDERED that the Clerk serve a copy of this order on all
parties by regular mail.

IT IS SO ORDERED.
HOMER, Magistrate J.

REPORT-RECOMMENDATION AND ORDER [FN1]

FN1. This matter was referred to the undersigned
pursuant to 28 U.S.C. § 636(b) and
N.D.N.Y.L.R. 72.3(c).

The plaintiff, an inmate in the New York Department of
Correctional Services ("DOCS"), brought this pro se
action pursuant to 42 U.S.C. § 1983. Plaintiff alleges that
while incarcerated in Bare Hill Correctional Facility
("Bare Hill") and Altona Correctional Facility ("Altona"),
defendants violated his rights under the Eighth and
Fourteenth Amendments.[FN2] In particular, plaintiff alleges
that prison officials maintained overcrowded facilities
resulting in physical and emotional injury to the plaintiff

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

and failed to provide adequate medical treatment for his injuries and drug problem. Plaintiff seeks declaratory relief and monetary damages. Presently pending is defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b). Docket No. 18. For the reasons which follow, it is recommended that the motion be granted in its entirety.

FN2. The allegations as to Bare Hill are made against defendants Goord, Lacy, and Doe. Allegations as to Altona are made against Goord and Babbie.

## I. Background

Plaintiff alleges that on August 21, 1997 at Bare Hill, while he and two other inmates were playing cards, an argument ensued, and one of the two assaulted him. Compl., ¶ 17. Plaintiff received medical treatment for facial injuries at the prison infirmary and at Malone County Hospital. *Id.* at ¶¶ 18-19. On September 11, 1997, plaintiff was transferred to Altona and went to Plattsburgh Hospital for x-rays several days later. *Id.* at ¶ 21.

Plaintiff's complaint asserts that the overcrowded conditions at Bare Hill created a tense environment which increased the likelihood of violence and caused the physical assault on him by another inmate. *Id.* at ¶¶ 10-11. Additionally, plaintiff contends that similar conditions at Altona caused him mental distress and that he received constitutionally deficient medical treatment for his injuries. *Id.* at ¶¶ 21-22. The complaint alleges that Altona's lack of a drug treatment program and a dentist or specialist to treat his facial injuries constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments. *Id.* at ¶¶ 22, 27-28.

## II. Motion to Dismiss

**\*2** When considering a Rule 12(b) motion, a court must assume the truth of all factual allegations in the complaint and draw all reasonable inferences from these facts in favor of the plaintiff. *Leeds v. Meltz,* 85 F.3d 51, 53 (2d Cir.1996). The complaint may be dismissed only when "it

appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Staron v. McDonald's Corp.,* 51 F.3d 353, 355 (2d Cir.1995) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "The issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed, it may appear on the face of the pleading that a recovery is very remote and unlikely, but that is not the test." *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995) (citations omitted). This standard receives especially careful application in cases such as this where a pro se plaintiff claims violations of his civil rights. *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.), *cert. denied,* 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994).

## III. Discussion

### A. Conditions of Confinement

Defendants assert that plaintiff fails to state a claim regarding the conditions of confinement at Bare Hill and Altona. For conditions of confinement to amount to cruel and unusual punishment, a two-prong test must be met. First, plaintiff must show a sufficiently serious deprivation. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citing *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); *Rhodes v. Chapman,* 452 U.S. 347, 348 (1981)(denial of the "minimal civilized measure of life's necessities"). Second, plaintiff must show that the prison official involved was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and that the official drew the inference. *Farmer,* 511 U.S. at 837.

### 1. Bare Hill

In his Bare Hill claim, plaintiff alleges that the overcrowded and understaffed conditions in the dormitory-style housing "resulted in an increase in tension, mental anguish and frustration among prisoners, and dangerously increased the potential for violence." Compl.,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

¶ 11. Plaintiff asserts that these conditions violated his constitutional right to be free from cruel and unusual punishment and led to the attack on him by another prisoner. The Supreme Court has held that double-celling to manage prison overcrowding is not a per se violation of the Eighth Amendment. *Rhodes*, 452 U.S. at 347-48. The Third Circuit has recognized, though, that double-celling paired with other adverse circumstances can create a totality of conditions amounting to cruel and unusual punishment. *Nami v. Fauver*, 82 F.3d 63, 67 (3d Cir.1996). While plaintiff here does not specify double-celling as the source of his complaint, the concerns he raises are similar. Plaintiff alleges that overcrowding led to an increase in tension and danger which violated his rights. Plaintiff does not claim, however, that he was deprived of any basic needs such as food or clothing, nor does he assert any injury beyond the fear and tension allegedly engendered by the overcrowding. Further, a previous lawsuit by this plaintiff raised a similar complaint, that double-celling and fear of assault amounted to cruel and unusual punishment, which was rejected as insufficient by the court. *Bolton v. Goord*, 992 F.Supp. 604, 627 (S.D.N.Y.1998). The court there found that the fear created by the double-celling was not "an objectively serious enough injury to support a claim for damages." *Id.* (citing *Doe v. Welborn*, 110 F.3d 520, 524 (7th Cir.1997)).

**\*3** As in his prior complaint, plaintiff's limited allegations of overcrowding and fear, without more, are insufficient. *Compare Ingalls v. Florio*, 968 F.Supp. 193, 198 (D.N.J.1997) (Eighth Amendment overcrowding claim stated when five or six inmates are held in cell designed for one, inmates are required to sleep on floor, food is infested, and there is insufficient toilet paper) *and Zolnowski v. County of Erie*, 944 F.Supp. 1096, 1113 (W.D.N.Y.1996) (Eighth Amendment claim stated when overcrowding caused inmates to sleep on mattresses on floor, eat meals while sitting on floor, and endure vomit on the floor and toilets) *with Harris v. Murray*, 761 F.Supp. 409, 415 (E.D.Va.1990) (No Eighth Amendment claim when plaintiff makes only a generalized claim of overcrowding unaccompanied by any specific claim concerning the adverse effects of overcrowding). Thus, although overcrowding could create conditions which might state a violation of the Eighth Amendment, plaintiff has not alleged sufficient facts to support such a finding here. Plaintiff's conditions of confinement claim as to Bare

Hill should be dismissed.

2. Altona

Plaintiff also asserts a similar conditions of confinement claim regarding Altona. For the reasons discussed above, plaintiff's claim that he suffered anxiety and fear of other inmates in the overcrowded facility (Compl., ¶¶ 21-22) is insufficient to establish a serious injury or harm.

Plaintiff's second claim regarding Altona relates to the alleged inadequacies of the medical treatment he received. The government has an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The two-pronged *Farmer* standard applies in medical treatment cases as well. *Hemmings v. Gorczyk*, 134 F.3d 104, 108 (2d Cir.1998). Therefore, plaintiff must allege facts which would support a finding that he suffered a sufficiently serious deprivation of his rights and that the prison officials acted with deliberate indifference to his medical needs. *Farmer*, 511 U.S. at 834.

Plaintiff alleges that the medical treatment available at Altona was insufficient to address the injuries sustained in the altercation at Bare Hill. Specifically, plaintiff cites the lack of a dentist or specialist to treat his facial injuries as an unconstitutional deprivation. Plaintiff claims that the injuries continue to cause extreme pain, nosebleeds, and swelling. Compl., ¶¶ 22 & 26. For the purposes of the Rule 12(b) motion, plaintiff's allegations of extreme pain suffice for a sufficiently serious deprivation. *See Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir.1996).

Plaintiff does not, however, allege facts sufficient to support a claim of deliberate indifference by the named defendants. To satisfy this element, plaintiff must demonstrate that prison officials had knowledge of facts from which an inference could be drawn that a "substantial risk of serious harm" to the plaintiff existed and that the officials actually drew the inference. *Farmer*, 511 U.S. at 837. Plaintiff's complaint does not support, even when liberally construed, any such conclusion. Plaintiff offers

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

no evidence that the Altona Superintendent or DOCS Commissioner had any actual knowledge of his medical condition or that he made any attempts to notify them of his special needs. Where the plaintiff has not even alleged knowledge of his medical needs by the defendants, no reasonable jury could conclude that the defendants were deliberately indifferent to those needs. *See Amos v. Maryland Dep't of Public Safety and Corr. Services,* 126 F.3d 589, 610-11 (4th Cir.1997), *vacated on other grounds,*524 U.S. 935, 118 S.Ct. 2339, 141 L.Ed.2d 710 (1998).

*4 Plaintiff's second complaint about Altona is that it offers "no type of state drug treatment program for the plaintiff." Compl., ¶ 22. Constitutionally required medical treatment encompasses drug addiction therapy. *Fiallo v. de Batista,* 666 F.2d 729, 731 (1st Cir.1981); *Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 760-61 (3d Cir.1979). As in the *Fiallo* case, however, plaintiff falls short of stating an Eighth Amendment claim as he "clearly does not allege deprivation of essential treatment or indifference to serious need, only that he has not received the type of treatment which he desires." *Id.* at 731. Further, plaintiff alleges no harm or injury attributable to the charged deprivation. Plaintiff has not articulated his reasons for desiring drug treatment or how he was harmed by the alleged deprivation of this service. *See Guidry v. Jefferson County Detention Ctr.,* 868 F.Supp. 189, 192 (E.D.Tex.1994) (to state a section 1983 claim, plaintiff must allege that some injury has been suffered).

For these reasons, plaintiff's Altona claims should be dismissed.

### B. Failure to Protect

Defendants further assert that plaintiff has not established that any of the named defendants failed to protect the plaintiff from the attack by the other inmate at Bare Hill. Prison officials have a duty "to act reasonably to ensure a safe environment for a prisoner *when they are aware* that there is a significant risk of serious injury to that prisoner." *Heisler v. Kralik,* 981 F.Supp. 830, 837 (S.D.N.Y.1997) (emphasis added); *see also Villante v. Dep't of Corr. of City of N.Y.,* 786 F.2d 516, 519 (2d

Cir.1986). This duty is not absolute, however, as "not ... every injury suffered by one prisoner at the hands of another ... translates into constitutional liability." *Farmer,* 511 U.S. at 834. To establish this liability, *Farmer's* familiar two-prong standard must be satisfied.

As in the medical indifference claim discussed above, plaintiff's allegations of broken bones and severe pain from the complained of assault suffice to establish a "sufficiently serious" deprivation. *Id.* Plaintiff's claim fails, however, to raise the possibility that he will be able to prove deliberate indifference to any threat of harm to him by the Bare Hill Superintendent or the DOCS Commissioner. Again, plaintiff must allege facts which establish that these officials were aware of circumstances from which the inference could be drawn that the plaintiff was at risk of serious harm and that they actually inferred this. *Farmer,* 511 U.S. at 838.

To advance his claim, plaintiff alleges an increase in "unusual incidents, prisoner misbehaviors, and violence" (Compl., ¶ 12) and concludes that defendants' continued policy of overcrowding created the conditions which led to his injuries. Compl., ¶ 10. The thrust of plaintiff's claim seems to suggest that the defendants' awareness of the problems of overcrowding led to knowledge of a generalized risk to the prison population, thus establishing a legally culpable state of mind as to plaintiff's injuries. Plaintiff has not offered any evidence, however, to support the existence of any personal risk to himself about which the defendants could have known. According to his own complaint, plaintiff first encountered his assailant only minutes before the altercation occurred. Compl., ¶ 17. It is clear that the named defendants could not have known of a substantial risk to the plaintiff's safety if the plaintiff himself had no reason to believe he was in danger. *See Sims v. Bowen,* No. 96-CV-656, 1998 WL 146409, at *3 (N.D.N.Y. Mar.23, 1998)(Pooler, J.)("I conclude that an inmate must inform a correctional official of the basis for his belief that another inmate represents a substantial threat to his safety before the correctional official can be charged with deliberate indifference"); *Strano v. City of New York,* No. 97-CIV-0387, 1998 WL 338097, at *3-4 (S.D.N.Y. June 24, 1998) (when plaintiff acknowledged attack was "out of the blue" and no prior incidents had occurred to put defendants on notice of threat or danger, defendants could not be held aware of any substantial risk

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

of harm to the plaintiff). Defendants' motion on this ground should, therefore, be granted.

### IV. Failure to Complete Service

**\*5** The complaint names four defendants, including one "John Doe" Correctional Officer at Bare Hill. Defendants acknowledge that service has been completed as to the three named defendants. Docket Nos. 12 & 13. The "John Doe" defendant has not been served with process or otherwise identified and it is unlikely that service on him will be completed in the near future. *See* Docket No. 6 (United States Marshal unable to complete service on "John Doe"). Since over nine months have passed since the complaint was filed (Docket No. 1) and summonses were last issued (Docket entry Oct. 21, 1997), the complaint as to the unserved defendant should be dismissed without prejudice pursuant to Fed.R.Civ.P. 4(m) and N.D .N.Y.L.R. 4.1(b).

### V. Conclusion

WHEREFORE, for the reasons stated above, it is

RECOMMENDED that defendants' motion to dismiss be GRANTED in all respects; and

IT IS FURTHER RECOMMENDED that the complaint be dismissed without prejudice as to the unserved John Doe defendant pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b); and it is

ORDERED that the Clerk of the Court serve a copy of this Report-Recommendation and Order, by regular mail, upon parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v.*

*Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,1998.
Waldo v. Goord
Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp., 1997 WL 599355 (N.D.N.Y.)

(Cite as: 1997 WL 599355 (N.D.N.Y.))

H

Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Kenneth BROWN, Plaintiff,
v.
Andrew PETERS, Warden, Watertown Correctional
Facility; Joseph Williams, Warden, Lincoln
Work-Release Center; Francis J. Herman, Senior Parole
Officer Interstate Bureau; T. Stanford, Senior Parole
Officer; Deborah Stewart, Parole Officer; John Doe # 1,
Parole Agent, Watertown Correctional Facility; John
Doe # 2, Parole Agent, Lincoln Work Release Center;
Susan Bishop, Director of Interstate Compact, South
Carolina; Cecil Magee, Parole Officer, South Carolina;
Frank Barton, Parole Officer, South Carolina; John
McMahan, Parole Officer, South Carolina, Defendants.
No. Civ.A. 95CV1641RSPDS.

Sept. 22, 1997.

Kenneth Brown, State Court Institute-Greene,
Waynesburg, PA, plaintiff, pro se.

Dennis C. Vacco, New York State Attorney General, The
Capitol Albany, NY, for defendants Peters, Herman
Stewart, Doe # 1, Doe # 2, and Williams, Jeffrey M.
Dvorin, Assistant Attorney General, Carl N. Lundberg,
Chief Legal Counsel, South Carolina Department of
Probation, Columbia, SC, for defendants Bishop, Magee,
Barton, McMahan, and Stanford, Carl N. Lundberg, of
Counsel.

DECISION AND ORDER

POOLER, J.

*1 The above matter comes to me following a
Report-Recommendation by Magistrate Judge Daniel
Scanlon, Jr., duly filed on April 17, 1997. Following ten
days from the service thereof, the Clerk has sent me the
entire file, including any and all objections filed by the
parties herein.

Plaintiff Kenneth Brown commenced this Section

1983 civil rights action on November 17, 1995. On
February 12, 1996, Magistrate Judge Scanlon ordered
Brown to submit an amended complaint alleging the
specific acts committed by the individuals named as
defendants which Brown claimed violated his
constitutional rights. Brown filed an amended complaint
on March 21, 1996. In his amended complaint, Brown
alleged that defendants violated his rights under the Eighth
and Fourteenth Amendments by failing to process properly
his interstate compact paperwork, resulting in Brown
being imprisoned pursuant to a parole hold when in fact he
had never violated the conditions of his parole. For a more
complete statement of Brown's claims, see his amended
complaint. Dkt. No. 5.

On August 5, 1996, defendants Peters and Williams
made a motion to dismiss for failure to state a claim
pursuant to Fed.R.Civ.P. 12(b)(6). Dkt. No. 13; Dkt. No.
14, at 2. On August 19, 1996, defendants Bishop, Magee,
Barton, and McMahan made a motion to dismiss the
complaint against them or, in the alternative, for summary
judgment. Dkt. No. 20. On October 17, 1996, defendants
Herman, Stewart, and Stanford made a motion to dismiss
for failure to state a claim. Dkt. No 34. On April 17, 1996,
Magistrate Judge Scanlon recommended that all
defendants' motions to dismiss be granted and that the
complaint be dismissed. Dkt. No. 50.

On June 9, 1997, Brown filed objections to the
magistrate judge's report-recommendation, having been
granted additional time in which to do so. Dkt. No. 52. In
addition, Brown filed on June 9, 1997, a motion for leave
to file a second amended complaint and a copy of his
proposed amended complaint. Dkt. No. 53. I turn first to
the last motion filed, Brown's motion for leave to amend
his complaint a second time.

Brown seeks to file a second amended complaint
"setting forth in detail the personal involvement of each
defendant and how their acts of commission and omission
served to deprive plaintiff of Constitutionally secured
rights." Dkt. No. 53. The district court has discretion
whether to grant leave to amend. Ruffolo v. Oppenheimer

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 599355 (N.D.N.Y.)

(Cite as: 1997 WL 599355 (N.D.N.Y.))

& Co., 987 F.2d 129, 131 (2d Cir.1993). In exercising that discretion, the court should freely grant leave to amend when justice so requires. Fed.R.Civ.P. 15(a). However, the court need not grant leave to amend where it appears that amendment would prove to be unproductive or futile. Ruffolo, 987 F.2d at 131.

Here, Brown moved to amend his complaint to add additional allegations against the named defendants. However, the additional allegations fail to cure the deficiency which forms the basis of defendants' motion to dismiss-the absence of defendants' personal involvement in a constitutional deprivation. Section 1983 imposes liability upon an individual only when personal involvement of that individual subjects a person to deprivation of a federal right. See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A complaint is fatally defective if it fails to allege personal involvement sufficient to establish that a supervisor was "directly and personally responsible for the purported unlawful conduct." Alfaro Motors, Inc. v. Ward, 814 F.2d 883, 886 (2d Cir.1987).

*2 Brown's proposed amended complaint alleges in conclusory fashion that defendants acted "in a grossly negligent and concerted manner which breached their duties owed to Plaintiff and is the proximate cause of [the violation of plaintiff's constitutional rights]." Proposed Am. Compl., at 3. Brown continues in the same vein, stating that defendants owed duties to plaintiff to carry out their jobs in a professional manner and they failed to carry out those duties appropriately. The complaint states that defendants held specific responsibilities, such as checking for outstanding warrants, which if performed properly should have alerted them to a problem. However, nowhere does the complaint set forth allegations that these defendants either participated directly in any constitutional infraction or that they were even aware of such an infraction. The proposed amended complaint merely alleges that these defendants failed in performing their supervisory and ministerial functions. "These bare assertions do not state a claim under 42 U.S.C. § 1983." Smiley v. Davis, 1988 WL 78306, *2 (S.D.N.Y.).

This plaintiff previously has had the opportunity to amend his complaint for the same reason asserted here, to

allege personal involvement on the part of defendants. Brown's first amended complaint failed to accomplish that task, and it appears that even if allowed to amend again Brown would be unable to make the requisite allegations with sufficient specificity to sustain his complaint. Consequently, I find that amendment would be futile, and I deny Brown's motion for leave to amend his complaint.

I turn now to the magistrate judge's report-recommendation and defendants' motions. The magistrate judge recommends that I grant defendants' motions and dismiss the complaint as to all defendants. The report-recommendation clearly describes the grounds on which the magistrate judge recommends dismissal as to each defendant. Fed.R.Civ.P. 72(b) requires the district judge to make a de novo determination on "any portion of the magistrate's disposition to which specific, written objection has been made." Brown's objections fail to address directly any of the analysis. Brown's objections state (1) that he has been deprived of his constitutional rights; (2) that he has stated a cause of action; (3) that the court wrongly refused to appoint an attorney for him and wrongly stayed discovery pending the outcome of these motions; (4) that he seeks to file an amended complaint; (5) the standard of review for a Fed.R.Civ.P. 12(b)(6) motion; (6) that he disagrees with the magistrate judge's recommendation to grant defendants' motions because the allegations in his complaint, which he repeats, show that his rights were violated; and (7) the text of the Fourteenth and Eighth Amendments.

Even affording the objections the liberal reading required for pro se pleadings, I find that these objections fail to state any basis whatsoever, much less a specific one, for the court not to adopt the magistrate judge's rulings. They simply re-state the relief sought and the facts on which Brown grounds his complaint and conclude that the magistrate judge's conclusions are wrong. When the parties make only frivolous, conclusive, or general objections, the court reviews the report-recommendation for clear error. See Camardo v. General Motors Hourly-Rate Employees Pension Plan, 806 F.Supp. 380, 382 (W.D.N.Y.1992) (court need not consider objections which are frivolous, conclusive, or general and constitute a rehashing of the same arguments and positions taken in original pleadings); Chambrier v. Leonardo, 1991 WL

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 599355 (N.D.N.Y.)

(Cite as: 1997 WL 599355 (N.D.N.Y.))

44838, *1 (S.D.N.Y.) (restatement of allegations already before the court and assertion that valid constitutional claim exists insufficient to form specific objections); *Schoolfield v. Dep't of Correction,* 1994 WL 119740, *2 (S.D.N.Y.) (objections stating that magistrate judge's decisions are wrong and unjust, and restating relief sought and facts upon which complaint grounded, are conclusory and do not form specific basis for not adopting report-recommendation); *Vargas v. Keane,* 1994 WL 693885, *1 (S.D.N.Y.) (general objection that report does not address violation of petitioner's constitutional rights is a general plea that report not be adopted and cannot be treated as objection within the meaning of 28 U.S.C. § 636), *aff'd,* 86 F.3d 1273 (2d Cir.), *cert. denied,* 519 U.S. 895, 117 S.Ct. 240, 136 L.Ed.2d 169 (U.S.1996). *See also Scipio v. Keane,* 1997 WL 375601, *1 (1997) (when objections fail to address analysis directly, court reviews report-recommendation for clear error); Fed.R.Civ.P. 72(b), Advisory Comm. Note (when no specific, written objections filed, "court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation").

**3** Because Brown fails to make specific objections or provide any basis for his general objections, I review the report-recommendation for clear error. After careful review, I conclude that the magistrate judge's report-recommendation is well-reasoned and is not clearly erroneous.[FN1] The magistrate judge employed the proper standard, accurately recited the facts, and reasonably applied the law to those facts. Consequently, I adopt the report-recommendation.

FN1. I note, however, that the report-recommendation would survive even *de novo* review.

CONCLUSION

Because plaintiff's proposed amendment demonstrates that amendment would be futile, I deny plaintiff's motion for leave to amend his complaint. I approve the magistrate judge's recommendation and grant defendants' motions to dismiss. Plaintiff's complaint is dismissed in its entirety.

IT IS SO ORDERED.

**ORDER and REPORT-RECOMMENDATION**

This matter was referred to the undersigned for report and recommendation by the Hon. Rosemary S. Pooler, United States District Judge, by Standing Order dated November 12, 1986. Currently before this Court are a number of motions. Defendants Peters and Williams have filed a motion to dismiss (dkt.13); defendants Bishop, Magee, Barton and McMahan have filed a motion for summary judgment, or in the alternative to dismiss (dkt.20); and defendants Herman, Stewart and Stanford also have filed a motion to dismiss (dkt.34). Plaintiff opposes these three motions (dkts.27, 29, 33, 38). Defendants Bishop, Magee and McMahan have filed a motion to stay discovery (dkt.41) and plaintiff has filed a motion to extend time (dkt.44) in which to file opposition to the latter motion for a stay of discovery.

The Court addresses these issues *seriatim.*

**BACKGROUND**

Plaintiff's amended complaint, which he has brought pursuant to 42 U.S.C. § 1983, alleges the following facts. In October, 1991, plaintiff was incarcerated in the Watertown Correctional Facility in Watertown, New York. He applied for an interstate compact because he wanted to return to South Carolina to live with his common law wife, Pamela Reid. During the application process, he was interviewed by the facility's parole officer, identified only as defendant John Doe # 1. After signing the necessary papers, his application was forwarded to defendant Andrew Peters, the facility's superintendent, who reviewed, signed and forwarded the papers to the Interstate Bureau. Amend. Compl. at ¶¶ 1-2; Exs. A, B.

On or about January 15, 1992, while his compact was waiting for review at the Interstate Bureau, plaintiff was approved for work release and sent to the Lincoln Work Release Center in New York City. While at the center, plaintiff spoke to a parole officer, defendant John Doe # 2, and told him that he was seeking a compact that would return him to South Carolina upon his conditional release. Plaintiff claims the parole officer told him that he would handle the necessary paperwork, although the officer had had no experience with an interstate compact. Amend. Compl. at ¶¶ 3, 4.

**4** Plaintiff, meanwhile, asked Reid whether any

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 9:10-cv-01494-NAM-DEP   Document 22   Filed 12/13/11   Page 127 of 129

Not Reported in F.Supp., 1997 WL 599355 (N.D.N.Y.)

(Cite as: 1997 WL 599355 (N.D.N.Y.))

officials had contacted her in South Carolina regarding his prospective residence in that state. Upon discovering no one had contacted her, plaintiff asked a lawyer he knew, Navron Ponds, to inquire as to his compact status. In March, 1992, the lawyer spoke with defendant Susan Bishop, who is the director of the interstate compact program in South Carolina. Bishop allegedly told Ponds that plaintiff "was disapproved because there was a discrepancy about approving plaintiff['s] compact." The "discrepancy" was the fact that plaintiff owed the state of South Carolina eighty-six days of confinement from a previous sentence. Plaintiff claims Bishop told Ponds to contact defendants Cecil Magee and Frank Barton, who worked for the South Carolina Parole Department. Sometime in March, 1992, Ponds made some calls to Barton and Magee. A verbal agreement was reached, and plaintiff, upon speaking with Barton and Magee was told that his compact had been approved. He also was told that he should report to the South Carolina Department of Parole upon being released. Amend. Compl. at ¶¶ 5-7.

Prior to leaving the Lincoln Work Release Center, plaintiff processed paperwork related to his interstate compact. His paperwork was sent by Doe # 2 to defendant Joseph Williams, the superintendent of the center. Williams reviewed, signed and returned the paperwork to plaintiff. On May 1, 1992, upon his release from the center, plaintiff traveled to South Carolina. Three days later, he entered a South Carolina parole office and promptly was arrested because of the eighty-six days of confinement that he owed the state. Plaintiff's paperwork was given to defendant John McMahan, a parole officer. Plaintiff claims that McMahan never returned this paperwork to him. On May 20, 1992, the state of South Carolina revoked plaintiff's parole and plaintiff was returned to prison to serve the eighty-six days that he owed. When he asked McMahan what would happen to his one year of parole from New York, the officer allegedly told him that his New York parole would run concurrently with his South Carolina parole, and that when he finished his South Carolina parole, he would not owe any parole whatsoever. Plaintiff served the eighty-six days he owed and was released on July 31, 1992. Amend. Compl. at ¶¶ 8-10.

In February, 1993, plaintiff was arrested on robbery

charges in South Carolina. The charges ultimately were dropped, but he apparently encountered some difficulties regarding this arrest as a result of a parole hold that New York state had placed upon him. Bishop's office told him that it had nothing to do with his parole hold and that any problem that he had was between him and the state of New York. He talked to authorities in Albany, New York regarding the parole hold, but was not successful in his efforts to have the hold removed. On September 30, 1993, after had been extradited to New York as a fugitive from justice, plaintiff was given a preliminary hearing at Riker's Island, New York. The hearing officer found no probable cause that plaintiff had violated any condition of parole. He was released. Amend. Compl. at ¶¶ 11-14; Exs. C-J.

**\*5** Plaintiff claims that he would not have suffered hardships if his interstate compact had been handled correctly. He alleges that defendant Deborah Stewart failed to follow up and see whether plaintiff had arrived in South Carolina. If she had, he argues, she would have discovered that he had been arrested upon his arrival. He alleges that defendant Francis Herman, a parole officer at the Interstate Bureau failed to do his job by not investigating plaintiff's violation reports. Amend. Compl. at ¶¶ 15-17; Exs. F-I.

Plaintiff asserts that the foregoing amounts violations of his Eighth and Fourteenth Amendment rights, wherefore he both compensatory and declaratory relief.

## DISCUSSION

A. Motion to Dismiss by Williams and Peters.

Williams and Peters have filed a motion to dismiss plaintiff's complaint pursuant to FED.R.CIV.P. 12(b)(6) on the grounds that it fails to state a claim upon which relief may be granted. In a Rule 12(b)(6) motion, all factual allegations in the complaint must be taken and construed in plaintiff's favor. *See* LaBounty v. Adler, 933 F.2d 121, 122 (2d Cir.1991) (citing *Ortiz v. Cornette,* 867 F.2d 146, 149 (1989)). The Court's role is not to assess whether plaintiffs have raised questions of fact or demonstrated an entitlement to a judgment as a matter of law, as in a motion made pursuant to FED.R.CIV.P. 56 for summary judgment, but rather to determine whether plaintiff's complaint sufficiently alleges all of the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 599355 (N.D.N.Y.)

(Cite as: 1997 WL 599355 (N.D.N.Y.))

necessary legal elements to state a claim under the law. *See Christopher v. Laidlaw Transit, Inc.* 899 F.Supp. 1224, 1226 (S.D.N.Y.1995), (citing *Ricciuti v. New York City Transit Authority,* 941 F.2d 119, 124 (2d Cir.1991)). Factual allegations in brief or memoranda may not be considered. *Fonte v. Board of Managers of Continental Towers Condominium,* 848 F.2d 24, 25 (2d Cir.1988). The Court now turns to the issues presented.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). As superintendents at New York State Correctional facilities, Williams and Peter may be found personally involved in the alleged deprivation of plaintiff's constitutionally protected rights by a showing that they: (1) directly participated in the infraction; (2) knew of the infraction, but failed to remedy the wrong; (3) created or continued a policy or custom under which unconstitutional practices occurred; or (4) were grossly negligent in managing subordinates who caused unlawful conditions or events. *Id.,* (quoting *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986)). Supervisory liability also may be imposed against Williams or Peters with a showing of gross negligence or deliberate indifference to plaintiff's constitutional rights. *Id.* Absent some personal involvement by Williams or Peters in the allegedly constitutionally infirm conduct of their subordinates, neither can be held liable under § 1983. *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

**\*6** Plaintiff has not provided any evidence linking either Williams or Peters to his alleged constitutional deprivations. All that plaintiff has alleged is that Williams and Peters, as superintendents, have reviewed and signed paperwork relating to plaintiff's compact. Though it has long been held that *pro se* complaints are held to "less stringent standards than formal pleadings drafted by lawyers" for the purpose of a motion to dismiss under Rule 12(b)(6), *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 595-96, 30 L.Ed.2d 652 (1972), plaintiff has not explained how the ministerial conduct of these two defendants was violative of the Constitution. Their motion to dismiss should be granted.

B. Motion for Summary Judgment or to Dismiss by Bishop, Magee, Barton and McMahan.

Bishop, Magee, Barton and McMahan have filed a motion for summary judgment, or in the alternative a motion to dismiss. The Court will treat their motion as a motion to dismiss. "[C]omplaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning." *Barr v. Adams,* 810 F.2d 358, 363 (2d Cir.1987). Plaintiff has not alleged specifically how the conduct of these four defendants infringed upon his constitutional rights. In his amended complaint, he contends that defendants violated the Constitution by "continuously breaching [[[their]] duty" to him. This language underscores the defect with the complaint: if it alleges anything at all, it alleges that defendants were negligent in handling plaintiff's interstate compact and parole. To state a cognizable § 1983 claim, the prisoner must allege actions or omissions sufficient to demonstrate deliberate indifference; mere negligence will not suffice. *Hayes v. New York City Dept. of Corrections,* 84 F.3d 614, 620 (2d Cir.1996); *Morales v. New York State Dep't of Corrections,* 842 F.2d 27, 30 (2d Cir.1988) (section 1983 does not encompass a cause of action sounding in negligence).

The Court finds that the claims against Bishop, Magee, Barton and McMahan should be dismissed.

C. Motion to Dismiss by Herman, Stewart and Stanford.

Plaintiff's claim against Stewart is that she failed to follow up and see whether plaintiff had arrived in South Carolina. Herman, he likewise asserts, failed to do his job because he did not investigate plaintiff's violation reports. Plaintiff has not alleged how these actions run afoul of the Constitution; and again, these claims seem to be grounded in negligence, which is not actionable under § 1983. *Hayes,* 84 F.3d at 620.

Plaintiff's claim against Stanford must fail because his complaint literally fails to state a claim against that defendant. Aside from naming Stanford as a defendant, and alleging that he was the appointed Senior Parole Officer at plaintiff's September 30, 1993 revocation hearing at Riker's Island, plaintiff does not detail how Stanford violated his constitutional rights. Absent some personal involvement by Stanford in the allegedly

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 599355 (N.D.N.Y.)

(Cite as: 1997 WL 599355 (N.D.N.Y.))

constitutionally infirm conduct of his subordinates, he cannot be held liable under § 1983. *Gill,* 824 F.2d at 196.

**\*7** Accordingly, the Court finds that Stanford, Stewart and Herman's motion to dismiss should be granted.

D. Plaintiff's "John Doe" Claims.

In so far as neither John Doe # 1 nor John Doe # 2 have been identified and served in this matter, the Court does not have jurisdiction over these parties and does not reach the merits of plaintiff's claims against them.
E. Discovery Motions.

Defendants Bishop, Magee and McMahan have filed a motion to stay discovery until the Court has made a ruling on their motion to dismiss. Plaintiff has filed a motion to extend the time in which he may file opposition to defendants' motion. Plaintiff, however, has filed his opposing response (dkt.47), therefore his instant discovery motion is denied as moot. In that the Court recommends granting defendants' motion to dismiss, discovery in this matter would be fruitless. Accordingly, defendants' motion for a stay of discovery pending the resolution of their motion to dismiss is granted.

### CONCLUSION

WHEREFORE, based upon the foregoing analysis, it is hereby
ORDERED, that plaintiff's motion to extend the time to file an opposing reply (dkt.44) is denied as moot; and it is further

ORDERED, that defendants Bishop, Magee and McMahan's motion to stay discovery until their motion to dismiss is decided (dkt.41) is granted; and it is further

RECOMMENDED, that defendants Peters and Williams' motion to dismiss (dkt.13) be granted; and it is further

RECOMMENDED, that defendants Bishop, Magee, Barton and McMahan's motion to dismiss (dkt.20) be granted; and it is further

RECOMMENDED, that defendants Herman, Stewart

and Stanford's motion to dismiss (dkt.34) be granted.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); FED.R.CIV.P. 6(a), 6(e) and 72.

N.D.N.Y.,1997.

Brown v. Peters
Not Reported in F.Supp., 1997 WL 599355 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.